UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

| | | |
|---|---|---|
| UNITED STATES | : | |
| v. | : | Case No. 1:23-CR-143 |
| SEBASTIAN ENRIQUE MARSET CABRERA | : | |
| Defendant | : | |

**DEFENDANT'S MOTION TO SUPPRESS STATEMENTS AND EVIDENCE OBTAINED THEREOF AS THE FRUIT OF THE POISONOUS TREE**

**INTRODUCTION**

Sebastian Marset is a Uruguayan citizen who was arrested in the city of Santa Cruz de la Sierra, Bolivia in the middle of the night by on March 13, 2026, by armed Bolivian police officers who fired indiscriminately into the home where the defendant and his family were sleeping. The home invasion and arrest were undertaken at the behest of the United States government. Despite the existence of a treaty with the United States, the defendant was not extradited but rather was taken to the local airport and summarily turned over to two Drug Enforcement Administration (DEA) agents. The defendant was flown to Peru, where he was then "escorted" onto a DEA jet that landed in Dulles International Airport on March 14, 2026 at approximately 11:00 a.m.

Upon his arrival in the United States after flying through the night, the agents engaged in improper tactics designed that convinced the defendant to waive his *Miranda* rights and make certain admissions during an interrogation at Dulles Airport. As explained herein, these statements must be suppressed because the: (1) any waiver was obtained by false promises of leniency; and (2) the agents ignored the defendant's unequivocal assertion of his right to counsel.

The DEA agents failed to record the interrogation, in direct contradiction of Department of Justice policy. As explained herein, both before and after the *Miranda* waiver, the defendant provided passwords for his telephones, computers, and tablet. The contents of these electronic devices must also be suppressed as the fruits of the poisonous tree as a result of the violation of the defendant's Fifth Amendment rights. The defense asks this Court to conduct an evidentiary hearing with respect to this motion and allow undersigned counsel give the opportunity to confront the Government's witnesses and resolve any factual disagreements between the parties.

## RELEVANT BACKGROUND

### ***1. The DEA Targets The Defendant For Money Laundering From South America To Europe***

Beginning in approximately 2021, the DEA began an investigation into international money laundering activities in Europe. The DEA began to focus on money launderers that they believed were connected to the defendant, who was sending drug shipments from South America to Europe. The principal DEA agent assigned to this case went so far as to initiate unsolicited contact with the defendant on March 27, 2025 by writing to him via the WhatsApp messaging application.

During the exchange of text messages, the DEA agent advised the defendant that he had a pending criminal investigation against him in the United States and that the United States was providing him an opportunity to resolve these problems "for the safety of his children and loved ones around him." The defendant responded that he had never sent a gram of cocaine to the United States and that the agent should spend his time investigating other people. The agent ended the communications by advising the defendant to contact him if he changed his mind.

### ***2. The Warrantless Search Of The Defendant's Home In Bolivia***

The status quo of the case remained unchanged for the next year. In the early morning

hours of March 13, 2026, at approximately 3:00 a.m., however, Bolivian intelligence agents forced entry into Defendant's private residence in Santa Cruz de la Sierra, Bolivia. The defense asserts that the entry and ensuring search of the premises was conducted without a judicial search warrant and without any other Bolivian judicial authorization. DEA agents have no police power outside of the United States but met with the Bolivian police the evening before the defendant was seized. The DEA actively coordinated the operation on March 13, 2026, in real time, communicating by telephone with the Bolivian police officers who executed the raid, directing and supervising the operation remotely.

Bolivian agents fired indiscriminately throughout the residence — including directly into Defendant's bedroom where his family and children were sleeping. Defendant's cellular phones, tablets, and computer were seized without a warrant by the Bolivian police and delivered to DEA agents. The family's personal belongings – including shoes and clothing - were stolen during the operation, although Bolivian authorities falsely declared that there was nothing in the defendant's house.

***3. The Defendant Is Forcibly Removed From Bolivia To The United States To Avoid Formal Extradition***

An extradition treaty between the United States and Bolivia has been in effect since 1995. www.state.gov/wp-content/uploads/2019/02/96-1121-Bolivia-Extradition-TreatyOCR.pdf. Article VI of the Treaty requires the United States to provide to Bolivia, *inter alia*, a "description of the facts of the offense . . . . [and] the text of the laws describing the essential elements of . . . the offense for which extradition is requested." In violation of the treaty, the defendant was transported to the Viru Viru International Airport in Santa Cruz, Bolivia and summarily turned over to the DEA by the Bolivian Director of National Intelligence. The defendant was never presented to a judicial officer in Bolivia nor given the

chance to contest the legality of his arrest. A DEA report concerning this operation states that the Chief of Mission at the United States Embassy in Bolivia "concurred with the DEA operation for the expulsion and logistics of transporting MARSET to the U.S. from Bolivia through Peru for his U.S. charges."

Article XII of the United States – Bolivia Extradition Treaty contains a "Rule of Specialty" provision, which provides that a person extradited can only be tried for the "offense for which extradition was granted." This principle is also recognized under American jurisprudence. See, e.g., United States v. Mangarella, 489 F. App'x 648, 652 (4th Cir. 2012)(The "rule of specialty" permits a person extradited to the United States to be tried only for the offense or offenses for which extradition was granted). In this case, the United States intentionally circumvented the rule and denied the defendant his legal protections. As a result of these machinations, the prosecutors were able to add additional charges in a Superseding Indictment after the defendant arrived in the United States, when they otherwise would not have been able to do.

***4. Custodial Interrogation In Transit From Bolivia To Peru***

According to a DEA report provided in discovery, in the Viru Viru airport, the agents advised the defendant of *Miranda* rights in Spanish. One of the agents recorded the advice of rights and the defendant's acknowledgement that he understood and waived them. The Bolivian police also turned over to the DEA a backpack containing cellular phones, tablets and a computer. The defendant was then moved to a DEA airplane and flown to Peru.

According to the DEA report, shortly after takeoff, one of the DEA agents gave the defendant a copy of the Indictment against him. At that time, the only charge pending against the defendant in the United States was conspiracy to commit money laundering. After

reviewing the Indictment, the defendant stated that he had some questions about the charges against him. A brief, ensuing conversation between the defendants and the agents was recorded.

The defendant was flown to Lima, Peru and the DEA agents escorted the shackled defendant to a different jet that landed at Dulles International Airport on March 14, 2026 at approximately 11:00 a.m., or thirty-three (33) hours after he was taken into custody in Bolivia.

***5. The Custodial Interrogation At Dulles Airport Violated The Defendant's Rights***

Upon arriving in the United States, the defendant was taken to an "interview room" by DEA Special Agents Michael Greisen and Tyler Ganzel and Intelligence Analyst Maritza Juno. The two agents initiated a strategy designed to extract incriminating information from the defendant through specific, promises of a benefit in his criminal case. [1]

In the first moments of the interrogation, the agents claimed that they needed to confirm certain "biographical information" from the defendant. This was merely the first pretext used by the agents to obtain a confession since they already had the requested information and had no need for confirmation. The agents also told the defendant that he was arrested in Bolivia based upon an "Interpol Red Notice." This was false because a Red Notice is a request to:

> locate and provisionally arrest a person pending extradition, surrender, or similar legal action. A Red Notice is not an international arrest warrant.

See https://www.interpol.int/en/How-we-work/Notices/Red-Notices/View-Red-Notices.

Prior to advising the defendant of his *Miranda* rights, SA Greisen displayed the federal guidelines table and told the defendant that if he provided the passwords to his phones, they

[1] The factual representations in this section of the Motion To Suppress are based upon a DEA report of the interview and undersigned counsels' review of the underlying facts with the defendant.

would deduct “four points” from the table. As a result of the specific promise of a sentence reduction the defendant provided the passwords to his phones. SA Greisen then asked for the password to defendant's computer, repeating the same promise: four additional points off. Defendant provided that password as well, again without receiving any *Miranda* warnings in the United States. After obtaining both passwords, agents told Defendant he was “doing well.”

It was only after he obtained the passwords to both devices that SA Greisen presented the Defendant with what he described as “a cooperation agreement.” The agent did not read the document to Defendant. He indicated where to put initials and where to sign, saying: in essence “put your initials here, here, here and sign here.” The Defendant read and signed the document as the agents then told him that he had to tell them the truth if he wanted “to see [his] children again.” The document was not a “cooperation agreement,” but another *Miranda* waiver in Spanish.

The DEA made no effort to make a simple audio or video recording of the *Miranda* waiver of the interrogation at Dulles Airport, despite being in the United States in a secure location at Dulles Airport. This failure violates the presumption created by a specific Department of Justice policy enacted on May 12, 2014, which states as follows:

> There is a presumption that the custodial statement of an individual in a place of detention with suitable recording equipment, following arrest but prior to initial appearance, will be electronically recorded, subject to the exceptions defined below. Such custodial interviews will be recorded without the need for supervisory approval.
>
> a. Electronic recording. This policy strongly encourages the use of video recording to satisfy the presumption. When video recording equipment considered suitable under agency policy is not available, audio recording may be utilized.
>
> b. Custodial interviews. The presumption applies only to interviews of persons in FBI, DEA, ATF or USMS custody. Interviews in non-custodial settings are excluded from the presumption.

> c. Place of detention. A place of detention is any structure where persons are held in connection with federal criminal charges where those persons can be interviewed. This includes not only federal facilities, but also any state, local, or tribal law enforcement facility, office correctional or detention facility, jail, police or sheriff's station, holding cell, or other structure used for such purpose.

A copy of the Policy Memorandum is Exhibit 1 hereto.

According to a DEA report of the interview, during the ensuing interrogation the defendant was asked questions concerning, *inter alia*, various cryptocurrency wallets, his relationship with co-defendant Santoro, weapons trafficking, and contacts with other South America based drug traffickers. The interrogation began at 11:00 a.m. and ended four and a half hours later at approximately 3:22 in the afternoon.

The defense believes that the DEA report of the interrogation is incorrect in two principal respects. First and most importantly, the defendant asserted his right to consult with counsel early in the interview and the agents should have immediately ceased speaking with the defendant. According to the defendant, he explicitly stated "I **want to speak with a lawyer — that paper said that everything I say can be used against me."** Second, the defense believes that the report of the interview does not memorialize the topics of conversation in their actual chronological order. Since the agents failed to record the interview – which the defense believes was intentional – there is no independent evidence to establish what transpired during the interrogation at Dulles Airport and an evidentiary hearing is warranted.

***6. March 16, 2026 Custodial Interrogation***

The United States Marshals Service is the organization with the responsibility to transport federal inmates to the United States District Court for the Eastern District of Virginia in Alexandria to attend their court proceedings. On March 16, 2026, however, DEA SAs Greisen and Ganzel for unknown reasons took over that responsibility and transported the defendant

from the Alexandria Detention Center to the federal courthouse for his initial appearance. According to the DEA report of the events, the defendant advised the agents that he wanted to "share" additional information.

The DEA report states that the agents reminded the defendant of his *Miranda* rights but did not execute a written additional waiver, notwithstanding his prior invocation of the right to counsel. According to the report, among the topics of conversation was the seizure by the Bolivian police of several "safes" and the defendant provided the agents with their combinations. At the time the interrogation was conducted, the defendant's case was under the court's jurisdiction, which constitutes a critical phase of the criminal process.

**LEGAL ANALYSIS**

***1. Any Statements Obtained During The Interrogation At Dulles Airport Must Be Suppressed As Obtained In Violation Of The Fifth Amendment And Miranda***

The text of the Fifth Amendment provides in relevant part that no person "shall be compelled in any criminal case to be a witness against himself. . . . " As a result, the Supreme Court has repeatedly – and unequivocally – ruled that a statement obtained from a person subject to custodial interrogation may not be admitted against him unless the knowingly and voluntarily waives his right to counsel. Miranda v. Arizona, 384 U.S. 436 (1966). See also Edwards v. Arizona, 451 U.S. 477, 484–485 (1981)("a suspect who has "expressed his desire to deal with the police only through counsel is not subject to further interrogation by the authorities until counsel has been made available to him"); Colorado v. Connelly, 479 U.S. 157, 168 (1986)("a *Miranda* waiver must be voluntary, knowing, and intelligent").

The Fourth Circuit has ruled that when considering the invocation of the right:

> we should indulge every reasonable presumption against waiver of fundamental constitutional rights," . . . . we cannot interpret an ambiguity caused by the Government to be a waiver of the right that "is indispensable to the protection of the Fifth Amendment

> privilege," that is, the right to counsel. *Miranda,* 384 U.S. at 469, 86 S.Ct. 1602. "**Doubts must be resolved in favor of protecting the constitutional claim."**

United States v. Johnson, 400 F.3d 187, 197 (4th Cir. 2005)(emphasis added).

In this case, two separate, but equally important aspects of the defendant's Fifth Amendment right were violated.

### A. Any Miranda Waiver Was Involuntary Because It Was Induced By A False Promise Of Leniency And His Free Will Was Overborne

First, any initial waiver of *Miranda* rights by the defendant in this case was not knowing or voluntary. Under well settled caselaw, a defendant's waiver of *Miranda* rights is not knowingly or voluntarily made when it is the product of false promises before the warnings are given. In general a "promise of leniency is relevant to determining whether a confession was involuntary and, depending on the totality of the circumstances, may render a confession coerced." United States v. Young, 964 F.3d 938, 944 (10th Cir. 2020). Moreover, "specific promises of leniency in exchange for [an accused's] statement. if not kept, could render a statement involuntary." United States v. Mashburn, 406 F.3d 303, 309–10 (4th Cir. 2005).

In United States v. Perez, 127 F.4th 146, 175 (10th Cir. 2025), for example, the Court of Appeals noted that in the following circumstances a defendant's *Miranda* waiver was not voluntary:

> we have found promises of leniency where the agent expressly (and falsely) promised a sentence reduction in exchange for a confession [to violate *Miranda*]. *See Young*, 964 F.3d at 944 (concluding that an agent's statements that the defendant's cooperation could "physically buy down the amount of time [he] see[s] in a federal prison" and that each truthful answer would "tick[ ] time off that record" were promises of leniency (internal quotation marks omitted)); *Lopez*, 437 F.3d at 1064–65 (same where an agent wrote the terms "murder," "mistake," "60," and "6" to convey that a confession to a mistaken killing would result in only six years' imprisonment, whereas a failure to confess would result in a murder conviction with sixty years' imprisonment).

In this case, SA Greisen specifically promised the defendant that he would receive an initial "four level" sentence reduction for providing the passwords to the cellular phones that were seized by the Bolivian police and then another four level reduction if he gave the agents the password to his computer. To further confirm the false promise, the agent produced a copy of the federal sentencing guideline table to show the size of the reduction. There could not have been any principled reason for the agents to review the sentencing guidelines with the defendant other than to obtain his *Miranda* waiver by a false promise. It is emphatically not within the province of a law enforcement agent to review sentencing guideline calculations.

This is precisely the type of promise that should result in the suppression of any statement made by the defendant during the ensuing interrogation because under the totality of circumstance, the defendant's free will was overborne. The defendant was arrested in Bolivia by armed agents who fired indiscriminately into the home where he was staying with his children. He was transported through the night from Bolivia to Peru and then to the United States. The defendant was frightened, tired, jet lagged and subjected to the calculated machinations of experienced United States law enforcement agents. The defendant is not a United States citizen, does not speak English, was not familiar with the nuances of the criminal justice system and/or the federal sentencing guidelines. The DEA agents seized upon the defendant's fears by repeating threatening that he would "never see his family again." The agents' failure to record the *Miranda* waiver and interrogation under circumstances when it would have been a simple and routine to do so lends further reason to believe that the agents relied upon false promises of leniency to obtain his consent because they did not want any record of their misconduct.

Accordingly, any statements made by the defendant during the interrogation at Dulles Airport should be suppressed. See United States v. Braxton, 112 F.3d 777, 781 (4th Cir. 1997)(In

order to determine whether a defendant's will has been overborne or his capacity for self-determination critically impaired, courts must consider "the totality of the circumstances, including the characteristics of the defendant, the setting of the interview, and the details of the interrogation")(internal quotations omitted).

**B. The Defendant Invoked His Right To Counsel During The Interrogation**

Any statement made by the defendant must also be suppressed because he specifically invoked his right to counsel during the interrogation at Dulles Airport. Once a defendant invokes the right to counsel, all interrogation must cease immediately and unconditionally. Edwards v. Arizona, 451 U.S. 477, 484-485 (1981). Davis v. United States, 512 U.S. 452, 458 (1994). Any statement obtained after that invocation is inadmissible regardless of its content. Maryland v. Shatzer, 559 U.S. 98, 104 (2010). In this case, the defense contends that during the interrogation at the airport the defendant unequivocally stated that he wanted to speak with counsel, but the questioning continued unabated. The violation of the defendant's *Miranda* rights would also preclude any alleged statements made to the DEA agents on March 16, 2026 en route between the jail and the courthouse.

Under these circumstances, the burden of proof is on the Government to prove that any statements are admissible against the defendant. United States v. Brooks, 2024 WL 1140692, at *17 (D. Md.)("[t]he government bears the burden of establishing, by a preponderance of the evidence, that defendant was advised of his rights and that his statements were made voluntarily"). In that analysis:

> The inquiry into whether an individual has waived his *Miranda* rights has "two distinct dimensions." . . . . the government must first show that the waiver of rights was "voluntary," *i.e.*, "that it was the product of free and deliberate choice rather than intimidation, coercion, or deception." Second, it must prove that the waiver was made knowingly, meaning that it was "made with a full awareness of both the nature of the

right being abandoned and the consequences of the decision to abandon it."

United States v. Brooks, 2024 WL 1140692, at *18 (D. Md. Mar. 14, 2024). Assuming that the Government seeks to introduce any of the defendants' statements at trial, this Court should conduct an evidentiary hearing and allow the defense the opportunity to confront the DEA agents who were present for the interrogations.

***2. The Information Obtained From the Involuntary Confession Must Be Suppressed As Fruit Of The Poisonous Tree***

As a result of the violation of the defendant's Fifth Amendment rights and because any statements made to the DEA agents were involuntary, this Court should also suppress any evidence derived therefrom. Specifically, this would include the contents of the defendant's cellular phones, tablet, computer, comments about his SkyEcc accounts and the like. A Fifth Amendment violation against self-incrimination occurs when the accused:

> is [1] compelled [2] to make a testimonial communication [3] that is incriminating. . . . While a testimonial communication is most often in verbal or written form, it may also be made by an act. . . . But to be a testimonial communication, the act must "relate a factual assertion or disclose information," . . . . it must "express the contents of [the person's] mind"

United States v. Oloyede, 933 F.3d 302, 309 (4th Cir. 2019)(internal citations and quotations omitted).

In this case, the defendant disclosed the password for his cellular phones, computer and discussed his SkyEcc messaging accounts as the result of the false promise of leniency. In United States v. Shvartsman, 722 F. Supp. 3d 276, 315–16 (S.D.N.Y. 2024), the district court found that the disclosure of his telephone passcode implicated defendant's Fifth Amendment rights because it was "both testimonial and incriminating."

Although the "fruit of the poisonous tree doctrine" is usually associated with a violation of a defendant's Fourth Amendment's rights, information obtained from an "involuntary"

statement obtained in violation of an accused's Fifth Amendment rights must also be suppressed. United States v. Pettigrew, 468 F.3d 626, 636 (10th Cir. 2006). Accord United States v. Windham, 362 F. Supp. 3d 310, 319 (D.S.C. 2019)(the remedy for a *Miranda* violation could include suppression of physical evidence if the statement was not voluntary").

In this case, for the reasons previously noted, the defendant's decision to speak with the DEA agents was not "voluntary" within the meaning of the Fifth Amendment, but rather was the product of false promises of leniency. Thus, because the defendant's right against self-incrimination directly resulted in the disclosure of the passwords, this Court should suppress the contents of the devices and prohibit their introduction at trial.

**CONCLUSION**

For all of the reasons set forth in this motion, the Court should suppress the statements made by the defendant and any resulting information derived from the involuntary interrogation.

Respectfully submitted,

/s/ Sandi S. Rhee

Sandi S. Rhee
Counsel for the Defendant
10001 Georgetown Pike, #63
Great Falls, VA 22066
(202) 285-8366
SandiRheeLaw@Gmail.com
VA Bar No. 47328

Robert Feitel

Robert Feitel
1300 Pennsylvania Avenue, N.W
#190-515
Washington, D.C. 20004
202 255 6637 (cellular)
District of Columbia Bar 366673
*Pro Hac Vice*

*Joseph King*

______________________________

Joseph King
VA Bar #65632
King, Campbell, Poretz & Mitchell Pllc.
118 N. Alfred Street
Alexandria, VA 22314
(703) 683-7070 (o)
(703) 652-6010 (f)
jking@kingcampbell.com

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was sent via ECF to Anthony Aminoff and Catherine Rosenberg, Assistant United States Attorneys for the Eastern District of Virginia, 2100 Jamieson Avenue, Alexandria, VA 22314, and current defense counsel this 24th day of September, 2026.

/s/ Sandi S. Rhee

Sandi S. Rhee