UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

| | | |
|---|---|---|
| UNITED STATES | : | |
| v. | : | Case No. 1:23-CR-143 |
| SEBASTIAN ENRIQUE MARSET CABRERA | : | |
| Defendant | : | |

**DEFENDANT'S MOTION TO DISMISS FOR VINDICTIVE PROSECUTION AND GOVERNMENT MISCONDUCT**

**INTRODUCTION**

This is a case about what happened to Sebastian Marset after he declined the DEA's "invitation" to voluntarily surrender to the United States because he had not committed any crimes against this country. The DEA dispatched Bolivia's intelligence service to arrest him in the city of Santa Cruz de la Sierra, purportedly based upon an Interpol Red Notice from Paraguay. The Bolivian police charged into Sebastian's home in the middle of the night while he and his family were sleeping, shot up the residence, and then stole all their belongings. Sebastian was taken to the airport but was not turned over to the Paraguayan authorities, but to the DEA. No extradition procedure ever took place.

Instead, Sebastian was flown in custody to the United States and when he arrived at Dulles Airport, the DEA agents improperly convinced him to speak by promising him reductions under the sentencing guidelines and then ignored the invocation of his *Miranda* rights. The conversation was not recorded despite a DEA directive to memorialize all such interrogations. The next business day the DEA agents transported Sebastian to court and asked him for a "donation" from his cryptocurrency accounts. When Sebastian refused to plead guilty to the money laundering conspiracy charge (for which there is no venue in this jurisdiction), the

prosecutors added three additional charges against him – which they could never have done had he been lawfully extradited to the United States. All of these facts – and others – form the basis of this motion to dismiss for vindictive prosecution. The defense recognizes that these motions are rare, but the circumstances of this case warrant the pleading, not only to protect this defendant's rights, but to act as a deterrent against similar Government misconduct in the future.

## RELEVANT FACTUAL BACKGROUND

According to the discovery provided in this case, for the last several years the DEA has been determined to find a way to arrest Sebastian Marset and bring him to the United States. Those efforts were not limited to trying to locate the defendant through legitimate law enforcement tactics.

### ***1. The DEA Threatens The Defendant To Surrender***

On March 26, 2025, the DEA used one of its "vetted units" of Colombian police officers to conduct surveillance of the defendant's significant other, identified as Susana, at the international airport in Medellin. A Colombian police officer approached Susana and gave her the business card of the lead DEA agent in this case and told her that he wanted to speak with her about Marset. The agent wrote to Susana, but she blocked his phone number. Undeterred, another DEA agent wrote to Susana and she blocked that phone number as well.

The next day, March 27, 2025, the DEA agents tried a more direct approach. The lead agent contacted the defendant via the WhatsApp messaging application and during the ensuing conversation made repeated references to the safety of the defendant's children. The agent stated that: (1) he wanted to give Sebastian "the opportunity to resolve his concerns for the safety of his children and loved ones around him;" (2) he was offering the defendant a way out of drug trafficking to "save MARSET'S children's lives;" and (3) "MARSET should think about his

kids." The defendant interpreted these uninvited messages as a threat against his family.

### *2. The United States Intentionally Circumvents Lawful Extradition*

One year later, on March 13, 2026, the DEA finally made its move against the defendant. According to the DEA reports in this case, in October 2025, the Brazilian federal police placed a GPS tracker in Susana's luggage and had located the device at a residence in Santa Cruz, Bolivia. No information was provided as to the details of how the tracking device was planted, whether it was authorized by a Brazilian court, or what role the DEA played in this event or in coordinating the exchange of location information between Brazilian and Bolivian authorities.

Armed with this information, in the middle of the night on March 13, 2026, Bolivian intelligence agents forced their entry into Defendant's private residence. No search warrant or judicial authorization for the intrusion was provided to the defense. Rather, the DEA agents (who have no police power outside of the United States) used the Bolivian police as their proxies to invade the home. The DEA actively coordinated this operation, communicating directly by telephone with the Bolivian police officers who executed the raid, directing and supervising the operation remotely.

The armed Bolivian agents indiscriminately fired their weapons throughout the residence — including directly into the bedrooms where his family and children were sleeping. Defendant's cellular phones, tablets, and computer were seized without a warrant and then he was delivered to the DEA agents waiting at the airport. The Bolivian police stole with impunity the family's personal belongings, including shoes and clothing and the like, while Sebastian was being removed from the home. The residence was left vacant when the police finally left. There is currently an investigation in Boliva into the theft and destruction of the defendant's family's residence.

The Bolivian government's putative justification for the arrest was an Interpol red notice issued by Paraguay. This was a fiction for three reasons. First, a red notice is not an arrest warrant. Second, Bolivia did not detain the defendant with the intent to extradite him to Paraguay. As demonstrated by the uncontested facts, Bolivia transported him to the Viru Viru international airport and without any judicial process, simply handed him over to the United States. Third, a report prepared by Bolivia's Minister of Government stated that Sebastian was turned over to the United States because of a "process and judgment" for drug trafficking. Since the defendant did not have any drug trafficking charges pending against him, nor any conviction, it is readily apparent that all of these actions were taken to place the defendant in the custody of the United States, so he could be brought to this country without the protections afforded him under the terms of the extradition treaty.

The remaining facts are also detailed in the Defendant's Motion To Suppress Statements, which is being filed contemporaneously.

***3. Custodial Interrogation In Transit From Bolivia To Peru***

At the Viru Viru airport in Bolivia, the agents advised the defendant of *Miranda* rights in Spanish. One of the agents recorded the advice of rights and the defendant's acknowledgement that he understood and waived them. The Bolivian police also turned over to the DEA a backpack containing cellular phones, tablets and a computer. The defendant was then moved to a DEA airplane and flown to Peru.

According to the DEA report, shortly after takeoff, one of the DEA agents gave the defendant a copy of the Indictment against him. At that time, the only charge pending against the defendant in the United States was conspiracy to commit money laundering. After reviewing the Indictment, the defendant stated that he had some questions about the charges

against him. A brief, ensuing conversation between the defendant and the agents was recorded.

The defendant was flown to Lima, Peru and the DEA agents then escorted him (while shackled and chained) to a different jet that landed at Dulles International Airport on March 14, 2026 at approximately 11:00 a.m., or thirty-three (33) hours after he was taken into custody in Bolivia.

### *4. The Custodial Interrogation At Dulles Airport Violated The Defendant's Rights*

Upon arriving in the United States, the defendant was taken to an "interview room" by DEA Special Agents Michael Greisen and Tyler Ganzel and Intelligence Analyst Maritza Juno. The two agents initiated a strategy designed to extract incriminating information from the defendant through specific, promises of a benefit in his criminal case.

In the first moments of the interrogation, the agents claimed that they needed to confirm certain "biographical information" from the defendant. This was merely the first pretext used by the agents to obtain a confession since they already had the requested information and had no need for confirmation.

Prior to advising the defendant of his *Miranda* rights, SA Greisen displayed the federal guidelines table and told the defendant that if he provided the passwords to his phones, they would deduct "four points" from the table. As a result of the specific promise of a sentence reduction the defendant provided the passwords to his phones. SA Greisen then asked for the password to defendant's computer, repeating the same promise: four additional points off. Sebastian provided that password as well, before receiving any *Miranda* warnings in the United States. After obtaining both passwords, agents told Defendant he was "doing well."

It was only after he obtained the passwords to both devices that SA Greisen presented the Defendant with what he mischaracterized "a cooperation agreement," but was in fact a

*Miranda* waiver form. The agent did not read the document to the Defendant but simply indicated where to put initials and where to sign, saying: in essence "put your initials here, here, here and sign here." The Defendant read and signed the document as the agents then told him that he had to tell them the truth if he wanted "to see [his] children again."

The DEA agents made no effort to make a simple audio or video recording of the *Miranda* waiver of the interrogation at Dulles Airport, despite being in the United States in a secure location at Dulles Airport. This failure violates the presumption created by a specific Department of Justice policy enacted more than a decade earlier, on May 12, 2014. During the ensuing interrogation the defendant was asked various questions concerning, *inter alia*, his relationship with co-defendant Santoro, weapons trafficking, and contacts with other South America based drug traffickers. The interrogation began at 11:00 a.m. and ended four and a half hours later at approximately 3:22 in the afternoon.

The defense believes that the DEA report of the interrogation is incorrect in two principal respects. First and most importantly, the defendant asserted his right to consult with counsel early in the interview and the agents should have immediately ceased speaking with the defendant. According to the defendant, he explicitly stated "I **want to speak with a lawyer — that paper said that everything I say can be used against me."** Second, the defense believes that the report of the interview does not memorialize the topics of conversation in their actual chronological order. Since the agents failed to record the interview – which the defense believes was intentional – there is no independent evidence to establish what transpired during the interrogation at Dulles Airport and an evidentiary hearing is warranted.

***5. Transport To The Alexandria Detention Center***

After the interrogation concluded, the DEA agents transported the defendant from Dulles

Airport to the Alexandria Detention Center. SA Greisen and IA Juno were in the rear of the vehicle on either side of the defendant, while SA Ganzel was in the front passenger with an unidentified driver. The vehicle first stopped to drop the analyst off at what appeared to be her home. After she exited the vehicle, the defendant advised counsel that Agent Greisen asked him as follows: "Can you donate the money in the wallets to us?" The digital wallets contained nearly crypto currency worth four million dollars. Under the totality of circumstances – particularly since the agents waited until the analyst left the vehicle - the defendant believed that the request for a "donation" was the equivalent of an extortion attempt by the lead agents involved in the investigation and not a forfeiture to the United States Government. The other agents waited until I/A Juno was gone because she understood Spanish and they wanted no witnesses to the conversation. The fact that the demand was made immediately after I/A Juno exited the vehicle indicates deliberate planning and thus, consciousness of guilt by the agents.

Marset responded in the affirmative but explained that access to the wallets required facial recognition or the keys contained in a "notebook" that had remained in Bolivia. The agents already had all the details concerning the digital wallets and indeed, information - including wallet addresses and asset amounts - appear in the DEA report of this interview. The existence of this information establishes that Agents Greisen and Ganzel had specific, detailed knowledge of Mr. Marset's digital assets at the time of the demand — confirming that the solicitation of a "donation" was not spontaneous. Moreover, in its rush to punish the defendant, the DEA agents sought a seizure warrant for the crypto-currency accounts on April 23, 2026, based upon a charge of "narco-terrorism" – even though: (1) the defendant had not been charged with the offense; and (2) the affidavit in support of the seizure warrant did not contain any facts to support the charge.

### *6. Transporting the Defendant To Court on March 16, 2026*

The United States Marshals Service is the organization with the responsibility to transport federal inmates to the United States District Court for the Eastern District of Virginia in Alexandria to attend their court proceedings. On March 16, 2026, however, DEA SAs Greisen and Ganzel for unknown reasons took over that responsibility and transported the defendant from the Alexandria Detention Center to the federal courthouse for his initial appearance. According to the DEA report of the events, the defendant advised the agents that he wanted to "share" additional information.

The DEA report of this event states that the agents reminded the defendant of his *Miranda* rights but did not execute a written additional waiver, notwithstanding his prior invocation of the right to counsel. According to the report, Agents Greisen and Ganzel - with no other witness present in the vehicle - asked him for the combination to his safe in Bolivia. The defendant believes that this was another effort by the agents to obtain financial benefits from the accused.

### *7. The DEA Agents Contact The Defendant's Mother*

As part of their relentless pursuit of the defendant, Agent Greisen subsequently contacted Mr. Marset's mother directly and requested photographs of the "notebook" that contained information concerning the digital wallets. The defendant's mother is a private individual, a foreign national, who was not the subject of any investigation and the agent's conduct is further confirmation of the lengths that the agents are willing to go to locate and obtain the contents of the crypto currency wallets.

### *8. The Government Adds Additional Charges When The Defendant Refuses To Plead Guilty*

After arriving in the United States, the defendant obtained retained defense counsel and

attended a meeting with the prosecutor assigned to this case. The Government's position was clear: even though he was only charged with a Money Laundering Conspiracy, in order to resolve the case, the defendant had to agree to waive his right to a grand jury returning a Superseding Indictment and plead guilty to a charge of Conspiracy to Commit Narco-Terrorism, with an agreed upon sentencing guideline Level 58, minus 3 levels for the entry of a guilty plea. The final adjusted guideline level under this plea offer would have been level 55, or 11 levels above the mandatory life sentence range of the guidelines. If the defendant did not plead guilty, then the prosecution would bring additional charges against him.

This was a false choice because there is no venue for the Money Laundering Conspiracy charge in this jurisdiction. Accordingly, the defendant declined the plea offer and the prosecution then returned a Second Superseding Indictment, charging him with: (1) Narco-Terrorism; (2) drug trafficking on the High Seas in violation of the Maritime Drug Law Enforcement Act; (3) Conspiracy to Commit Money Laundering; and (4) Money Laundering. The Government would not have been able to add the charges contained in counts one and two if the defendant had been legally extradited according to the Extradition Treaty between Bolivia and the United States at the time he was arrested. The United States' intentional efforts to circumvent the extradition process gave the prosecutors a powerful tool that would have otherwise not been available to them as part of a pressure campaign to extract a guilty plea from the defendant.

***9. The DEA Stops The Defendant's Bolivian Attorney In The Bogota Airport***

On or about July 27, 2026, the defendant's Bolivian lawyer, identified for his protection only by his initials, "R.A." traveled to Bogota, Colombia to attend a friend's wedding. As R.A. was waiting to enter the country, he stopped by Colombian police officers, removed from the immigration line and brought – without his consent - to meet with DEA Special Agent Tamara

Teller. Teller told R.A. that she wanted to speak with him at the U.S. Embassy about his client Sebastian Marset on July 31, 2026. SA Teller did not provide any information as to the topics of conversation, did not state whether R.A. was a witness, subject, or target of the investigation, but acted as though it were a *fait accompli* that R.A. would be so intimidated he would agree to meet, notwithstanding his attorney client privilege with the defendant. R.A. was allowed to leave the airport, but SA Teller sent him a "reminder" text message, which is reprinted below in its original Spanish and then translated into English:






This conduct is outrageous. The naked attempt to intimidate the defendant's lawyer – while was on a personal trip outside of his own country – speaks volumes about the Government's intent in this case.

With this factual predicate, the next section analyzes the legal principles applicable to a motion for vindictive prosecution.

**LEGAL ANALYSIS**

The Constitution forbids the government from prosecuting an individual based on his a government official's animus toward the individual. Objective evidence establishes that the prosecutors and agents in this case took steps to retaliate against the defendant because of personal animus. Such a vindictive prosecution serves no legitimate government interest and contradicts fundamental constitutional values.

***1. The Constitution Prohibits the Government from Vindictively Prosecuting a Defendant***

"[V]indictive prosecution has no place in our system of justice." United States v. Ball, 18 F.4th 445, 454 (4th Cir. 2021). It is "well established that a prosecutor violates the Due Process Clause of the Fifth Amendment by exacting a price for a defendant's exercise of a clearly established right or by punishing the defendant for doing what the law plainly entitles him to do." United States v. Wilson, 262 F.3d 305, 314 (4th Cir. 2001). Indeed, "for an agent of the State to pursue a course of action whose objective is to penalize a person's reliance on his legal rights is 'patently unconstitutional'" and "a due process violation of the most basic sort." Bordenkircher v. Hayes, 434 U.S. 357, 363 (1978). (citations omitted).

In order to "establish prosecutorial vindictiveness, a defendant must show, through objective evidence, that (1) the prosecutor acted with genuine animus toward the defendant and (2) the defendant would not have been prosecuted but for that animus." Wilson, 262 F.3d

at 314. A defendant may satisfy the first prong by showing either that "the prosecutor harbored genuine animus toward the defendant," or that the prosecutor "was prevailed upon to bring the charges by another with animus such that the prosecutor could be considered a 'stalking horse.'" United States v. Sanders, 211 F.3d 711, 717 (2d Cir. 2000). And a defendant may satisfy the second prong by showing that "he would not have been prosecuted . . . but for the vindictive motive" of the prosecutor or her superiors. *Wilson*, 262 F.3d at 317 (emphasis omitted).

Though a defendant can establish an "improper motive with direct evidence," such a motive can also be "presumed" if the defendant "shows that the circumstances 'pose a realistic likelihood of vindictiveness.'" Id. at 314 "[A] presumption of vindictive prosecution . . . must be supported by a showing sufficiently strong to overcome the presumption of prosecutorial regularity" that normally attaches to prosecutorial "charging decisions." Id. at 315. Where a defendant makes that showing, "the burden shifts to the government to present objective evidence justifying its conduct." Id.

As a subset of these principles, the Due Process Clause forbids vindictive prosecutions motivated by the government's "genuine animus toward the defendant," regardless of whether that animus is connected to the defendant's exercise of his constitutional rights. Wilson, 262 F.3d at 314. That is because "the Due Process Clause was intended to prevent government officials 'from abusing [their] power or employing it as an instrument of oppression.'" County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998) And that principle applies with particular force here because "[t]he United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in

a criminal prosecution is not that it shall win a case, but that justice shall be done." Berger v. United States, 295 U.S. 78, 88 (1935). Thus, a vindictive prosecution brought to effectuate the DEA's animus toward a defendant regardless of whether or not he committed a prosecutable offense in the United States serves no "legitimate Government end," Wade v. United States, 504 U.S. 181, 186 (1992).

***2. Sebastian Marset Is The Victim Of A Vindictive Prosecution***

The totality of circumstances in this case demonstrate that the criminal case against the defendant is the result of a vindictive prosecution. From the very first moment, the DEA attempted to obtain the defendant's compliance by threats against his family. When the defendant rebuffed the DEA's "opportunity" to self-surrender for the security of his family and loved ones, the agents sent into motion a sequence of events designed to ensure that Sebastian Marset would be brought to this country in violation of the United States international treaty obligations and with the intent to deprive him of the benefits afforded extradites under that treaty.

Thus, the United States engineered the defendant's arrest on the pretext of a Red Notice issued by Paraguay and then contrived his expulsion from Bolivia to evade the requirements of the extradition treaty between the two countries. As part of that plan, the DEA dispatched a team of Bolivian intelligence officers who perpetrated mayhem at the defendant's home while his family slept.

The Government of Bolivia surrendered its sovereignty and falsely claimed that the defendant was being turned over to the United States for international drug charges, even though no such charges existed. The DEA agents who initiated this sequence of events were anxiously waiting at Dulles Airport but intentionally but did not record the defendant's interrogation,

despite regulations that require them to memorialize the conversation. The same agents not only made false promises to the defendant to obtain incriminating statements but also ignored the defendant's request to speak with an attorney. The capstone of this plan was the DEA agent's request – made in private – for a "donation" from the defendant's crypto currency wallets.

The Government's efforts to improperly coerce a guilty plea continued after the defendant arrived in the United States. There is no venue in this jurisdiction for the original Money Laundering Conspiracy charge in this case and the additional charges contained in the Second Superseding Indictment (SSI) fail both because the defendant should never have been brought to the United States in the first place and the factual allegations in the SSI do not support the charges. The Hobson's choice presented to Sebastian – either plead guilty to the money laundering conspiracy or face additional charges – was intended to coerce him to forgo his right to bring appropriate legal challenges to the charges.

The Government's efforts to harass the defendant's family and associates continued after he arrived in the United States. The DEA's contacts with the defendant's mother and then his Bolivian attorney (whose communications with the defendant are privileged) are not investigative techniques, but rather coercive efforts to send a message to the defendant that no one in his circle was safe from the United States.

These events more than sufficiently satisfy the presumption of vindictiveness, and this Court should hold an evidentiary hearing to allow the defense to confront the witnesses with personal knowledge of these matters.

**CONCLUSION**

For all the reasons set forth herein, this Court should order an evidentiary hearing with respect to this Motion To Dismiss.

Respectfully submitted,

/s/ Sandi S. Rhee

Sandi S. Rhee
Counsel for the Defendant
10001 Georgetown Pike, #63
Great Falls, VA 22066
(202)285-8366
SandiRheeLaw@Gmail.com
VA Bar No. 47328

Robert Feitel

Robert Feitel
1300 Pennsylvania Avenue, N.W
#190-515
Washington, D.C. 20004
202 255 6637 (cellular)
District of Columbia Bar 366673
*Pro Hac Vice*

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was sent via ECF to Anthony Aminoff and Catherine Rosenberg, Assistant United States Attorneys for the Eastern District of Virginia, 2100 Jamieson Avenue, Alexandria, VA 22314, and current defense counsel this 24th day of September 2026.

/s/ Sandi S. Rhee

Sandi S. Rhee