IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>SEBASTIAN ENRIQUE MARSET CABRERA,<br><br>*Defendant.* | Criminal No. 1:23-cr-143<br><br>Hon. Rossie D. Alston |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS STATEMENTS (DKT. 114) AND MOTION TO DISMISS FOR VINDICTIVE PROSECUTION (DKT. 115)**

The United States of America, by and through undersigned counsel, respectfully files this response in opposition to the defendant's Motion to Suppress Statements and Evidence Obtained Thereof as the Fruit of the Poisonous Tree, Dkt. 114, and the Defendant's Motion to Dismiss for Vindictive Prosecution and Government Misconduct, Dkt. 115. For the following reasons, both motions should be denied.

The defendant, Sebastian Enrique Marset Cabrera, was for many years one of the most prolific drug traffickers in South America. The self-proclaimed "King of the South," he trafficked ton quantities of cocaine, worth millions of U.S. dollars, from South America to various locations around the world, particularly Europe, but also the United States. The defendant threatened and committed numerous acts of violence in furtherance of his drug trafficking activity. These acts of violence were intended to advance the defendant's drug trafficking organization, ensure his own liberty, and intimidate others into submitting to his will.

The defendant was first indicted in this District in March 2024. He remained a fugitive for two years; in May 2025, he was added to the Drug Enforcement Administration's Most Wanted

Fugitives List. On March 13, 2026, Bolivian law enforcement authorities arrested the defendant without incident in Santa Cruz de la Sierra, Bolivia. He was expelled from Bolivia to face justice in the United States. His arrest and expulsion did not run afoul of U.S. law. The Drug Enforcement Administration ("DEA") Special Agents assigned to the case acted lawfully and professionally throughout the investigation, including during their post-arrest interactions with the defendant. Moreover, the prosecution of one of the world's most prolific and violent drug traffickers is not vindictive; rather, it is an appropriate and just response to the defendant's criminal conduct.

## FACTUAL BACKGROUND

### I. DEA Special Agents Contacted the Defendant in March 2025 to Encourage the Defendant to Turn Himself In.

The defendant was indicted in the Eastern District of Virginia in March 2024. For two years thereafter, he remained a highly wanted fugitive. In March 2025, the DEA attempted to contact the defendant in an effort to encourage the defendant to turn himself in to U.S. law enforcement and resolve his pending charge in the United States efficiently and professionally. This kind of attempted contact with wanted fugitives is a regular practice in DEA investigations.

On or about March 26, 2025, in an effort to get in contact with the defendant, DEA Special Agents approached the defendant's girlfriend, Susana Castaño Rios ("Susana"), at the El Dorado International Airport in Bogata, Colombia. The agents gave Susana the business card of DEA Special Agent Greisen, informing her that he would like to speak with her soon about the defendant. Susana declined to speak with the DEA at the airport. Special Agent Greisen later attempted to contact Susana by text message, and she again declined to respond. The DEA did not attempt further contact with Susana.

Later that same evening, Special Agent Greisen contacted the defendant directly via WhatsApp. Again, this outreach was done to encourage the defendant to turn himself in to U.S.

law enforcement, a common practice in DEA investigations. The first message sent from Special Agent Greisen to the defendant, written in Spanish, was direct and professional. An English translation of the message is reproduced in its entirety below:

> Sebastián, my name is Mike Greisen, and I am a DEA agent. We have tried twice to give you the opportunity to establish direct communication with me and my team. It appears you have rejected both opportunities. We wanted to inform you and explain how you could resolve your issues with the United States discreetly and professionally, acknowledging your concerns for your children and other loved ones. I would like to explain how to address those concerns while resolving your problems with the United States—problems that are not going away. You have the chance to set things right. Otherwise, you are simply waiting for the day of your imminent capture. The United States has a long arm of justice, vast resources, and patience. We will keep up the pressure until we capture you, just as we did with El Chapo, Mayo, Caro Quintero, Otoniel, and many others. The choice is yours.

Moments later, the defendant responded with a series of messages stating, in sum and substance, that he would never be captured, that his only legal problems were with Paraguay, and that he would resolve those problems with money. The defendant wrote: "[n]o me van a capturer nunca" ("they are never going to capture me") and "[l]a justicia no existe" ("justice doesn't exist").

Special Agent Greisen responded that U.S. conspiracy law is a complex matter, and advised that the defendant should speak with a U.S. defense attorney. Special Agent Greisen also acknowledged that family members, including children, of drug traffickers are often put at risk by criminal conduct, given the inherent violence involved in the drug trade; often, a defendant's only way out of this violent lifestyle is by turning oneself in to law enforcement or by an arrest. An English translation of the message sent by Special Agent Greisen is produced in its entirety below:

> I understand your position and the complexities involved. But as a professional, I'm going to keep doing my job, brother. I reached out personally to send you this message directly. I truly appreciate your candor. I'm simply trying to offer you a way out and save your children's lives.

The defendant again responded with a series of messages. He stated that his children were alive and with him, and asked: "Los van a matar o qué?" ("Are they going to kill them or what?"). Without waiting for a response, the defendant continued: "Yo soy mucho más inteligente que toda la dea junta" ("I am smarter than the entire DEA put together").

Special Agent Greisen acknowledged that he (Special Agent Greisen) did not need to be a genius to recognize the defendant's WhatsApp profile because the profile contained a picture of the defendant's child.

The defendant responded: "Estás acostumbrado a los sapos que tienen por tu país" ("You're used to the snitches they have in your country"). The defendant then went so far as to threaten Special Agent Greisen. The defendant wrote: "Mira que nadie es inmortal. Hijo de puta." ("Look, nobody's immortal. You son of a bitch."). Then defendant continued: "Vos debes de ser un sapo más. Convertido en dea." ("You must be just another snitch. Turned into DEA.")

The defendant then called Special Agent Greisen over WhatsApp. They spoke on the phone in Spanish for approximately two minutes. Special Agent Greisen recorded the phone call, which was later transcribed and translated to English. During the call, Special Agent Greisen again indicated that the defendant was charged in the United States and offered the defendant an opportunity to hire a lawyer in the United States, so that the matter could be handled professionally. The defendant responded that he would never be captured; he stated: "I have been running for three years, and I will keep running all my life, if necessary. You all will never capture me." The defendant further stated: "Leave my girlfriend alone because it's going to get ugly. Look, I'm not afraid of that, nor the DEA, or anyone, anyone. I'm not afraid of anyone. We are all mortals." Special Agent Greisen responded that he understood the defendant's position, and that the charges were not going away. The defendant then responded: "I am not interested in the charges. I am not

interested in the charges. I am a criminal; I will be a criminal all my life, whoever comes to look for me." The defendant then ended the phone call.

The defendant then sent Special Agent Greisen another message over WhatsApp, which stated: "Que te quede clarao" ("Let this be clear to you").

Special Agent Greisen then responded by text message and concluded the conversation. An English translation of the message is reproduced in its entirety below:

> I'm glad your kids are with you and safe. You need to respect the fact that I'm communicating with you directly, like a man. So, that's how we'll leave it. You have my number if you change your mind.

In this exchange, which occurred over the course of approximately 30 minutes, Special Agent Greisen acknowledged the inherent risk to the defendant's children by virtue of the defendant's criminal conduct. Special Agent Greisen also made clear that he was concerned about the children's safety and was glad that they were safe. Any reference by Special Agent Greisen to the defendant's children was certainly not intended as threat; rather, Special Agent Greisen intended to offer the defendant a clean and peaceable exit from his drug trafficking activity by turning himself in to U.S. law enforcement.

Yet, the defendant, in turn, explicitly threatened Special Agent Greisen. The defendant referred to Special Agent Greisen as a "snitch," remarked that the defendant was "smarter than the entire DEA put together," and – most notably – threatened "nobody is immortal." The defendant further admitted that he was a criminal and would keep running from law enforcement all his life.

II. <u>The Defendant is Arrested in Santa Cruz de la Sierra, Bolivia on March 13, 2026, by Bolivian Law Enforcement</u>.

On or about March 11, 2026, Bolivian law enforcement informed the DEA that it had learned through a source of intelligence that the defendant was located near Santa Cruz de la Sierra, Bolivia. Bolivian law enforcement further informed the DEA that it intended to arrest the

defendant. Although the DEA was briefed on the operation before and after it occurred, the DEA was not involved in the details of the planning or execution of the operation.

Less than 48 hours later, in the early morning hours of March 13, 2026, Bolivian law enforcement executed the operation to arrest the defendant. No DEA personnel were present for the operation.

The defendant was arrested without incident and taken into Bolivian law enforcement custody. Bolivian law enforcement then searched the residence in which the defendant was located, as well as an adjacent residence that was connected via an underground tunnel. Bolivian law enforcement also searched another location nearby at which the defendant's security detail was located.

The arrest and searches all occurred without incident. According to the information received by the DEA, no shots were fired during the course of the entire operation.

Inside the residence in which the defendant was located, Bolivian law enforcement located and seized more than 20 electronic devices. Later that same day, Bolivian law enforcement transferred the defendant and the seized electronic devices to DEA custody.

III. The Defendant Was Flown from Santa Cruz de la Sierra, Bolivia, to Lima, Peru, and then to Dulles International Airport in the Eastern District of Virginia.

Once the defendant was in the custody of Bolivian law enforcement, two DEA agents, who were based in Lima, Peru, flew from Lima to Santa Cruz de la Sierra to obtain custody of the defendant. These two DEA agents, Special Agent Reyes and Special Agent Vega, met the defendant and administered *Miranda* warnings to him by reading each warning out loud from a Spanish-language DEA-13b form. At the conclusion of that reading, the defendant stated that he understood his rights and then initialed each warning and signed the DEA-13b form ("Exhibit 1").

Special Agent Reyes and Special Agent Vega then escorted the defendant to a DEA aircraft. These agents, as well as two DEA agent pilots, then flew with the defendant to Lima, Peru. During the flight, the defendant asked if the agents could explain the charges against him. Special Agent Reyes provided the defendant with a copy of the unsealed indictment. The defendant confirmed he could read English, and proceeded to ask a few questions and discuss the case. Special Agent Reyes and Special Agent Vega were not the case agents assigned to the defendant's case and were unfamiliar with the details of the case. Out of precaution, Special Agent Reyes stated that the conversation with the defendant would need to be audio recorded, which the defendant acknowledged and agreed to. Special Agent Reyes then explained the indictment to the defendant in general terms. The defendant agreed with some of the allegations in the indictment – including that co-conspirator Federico Santoro Vassallo delivered money to the defendant in South America – but disagreed with other allegations. Special Agent Reyes stated that the defendant would need to discuss these concerns with his attorney. The defendant said he accepted the situation, and that he would discuss his concerns further in the future.

After the defendant landed in Lima, Peru, the DEA secured a chartered plane to fly him from Lima to Dulles International Airport, located in the Eastern District of Virginia. Special Agent Reyes and Special Agent Vega again accompanied the defendant on this flight; the plane was flown by two private pilots. No substantive conversations with the defendant occurred during this flight.

## IV. DEA Interviewed the Defendant at Dulles International Airport.

The defendant landed at Dulles International Airport the morning of Saturday, March 14, 2026. Upon his arrival, Special Agent Greisen and Special Agent Ganzel – the DEA agents assigned to the defendant's case – met the defendant, and escorted him from the plane to the Customs and Border Protection ("CBP") area at Dulles, where he was processed into the United

States. The agents then escorted the defendant to an interview at Dulles International Airport, where they were accompanied by DEA Intelligence Analyst Juno.[1]

Special Agent Greisen and Intelligence Analyst Juno are fluent Spanish speakers, and communicated with the defendant in Spanish during the entire meeting. Special Agent Ganzel speaks English, and his communications with the defendant were translated by Special Agent Greisen and Intelligence Analyst Juno. The investigators perceived that at no time did they or the defendant have trouble understanding one another.

The meeting occurred at an interview room at Dulles International Airport. The interview was not recorded. It is regular DEA practice that interviews are only recorded when they occur in a room that contains suitable recording equipment. (The defendant's motion acknowledges this requirement, citation a 2014 DOJ Policy that provides "[t]here is a presumption that the custodial statement of an individual in a place of detention *with suitable recording equipment*, following arrest but prior to initial appearance, will be electronically recorded.") Dkt. 114 at 6 (emphasis added). In practice, these are typically rooms located at law enforcement facilities, such as police stations, that are equipped with cameras and audio recording devices. The interview room at Dulles International Airport was not equipped with such suitable recording equipment. The fact that the interview was not recorded was appropriate, and followed standard DEA practice.

At approximately 11:00am, Special Agent Greisen, Special Agent Ganzel, and Intelligence Analyst Juno (collectively, "the investigators") identified themselves with their credentials as the investigators in charge of the defendant's case. They removed the defendant's handcuffs and provided him with water and snacks. Throughout the course of the interview, the defendant was

[1] In total, the meeting with the defendant at Dulles International Airport lasted from approximately 11:00am to 3:22pm ET. Special Agent Greisen, Special Agent Ganzel, and Intelligence Analyst Juno were present throughout the duration of the interview. DEA Special Agent Stanton joined for approximately the last one hour of the interview.

given multiple breaks to utilize the bathroom, and was escorted to the bathroom uncuffed. He was also provided coffee and additional snacks throughout.

The investigators then reviewed biographical information using standard booking questions with the defendant. The defendant was presented with a copy of his Uruguayan cedula ID, the INTERPOL Red Notice filed out of the United States, and a DEA Form 202. The defendant reviewed and confirmed the biographical information in these documents, signing each one.

The investigators then explained to the defendant the existing charge of a money laundering conspiracy, as well as the potential pending charge of narcoterrorism. The investigators also explained the U.S. Sentencing Guidelines to the defendant. The investigators explained the concept of an offense level under the U.S. Sentencing Guidelines, starting with a base offense level, based on drug quantity, and impacted by various sentencing enhancements and reductions that could apply.

The investigators explained to the defendant, in general terms, that cooperation with the U.S. government would be advantageous to the defendant for a possible sentence reduction in the future. The investigators perceived that the defendant was inquisitive about cooperation, and asked questions about how it worked. The investigators stated that no promises or guarantees would be made by the government in exchange for information from the defendant, and that the defendant would have to voluntarily provide complete and truthful information. The investigators further explained, in general terms, that if the defendant were to cooperate with the government, up to and including testifying in a trial, the defendant could be eligible for a substantial reduction in his sentence, which ultimately would be decided by a judge.

The investigators stated that it would be advantageous to begin cooperating with the government that day. The defendant was then presented with the Spanish language DEA-13 b form.

(This was the same kind of form that he previously reviewed and signed with Special Agent Reyes and Special Agent Vega while in Santa Cruz de la Sierra, Bolivia). The investigators explained that to conduct a voluntary interview, the defendant had to read and understand the rights afforded to him. The investigators then read and explained the form to him, reading aloud each bullet point while the defendant read and marked each bullet point with his initials. The defendant indicated on the form that he read, understood, and waived his rights and agreed to the interview without the presence of an attorney. The defendant, Special Agent Greisen, and Special Agent Ganzel then all signed and dated the form at approximately 11:13 AM. (*See* "Exhibit 2"). The defendant was asked if he had any questions about the form prior to beginning an interview, to which he stated no.

At no point did anyone refer to the DEA-13b form as a "Cooperation Agreement."

The investigators then presented the defendant with a Spanish language DEA-88a ("Consent to Search") form. The investigators explained that part of the defendant's cooperation with the government included consenting to the search of the electronic devices seized at the time of his arrest. The defendant reviewed the form, indicated that he understood, and signed and dated the form, affirming that he consented to the search of his cell phones and electronic other devices seized and in the custody of the DEA. (*See* "Exhibit 3").

After the defendant signed the DEA-88a form, he commented to the investigators in a joking tone that signing the form was worth "points" off his sentencing exposure. The investigators reiterated that was not for them to decide, and the defendant's sentence would be determined by a judge.

At no point did the investigators promise the defendant "points" – or a reduction to his sentence – for any particular information.

The investigators then reviewed the seized electronic devices with the defendant. In total, Bolivian law enforcement seized approximately 23 cellphones, 2 Apple iPads, and 1 Apple MacBook, which were then transferred to DEA custody. The investigators showed the defendant each device individually to determine ownership. The defendant identified three Apple iPhones (an orange iPhone 17 Pro Max, a white iPhone 17, and a rose gold iPhone 16), a MacBook and an iPad as the devices that he used. The investigators then asked for the password to these devices, which the defendant provided.

The investigators then asked the defendant if he had any cryptocurrency wallets, and the defendant confirmed he did. The defendant directed the investigators to the white iPhone 17; he opened the application imToken, and showed the investigators a cryptocurrency wallet that had approximately $1.5 million worth of cryptocurrency in it. The defendant then directed the investigators to the orange iPhone 17 Pro Max; he opened the application imToken and showed the investigators a wallet that had approximately $1.43 million worth of cryptocurrency in it; the defendant then opened another application, TronLink, and showed the investigators a wallet that had approximately $1.03 million worth of cryptocurrency in it. The investigators asked the defendant if he had the seed phrases[2] to access those accounts; he responded that he had written the seed phrases down in a notebook which was left at the residence during his arrest in Bolivia.

The defendant stated that this cryptocurrency was the proceeds from his cocaine trafficking in Bolivia. The investigators asked where the defendant stored the rest of his money; he responded that he did not have more money because he preferred to re-invest the proceeds in more drug purchases. The defendant stated that, at that moment, he had his money invested in approximately ten tons of cocaine.

[2] A “seed phrase” is a sequence of random words that acts as a master key to backup and recover a cryptocurrency wallet.

The investigators continued and conducted a substantive interview with the defendant, during which he admitted to numerous criminal acts, including drug trafficking and various acts of violence. The defendant also denied his involvement in some other criminal acts when asked by the investigators.

Throughout the substantive interview, the defendant remarked several times, in a joking tone, that certain information should be worth "points" off his Sentencing Guidelines. The investigators reiterated throughout that interview that the defendant's sentence was not up to them, and would be decided by a judge.

At no point did the defendant ever invoke his right to counsel or ask to end the interview.

At the conclusion of the interview, the investigators agreed to let the defendant make a phone call to his mother and let her know he was ok and to check on his children. The call was placed on speaker phone. During the call, the defendant asked how everyone was doing and if his children were ok. The defendant's mother said everyone was ok and mentioned that she had received his notebook. The defendant did not acknowledge or ask what notebook, and instead changed the subject.

After the meeting, Special Agent Greisen and Special Agent Ganzel transported the defendant from Dulles International Airport to the Alexandria Adult Detention Center ("ADC"). Intelligence Analyst Juno left separately; she did not accompany the agents and the defendant on the drive to the ADC.

At no point during the drive from Dulles International Airport to the ADC did the agents discuss cryptocurrency with the defendant.

## V. DEA Transported the Defendant to the Courthouse for His Initial Appearance.

The next business day, namely, Monday, March 16, 2026, Special Agent Greisen and Special Agent Ganzel transported the defendant from ADC to the U.S. District Court in Alexandria, Virginia, for his initial appearance. Nobody else was in the vehicle.

That the case agents – and not the U.S. Marshals Service – transported the defendant to his initial appearance is standard practice. Only after a defendant is remanded to the custody of the U.S. Marshals Service following an initial appearance do the Marshals take over the responsibility of transporting the defendant; before the initial appearance, a defendant remains in the custody of the arresting law enforcement agency. *See generally* 28 CFR § 0.111(k) (the U.S. Marshals Service sustains custody of a defendant after the defendant is either arrested by a marshal or remanded to a marshal by the court).

Upon retrieving the defendant from ADC, Special Agent Greisen and Special Agent Ganzel escorted the defendant to the transport vehicle. During the walk to the transport vehicle, the defendant informed the agents that he had been thinking over the weekend and wanted to share some additional information that was discussed during the interview with agents on Saturday, March 14. Special Agent Greisen stopped the defendant, and reminded him of his *Miranda* rights, which were discussed on March 14. Special Agent Greisen reminded the defendant of his right to remain silent, that anything said can and would be used against the defendant in court, and the right to consult an attorney prior to answering questions. The defendant interrupted Special Agent Greisen, stated he understood his rights, and referred to the document he signed and dated (the Spanish language DEA-13b - *Miranda* Waiver form) on March 14.

Prior to conversing with the defendant about the information the defendant wanted to provide, the agents provided the defendant with a toothbrush, toothpaste, wet wipes, and a bottle

of water. The defendant took a moment to quickly clean himself and brush his teeth; the agents then took possession of the toothbrush, toothpaste, and wet wipes and began the transport.

The defendant then volunteered further information to the agents. Among other information, the agents and the defendant discussed the fact that Bolivian law enforcement had discovered multiple safes during the arrest operation in Bolivia. The agents asked the defendant what these safes contained, and the defendant stated that they contained valuables, including currency and luxury watches. The defendant agreed to provide the access codes to the safes. The defendant also stated that there was another phone, contained in a safe, that belonged to him that the DEA had not reviewed with him on March 14.

The conversation ended when the defendant arrived at the courthouse.

After the defendant's initial appearance, the defendant was remanded to the custody of the U.S. Marshals Service.

The DEA agents then called the defendant's mother later that same day. They informed her that the defendant had his initial appearance and was doing well. They also asked her about the notebook that she had mentioned on the call with the defendant on March 14. The defendant's mother subsequently sent a photograph of a notebook to Special Agent Greisen, and asked him to show the picture to the defendant, to confirm if it was the correct notebook. The defendant's mother never sent a picture of any contents inside the notebook, nor did the DEA agents ever ask her to. The DEA agents never received the notebook.

VI. <u>The Defendant Declined the Government's Plea Offer and a Second Superseding Indictment Was Returned.</u>

The defendant was first indicted in this District in March 2024. *See* Dkt. 20 ("Superseding Indictment"). That first Superseding Indictment charged the defendant and co-conspirator Federico Santoro Vassallo with one count of conspiracy to commit money laundering, in violation of 18

U.S.C. § 1956(h), and was the operative indictment at the time the defendant was arrested March 2026.

In April 2026, a plea offer was extended to the defendant; the offer was to one count of conspiracy to commit narcoterrorism, in violation of 21 U.S.C. § 960a. The defendant rejected the plea offer.

On June 25, 2026, a Second Superseding Indictment was returned in this Court, charging the defendant with conspiracy to commit narcoterrorism, in violation of 21 U.S.C. § 960a; conspiracy to possess with intent to distribute cocaine aboard a vessel subject to U.S. jurisdiction, in violation of 46 U.S.C. §§ 70503, 70506; money laundering conspiracy, in violation of 18 U.S.C. § 1956(h); and money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i)). *See* Dkt. 92 ("Second Superseding Indictment). This is now the operative indictment.

## VII. The Defendant's Attorney Was Stopped in Bogata.

On July 21, 2026, DEA agents based in Bogota, Colombia approached two individuals, including R.A., who were traveling through the El Dorado International Airport in Bogota, Colombia. These DEA agents asked to speak with each individual about an investigation that was separate from, but related to, the investigation concerning the defendant. These individuals were believed to have engaged in criminal conduct associated with the defendant.

R.A. is not licensed to practice law in the United States and is not involved in representing the defendant in this case. The DEA agents did not intend to discuss any attorney-client privileged matters with R.A. R.A. briefly spoke with the DEA agents, provided his business card, and said he would answer if called. At that point, the DEA agents ended the interview so that R.A. could make his connecting flight.

That these DEA agents asked to have a consensual conversation with individuals regarding an investigation is standard law enforcement practice.

**ARGUMENT**

I. The Defendant's Motion to Suppress Statements, Dkt. 114, Must Be Denied.

Any statement given freely and voluntarily without any compelling influences is admissible in evidence. *See Miranda v. Arizona*, 384 U.S. 436, 478 (1966). The government bears the burden of proving by a preponderance of the evidence that the statement was voluntary. *See Lego v. Twomey*, 404 U.S. 477, 489 (1972). "The mere existence of threats, violence, implied promises, improper influence, or other coercive police activity, however, does not automatically render a confession involuntary." *United States v. Braxton*, 112 F.3d 777, 781 (4th Cir. 1997). The proper inquiry "is whether the defendant's will has been 'overborne' or his 'capacity for self-determination critically impaired.'" *United States v. Pelton*, 835 F.2d 1067, 1071 (4th Cir. 1987) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973)).

"To determine whether a defendant's will has been overborne or his capacity for self-determination critically impaired, courts must consider the totality of the circumstances, including the characteristics of the defendant, the setting of the interview, and the details of the interrogation." *Braxton*, 112 F.3d at 781 (internal citations omitted); *see also United States v. Russell*, 172 F.4th 434, 440 (4th Cir. 2026) (same). Moreover, "execution of a valid *Miranda* waiver gives rise to a strong presumption that subsequent statements are voluntary." *United States v. Hood*, 767 Fed. Appx. 456, 459 (4th Cir. 2019) (citing *Missouri v. Seibert*, 542 U.S. 600, 609 (2004)). *See also Berkemer v. McCarty*, 468 U.S. 420, 433 n.20 (1984) ("[C]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare.")

Here, the defendant's statement was given freely and voluntarily; his will was not overborne. As an initial matter, DEA agents twice administered *Miranda* warnings to the defendant. First, Special Agent Reyes and Special Agent Vega administered *Miranda* warnings to the defendant immediately following his arrest in Santa Cruz de la Sierra, Bolivia – before he had any substantive conversations with U.S. law enforcement officials whatsoever. Then, Special Agent Greisen and Special Agent Ganzel administered *Miranda* warnings to the defendant a second time upon his arrival at Dulles International Airport. On both occasions, the DEA agents read each warning aloud to the defendant from a Spanish-language DEA-13b form; and, on both occasions, the defendant initialed each warning, confirmed he understood, and agreed to speak with investigators. Given the clear administration of these warnings and the defendant's clear waiver – not once, but twice – the subsequent statements by the defendant are presumptively voluntary.

At no point was the defendant's will overborne. The DEA agents ensured that the defendant was comfortable throughout the interview at Dulles International Airport. They uncuffed the defendant, spoke to him in his native language, and provided him with water, coffee, snacks, and multiple opportunities to use the bathroom.

The defendant raises several discrete arguments as to why his post-arrest statements should nevertheless be suppressed, but none are successful.

First, the defendant's claim that the agents' review of his biographical information was mere pretext to obtain a confession is without merit. There are several exceptions to the general rule requiring *Miranda* warnings before an individual in custody may be interrogated. Among them, the "booking exception" provides that routine questions securing personal information, such as biographical data necessary to complete booking, do not constitute an "interrogation" for the

purposes of *Miranda*, *see, e.g., Pennsylvania v. Muniz*, 496 U.S. 582, 601-02 (1990); *United States v. D'Anjou*, 16 F.3d 604, 608-09 (4th Cir. 1994), although the exception does not apply to questions during booking that are designed to elicit incriminatory admissions, *id*. *See also United States v. Contreras*, 149 F.4th 349, 376 (4th Cir. 2025) (same). The agents' review of the defendant's biographical information was not pretextual and not intended to elicit incriminatory admissions; rather, it was standard procedure and not subject to *Miranda*.

Second, the defendant's claim that he was promised "points" off his Sentencing Guidelines for particular cooperative acts, such as providing the passwords to his electronic devices, is false. He was never so promised, and therefore was not coerced by this possibility. To be sure, the DEA agents reviewed the U.S. Sentencing Guidelines with the defendant and explained that cooperation with the U.S. government would be advantageous to the defendant for a possible sentence reduction in the future. However, the agents never made any particular promises to the defendant in exchange for information. The agents made clear that the defendant's sentence ultimately would be decided by a judge. The defendant joked that signing a DEA-88a form, authorizing a consent to search his electronic devices, and providing other information, should be worth "points" off his sentencing exposure; but the DEA again agents reiterated that the defendant's sentence would be determined by a judge.

Third, the defendant waived his right to counsel prior to the interview, and at no point during the interview did the defendant invoke his right to counsel. The Spanish-language DEA-13b form, which the defendant signed twice, provided, among other rights, "Antes de hacerle cualquier pregunta usted tiene el derecho de consultar un abogado" ("Before any questions are asked, you have the right to consult an attorney") and "Usted tiene el derecho de tener un abogado presente durante el interrogatorio" ("You have the right to have an attorney present during

questioning"). In signing this form, the defendant was advised of, and knowingly waived his right to, counsel during the interview. Additionally, at no point during the interview did the defendant invoke his right to counsel or ask to end the interview. Had he done so, the DEA agents would have terminated the interview immediately.

Fourth, the defendant now takes issue with statements he volunteered while being transported to his initial appearance on March 16, 2026. However, statements of any kind that are volunteered by the defendant while he is in custody are not implicated by *Miranda*. *Rhode Island v. Innis*, 446 U.S. 291, 300-02 (1980); *see also United States v. Johnson*, 734 F.3d 270, 276-78 (4th Cir. 2013). These volunteered statements are thus admissible. Moreover, the DEA agents reminded the defendant during this transport of his rights under *Miranda*, and the defendant confirmed he understood his rights.

Finally, the defendant's claim that the Court should suppress any information obtained from the defendant's statement as fruit of the poisonous tree fails as a matter of law. Case law is clear that the "fruit of the poisonous tree" doctrine does not require suppression of physical or other derivative evidence discovered as a result of any statements obtained in violation of *Miranda*. *See United States v. Sterling*, 283 F.3d 216, 218-19 (4th Cir. 2002) (holding fruits of the poisonous tree doctrine inapplicable to *Miranda* violations and affirming admission of derivative evidence discovered as the result of un-*Mirandized* custodial statements), *cert. denied* 536 U.S. 931 (2002); *see also United States v. Oloyede*, 933 F.3d 302, 308-10 (4th Cir. 2019) (contents of cell phone admissible following defendant's compliance with un-*Mirandized* request that she unlock it). Thus, even if there was a violation of *Miranda*, which there was not, any derivative evidence obtained as the result of the defendant's statements should not be suppressed.

For all these reasons, the defendant's Motion to Suppress Statements and Evidence Obtained Thereof as the Fruit of the Poisonous Tree, Dkt. 114, must be denied.

II. The Defendant's Motion to Dismiss for Vindictive Prosecution and Government Misconduct, Dkt. 115, Must Be Denied.

**A. The Defendant is Not a Victim of Vindictive Prosecution.**

"To establish prosecutorial vindictiveness, a defendant must show, through objective evidence, that (1) the prosecutor acted with genuine animus toward the defendant and (2) the defendant would not have been prosecuted but for that animus." *United States v. Wilson*, 262 F.3d 305, 314 (4th Cir. 2001). "If the defendant is unable to prove an improper motive with direct evidence, he may still present evidence of circumstances from which an improper vindictive motive may be presumed. To invoke such a presumption, a defendant must show that the circumstances 'pose a realistic likelihood of vindictiveness.'" *Id*. (quoting *Blackledge v. Perry*, 417 U.S. 21, 27 (1974)). "The standard is a 'rigorous' one." *Id*. at 315 (quoting *United States v. Armstrong*, 517 U.S. 456, 468 (1996)).

Here, the defendant makes no attempt to show with direct evidence that the prosecution acted with an improper vindictive motive, and no improper motive can be presumed under the circumstances. Indeed, a presumption of vindictiveness "will rarely, if ever, be applied to prosecutors' pretrial decisions." *Id.* at 315 (citing *United States v. Goodwin,* 457 U.S. 368, 381 (1982)). "Because of the broad discretion given prosecutors and the wide range of factors that may properly be considered in making pretrial prosecutorial decisions, 'a prosecutor should remain free before trial to exercise [that] broad discretion entrusted to him to determine the extent of the societal interest in prosecution. An initial decision should not freeze future conduct.'" *Id*. (quoting *Goodwin*, 457 U.S. at 382). "[A] prosecutor's charging decision is presumptively lawful." *Id*. Furthermore, and particularly relevant here, the Supreme Court has held that vindictiveness cannot

be shown by a prosecutor's decision to seek additional charges against a defendant who decides to plead not guilty. *Bordenkircher v. Hayes*, 434 U.S. 357, 364-65 (1978); *see also United States v. Watson*, 537 Fed. Appx. 213, 216-17 (4th Cir. 2013) (same). In *Bordenkircher*, the Supreme Court commented that the course of conduct engaged in by the prosecutor, "which no more than openly presented the defendant with the unpleasant alternatives of forgoing trial or facing charges on which he was plainly subject to prosecution, did not violate the Due Process Clause of the Fourteenth Amendment." *Bordenkircher*, 434 U.S. at 365.

Here, the defendant cannot establish a presumption of vindictive prosecution. To be sure, the defendant rejected the plea offer extended in April 2026, and the prosecution subsequently secured a Second Superseding Indictment, bringing additional charges, in June 2026. Under the Supreme Court precedent established in *Bordenkircher*, this is clearly not vindictive conduct, but rather a lawful exercise of prosecutorial decision-making. The government was clear to the defendant from the start that his options were either to plead guilty to a violation of 21 U.S.C. § 960a, or be indicted for it and face trial. The Grand Jury found probable cause for the offenses in the Second Superseding Indictment, and the prosecution's pre-trial charging decisions are presumptively lawful. The defendant fails to establish a presumption to the contrary.

**B. The Defendant is Not a Victim of Outrageous Government Conduct.**

The defendant raises multiple arguments under the general theme of government misconduct. None of the arguments has merit.

First, the defendant takes issue with the circumstances of his arrest and the search of his residence in Bolivia, which occurred without a warrant issued by a U.S. court. Yet the Supreme Court has clearly held that the Fourth Amendment does not apply to searches and seizures of property owned by nonresident aliens located in a foreign country. *United States v. Verdugo-*

*Urquidez*, 494 U.S. 259, 267, 274-74 (1990). The Court reasoned that the Fourth Amendment protects only "the People of the United States." *Id*. at 266. *See also e.g., Castro v. Cabrera*, 742 F.3d 595, 599 (5th Cir. 2014); *United States v. Stokes*, 726 F.3d 880, 892 (7th Cir. 2013). Accordingly, the Fourth Amendment does not apply to searches of nonresident aliens conducted in a foreign country by foreign authorities, *see e.g., United States v. Defreitas*, 701 F. Supp. 2d 297, 297 (E.D.N.Y 2010); *United States v. Cho-Ing Tseng*, 311 F. App'x 950, 951-52 (9th Cir. 2009). Courts may, however, suppress evidence that was obtained in a manner that "shocks the conscience" or fails to "respect certain decencies of civilized conduct." *Rochin v. California*, 342 U.S. 165, 172-73 (1952).

Here, the defendant – a Uruguayan citizen – was arrested in Bolivia. The arrest and accompanying search of the defendant's residences were conducted by Bolivian law enforcement. The Fourth Amendment is therefore inapplicable. Moreover, nothing about the circumstances of the defendant's arrest overseas was unconscionable. He was arrested without incident – no shots were fired according to the information received by DEA – and later safely transferred into DEA custody.

Second, the defendant takes issue with the manner with which he was brought to the United States. He was expelled from Bolivia; he was not extradited. However, at no point did the United States intentionally circumvent the lawful extradition process. To the contrary, as discussed above, on or about March 11, 2026, Bolivian law enforcement informed the DEA that it intended to arrest the defendant, and less than 48 hours later, the operation occurred. The DEA was not involved in the details of the planning or execution of the operation. Although the DEA accepted custody of the defendant, nothing about the operation reflects a U.S. effort to circumvent extradition. Bolivia,

a sovereign nation, made the decision to expel a dangerous and highly sought-after fugitive from its country.

Moreover, the manner in which the defendant came into U.S. custody is irrelevant. For nearly 140 years, the Supreme Court has held that the manner in which a defendant is brought to the U.S. justice system does not affect the ability of the government to try him. This principle, commonly referred to as the *Ker-Frisbie* doctrine, states that "the power of a court to try a person for a crime is not impaired by the fact that he has been brought within the court's jurisdiction by reason of 'forcible abduction.'" *Frisbie v. Collins*, 342 U.S. 519, 522 (1952) (citing *Ker v. Illinois*, 119 U.S. 436, 444 (1886)).

In *Ker*, the defendant was forcibly abducted from Peru by a U.S. agent, bypassing the formal extradition process. He was brought to the United States, where he was convicted of larceny. The Supreme Court rejected the defendant's due process argument, and held that: "such forcible abduction [was] no sufficient reason why the party should not answer when brought within the jurisdiction of the court which has the right to try him for such an offense, and presents no valid objection to his trial in such court." *Ker*, 119 U.S. at 444. The Supreme Court reaffirmed *Ker* in *Frisbie*, in which the Court upheld the conviction of a defendant who was kidnapped in Chicago by Michigan police officers, and brought to trial in Michigan. In upholding the defendant's conviction, the Supreme Court observed: "This Court has never departed from the rule announced in [*Ker*], that the power of a court to try a person for a crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a 'forcible abduction.' … There is nothing in the Constitution that requires a court to permit a guilty person rightfully convicted to escape justice because he was brought to trial against his will." *Frisbie*, 342 U.S. at 522. *See also United States v. Wilson*, 721 F.2d 967, 972 (4th Cir. 1983) ("[A] court's power to try a criminal defendant

is not impaired by the government's use of even forcible abduction to bring the defendant within the court's jurisdiction"); *United States v. Porter*, 909 F.2d 789, 791 (4th Cir. 1990) (same).

Later, in *United States v. Alvarez-Machain*, the Supreme Court held that, unless a treaty is explicit that its terms provide the only way in which the United States may gain custody of a foreign national for purposes of prosecution, the forcible abduction of a defendant from a foreign country with which the United States has an extradition treaty will not divest a court of jurisdiction. *United States v. Alvarez-Machain*, 504 U.S. 655, 660–61 (1992). In *Alvarez-Machain*, the defendant, a citizen and resident of Mexico, was forcibly kidnapped from his home in Mexico and was flown by private plane to Texas where he was arrested for his participation in the kidnapping and murder of a DEA agent and the agent's pilot. The United States had an extradition treaty with Mexico. Nevertheless, the Supreme Court held that a treaty should not be interpreted to include an implied term prohibiting prosecution where a defendant's presence was obtained by means other than those established by the treaty. *Id*. at 666-69. *See also Kasi v. Angelone*, 300 F.3d 487, 493 (4th Cir. 2002) ("Under this country's jurisprudence, it has long been held that a criminal defendant who has been abducted to the United States from a foreign nation with which the United States has an extradition treaty does not thereby acquire a defense to the jurisdiction of the courts within this country.").

Here, of course, nothing like a forcible abduction by U.S. agents occurred; the Bolivian government conducted its own arrest operation and expelled the defendant into U.S. custody. And the operative 1995 Extradition Treaty between the United States and Bolivia does not include any express language stating that extradition is the exclusive means by which the United States may acquire jurisdiction over a defendant. Article I of the Treaty provides that the Parties: "agree… to surrender to each other persons who have been charged with, found guilty of, or sentenced for an

extraditable offense…." However, the Treaty does not provide that extradition is the only means by which the United States may acquire jurisdiction over a defendant, nor does it provide that other methods, such as expulsion, are prohibited or invalidate jurisdiction. *See* Extradition Treaty Between the United States of America and the Republic of Bolivia, U.S.–Bol., June 27, 1995, Treaty Doc. No. 104-22, entered into force Nov. 21, 1996.

Under this Treaty and Supreme Court precedent, the manner by which the defendant arrived in U.S. custody is of no consequence, and does not limit the ability of the U.S. government to prosecute him.

The defendant further argues that the prosecution would not have been able to bring additional charges against the defendant had he been extradited. This is correct; the "rule of specialty" bars trying an extradited defendant for crimes other than 'the offense with which he is charged in the proceedings for his extradition.'" *United States v. Day*, 700 F.3d 713, 722 (4th Cir. 2012) (quoting *United States v. Rauscher*, 119 U.S. 407, 430 (1886)). However, the rule of specialty only applies to extraditions pursuant to a treaty. The rule does not apply when a defendant is removed from a country by another means, such as expulsion. *See United States v. Valencia-Trujillo*, 573 F.3d 1171, 1178-79 (11th Cir. 2009) (holding that a defendant lacked standing to challenge the rule of specialty where the defendant did not establish that he was extradited under a United States–Colombia extradition treaty). As discussed, the fact of the defendant's expulsion is entirely proper, and therefore the rule of specialty does not apply in this case.

Third, and finally, the defendant raises a series of arguments regarding what he characterizes as inappropriate government conduct throughout the investigation of this case. As is discussed in detail in the Factual Background section, above, many of these allegations made by the defendant are simply false. The DEA agents never threatened the defendant's children, never

promised the defendant certain "points" off his Sentencing Guidelines for certain cooperative acts, and never attempted to extort the defendant by asking for a cryptocurrency "donation." Other allegations made by the defendant intentionally mischaracterize as unscrupulous what are in fact standard law enforcement practices. For instance, the DEA's outreach to the defendant and to Susana prior to his arrest in an effort to get the defendant to turn himself in; the lack of a recording during the interview at Dulles International Airport; and the DEA's transport of the defendant to his initial appearance, are all standard law enforcement practices. They do not amount of government misconduct.

The Fourth Circuit has held that a due process violation may only be found when the conduct at issue "is outrageous, not merely offensive." *United States v. Hasan*, 718 F.3d 338, 343 (4th Cir. 2013) (quoting *United States v. Goodwin*, 854 F.2d 33, 37 (4th Cir. 1988)). Under Fourth Circuit caw law, the standard for whether government conduct is so outrageous as to offend due process is that the conduct must be "shocking" or "offensive to traditional notions of fundamental fairness." *United States v. Osborne*, 935 F.2d 32, 37 (4th Cir. 1991) (internal citations omitted). In *Hasan*, the Fourth Circuit noted: "this Court has never held in a specific case that the government has violated the defendant's due process rights through outrageous conduct." *Hasan,* 718 F.3d at 343.

Nothing about the investigation or the prosecution of the defendant has been outrageous; at no point has due process or fundamental fairness been offended. The defendant may not like the circumstances of his arrest and prosecution and may now regret his initial cooperative posture with law enforcement. Yet, the investigation and prosecution of the defendant have been entirely lawful. Therefore, the defendant's Motion to Dismiss for Vindictive Prosecution and Government Misconduct, Dkt. 115, must be denied.

## CONCLUSION

For the foregoing reasons, the defendant's Motion to Suppress Statements and Evidence Obtained Thereof as the Fruits of the Poisonous Tree, Dkt. 114, and Motion to Dismiss for Vindictive Prosecution and Government Misconduct, Dkt. 115, must both be denied.

Respectfully submitted,

Todd W. Blanche
Attorney General

Theophani K. Stamos
First Assistant United States Attorney

By: /s/ Catherine Rosenberg

Anthony T. Aminoff
Catherine Rosenberg
Assistant United States Attorneys
(703) 299-3700
Catherine.Rosenberg2@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that, on September 7, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, with automatically generated a Notice of Electronic Filing to counsel of record in this case.

/s/
Catherine Rosenberg
Assistant United States Attorney