UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

| | | |
|---|---|---|
| UNITED STATES | : | |
| v. | : | Case No. 1:23-CR-143 |
| SEBASTIAN ENRIQUE MARSET CABRERA | : | |
| Defendant | : | |

**DEFENDANT'S REPLY IN SUPPORT OF MOTION TO SUPPRESS STATEMENTS AND TO DISMISS FOR VINDICTIVE PROSECUTION**

**INTRODUCTION**

The parties have presented vastly different versions of the facts surrounding virtually every aspect of this case and the motivations behind them. This reply memorandum in support of the defense motion to: (1) suppress statements obtained in violation of the defendant's *Miranda* rights; and (2) to dismiss for vindictive prosecution identifies the major points of disagreement, which must be resolved through an evidentiary hearing where the Government has the burden of proof. See Colorado v. Connelly, 479 U.S. 157, 168 (1986)(the State bears the burden of proof in a motion to suppress a statement that the defendant claims was obtained in violation of *Miranda* doctrine). After such a hearing the defense is confident that the instant motions will be granted.

**DEFENSE VERSION OF DISPUTED FACTS**

In the Government's view, the defendant was "one of the most prolific" drug traffickers in South America. See Gov. Combined Opp; ECF 128 at p.1.This conclusion caused the Government to charge the defendant not with drug trafficking, but with Conspiracy To Commit Money Laundering, even though there is no venue in this jurisdiction for the charge and notwithstanding that the defendant never sent so much as a gram of cocaine to the United States.

After returning the Indictment, the DEA agents then attempted to convince the defendant to voluntarily surrender to the United States. They first contacting his girlfriend without warning to enlist her aid. When that failed, DEA special agent Greisen contacted the defendant directly, invoking the safety of his children as a reason for him to surrender. The defendant viewed this as a direct threat and advised the agents that he had not committed any crime against the United States, that the agents should stay away from his children and that he would rather remain a fugitive than surrender.

Against this background, the DEA exerted its influence to convince Bolivia to take the defendant into custody and expel him. During this operation, Bolivian police fired wildly inside the home where the defendant and his family were sleeping. The Government's opposition notes that according to information received by the DEA "no shots were fired during the course of the entire operation." <u>See</u> ECF 128 at p. 6. There is no evidence that the DEA (or anyone else for that matter) independently investigated whether the armed Bolivian police officers discharged their weapons.

Moreover, the Government asserted in its Opposition that "[a]lthough the DEA was briefed on the operation before and after it occurred, the DEA was not involved in the details of the planning or execution of the operation." This representation is directly contradicted by a contemporaneous DEA report which stated that the day before the defendant was taken into custody, the United States Chief of Mission in Bolivia was "briefed on the planned operation" and "concurred with the DEA operation for the expulsion and logistics of transporting MARSET to the U.S. from Bolivia through Peru for this U.S. charges.

The tactical use of expulsion was designed to deny the defendant the opportunity to contest his extradition pursuant to the treaty in effect between the United States and Bolivia,

particularly since there was no venue in this jurisdiction for the money laundering conspiracy charge.

Instead of legal process, the defendant was hauled to the international airport in Bolivia, where DEA agents were coincidentally waiting with an airplane. The Government asserts that the defendant waived his *Miranda* rights at the airport in Bolivia, but the evidence to be adduced at the evidentiary hearing will provide additional context for the Court to rule on the effect of any such waiver.

The defendant was shuttled from Bolivia to Peru and while in transit asked questions to the two DEA agents guarding him. One of the agents recorded the conversation. Upon his arrival at Dulles, SA Greisen was waiting for the defendant. The game of good cop/bad cop then began, with Greisen playing both roles. Armed with a sentencing guideline table (an extraordinarily unusual reference document for a DEA agent to use during an interrogation), he threatened the defendant that he would receive a life sentence and never see his children again if he didn't cooperate. Greisen then promised the defendant a four-level a sentence reduction if he did provide information. Greisen of course had no authority to promise any specific sentence reduction, but the defendant is a foreign national without any understanding of how the United States criminal justice system functioned. During the evidentiary hearing, the defense will demonstrate that any *Miranda* waiver executed at Dulles Airport was the result of coercion and false promises of benefits. The evidence will also contradict any claim that the defendant did not ask to speak with a lawyer during the interview.

Remarkably, this interview – which was conducted in a major international airport located in Special Agent Greisen's area of jurisdiction – was not recorded, even though the agents planned the defendant's arrival. The Government noted in its Opposition that according to

DEA policy, “interviews are only recorded when they occur in a room that contains suitable recording equipment.” Opp. at p. 8. Since the DEA agents on board an international flight were able to find “suitable” recording equipment, the lack thereof at the airport seems calculated. Greisen did have a working telephone in his possession, which he allowed the defendant to use with the speakerphone function to call his mother and Uruguayan lawyer. During the evidentiary hearing, the defense will confront the Government’s witness with respect to the defendant’s request to speak with an attorney

Similarly, the defense believes it will be able to establish through independent evidence that during the transfer from Dulles to the Alexandria jail, Greisen asked for a "donation" of the funds in the defendant’s cryptocurrency wallets. And finally, on March 16, 2026, while transporting the defendant from the jail to the courthouse, Greisen asked for the combination to the safe in Bolivia because he was looking for the “notebook” which contained the passkeys to the crypto-currency accounts. Since the notebook wasn't in the safe, Greisen took the liberty of writing to the defendant’s mother asking for information about a “notebook.”

Ultimately the defendant obtained legal representation in the United States and learned that the price of resolving his case had risen exponentially. He would be required to waive his right to a grand jury indictment and plead a “narco-terrorism” charge with a guideline range - after agreeing to a laundry list of upward sentencing enhancements – of life in jail. Since the defendant had not sent a gram of cocaine to the United States, nor participated in any money laundering or terrorist activities, he declined the offer.

**LEGAL SUMMARY**

The Second Circuit Court of Appeals recently observed that “the Constitution, the Supreme Court, and this Circuit have . . . identified a host of other protections that courts must

afford defendants in criminal proceedings." Wong v. Blanche, No. 22-6185, 2026 WL 2416711, at *4 (2d Cir. Aug. 19, 2026). Among those guarantees are the right to challenge a confession that is obtained by overbearing a defendant's will, Ortiz v. Stambach, 137 F.4th 48, 67 (2d Cir. 2025); by false promises of leniency, United States v. Young, 964 F.3d 938, 943 (10th Cir. 2020); or violation of a defendant's *Miranda* rights. United States v. Young, 964 F.3d 938, 943 (10th Cir. 2020). Likewise, criminal cases brought for vindictive or other improper reasons cannot stand, however rare such situations may occur or how high the defendant's burden. United States v. Villa, 70 F.4th 704, 710 (4th Cir. 2023).

This case presents a set of extraordinarily unusual circumstances, and the defense believes that after a full review of the totality of facts surrounding the defendant's alleged confessional statements and the decisions to bring this case, this Court will provide appropriate relief. The defense welcomes the opportunity to cross-examine the Government's witnesses, which is of course the "greatest legal engine ever invented for the discovery of truth."

**CONCLUSION**

For all these reasons, the defense respectfully moves this Court to conduct an evidentiary hearing on the issues raised by the pending motions.

Respectfully submitted,

/s/ Sandi S. Rhee

Sandi S. Rhee
Counsel for the Defendant
10001 Georgetown Pike, #63
Great Falls, VA 22066
(202)285-8366
SandiRheeLaw@Gmail.com
VA Bar No. 47328

*Robert Feitel*

____________________________

Robert Feitel
1300 Pennsylvania Avenue, N.W
#190-515
Washington, D.C. 20004
202 255 6637 (cellular)
District of Columbia Bar 366673
*Pro Hac Vice*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was sent via ECF to Anthony Aminoff and Catherine Rosenberg, Assistant United States Attorneys for the Eastern District of Virginia, 2100 Jamieson Avenue, Alexandria, VA 22314, this 14th day of September, 2026.

*/s/ Sandi S. Rhee*

____________________________________

Sandi S. Rhee