UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

| | | |
|---|---|---|
| UNITED STATES | : | |
| v. | : | Case No. 1:23-CR-143 |
| SEBASTIAN ENRIQUE MARSET CABRERA | : | |
| Defendant | : | |

# DEFENDANT'S REPONSIVE POST-HEARING SUBMISSION

## INTRODUCTION

Since brevity is the soul of wit, this response to the Government's post-hearing memorandum will be direct and to the point. As explained herein, the totality of circumstances demonstrate that this prosecution was ill-conceived and executed and that the goal was to bring the defendant to the United States irrespective of the lack of evidence that his alleged criminal conduct affected the United States.

## ANALYSIS

### *1. The Money Laundering Counts Lack Venue In This Court*

The most extreme example of the endemic problems in this case is with the Government's ever shifting arguments to support venue. A comparison of their representations concerning the role of the "server" in Richmond, Virginia, makes the point clear:

In its Opposition to the defendant's motion to dismiss, the prosecutors argued that the server "processed" the wire transfer, writing:

> The Richmond, Virginia server rotated into use on February 19, 2021, and the government has been informed by Bank of America that the Richmond server processed the transaction.

ECF 123 at p. 4.

In its post-hearing memorandum, after hearing the testimony of the defense witness, the

Government offered an entirely different theory as to the server's role:

> It is anticipated at trial that a Bank of America employee would testify that if the transaction failed the compliance test that the transaction would not proceed. In other words, for Bank of America, passing the compliance check would be considered a necessary prerequisite.

ECF 155 at p 14. The Government's representation as to the expected trial testimony is not only diametrically different than its prior proffer but is also missing an essential element. The Government does not contend that the "server" allegedly located in Richmond, Virginia was the location where the compliance check took place. For all anyone knows (and of course the burden is with the prosecution), the server just passed the data concerning the wire to some other location, where the actual check was conducted.

More importantly, however, the venue provision in the money laundering statute, however, does not link jurisdiction to events that are a "necessary prerequisite" to the transaction. By its unequivocal terms, venue is any district where the "financial or monetary transaction is conducted." A transaction includes:

> A transfer between accounts … or any other payment, transfer, or delivery, by through, or to a financial institution, by whatever means effected," and, for purposes of venue, the **transfer of funds from one place to another**, by wire or other means, constitutes a single, continuing transaction.

18 U.S.C. §§ 1956(c)(3), 1956(i)(3)(emphasis in original).

The Government's post hearing memorandum concedes that the wire transfer did not transfer through Virginia. Rather, the server related to an independent bank compliance process. Whether the compliance check was necessary or facilitated the wire is irrelevant because the plain language of the money laundering statute does not include those terms – or such usage – as a predicate for venue. In reaching decisions about venue, the Court should be careful to separate "essential conduct elements" from "circumstance element[s]." United States v. Diab, 2023 WL 11016447 at *9 (D. Mass.). The server's involvement was less than circumstantial: it was fortuitous, *de minimis*, and wholly coincidental – particularly given the Government's assertion

that the "server" changes every four months. The constitutional guarantee of venue should not be held hostage to such ephemeral circumstances.

The Government's other alternative arguments to establish venue should likewise be rejected. The first argument is that phone calls were made to this jurisdiction. The Government represented to the Court as follows:

> an undercover officer (UC) received phone calls and text messages within the Eastern District of Virginia, wherein a member of the conspiracy asked the UC if the UC could contact co-defendant Federico Santoro in order to facilitate getting more time to pay back drug money owed to the defendant.

ECF 155 at p.17. This explanation is completely at odds with the information contained in a request for a search warrant of the UC's phone. In that sworn affidavit (where the person who called the agent is designated as "CC-1), the DEA undercover agent wrote: [1]

> In February and March of 2021, through a series of recorded conversations and text messages with CC-1, I arranged to deliver in Belgium 80,700 Euros (approximately $100,000 in U.S. currency at the time) in bulk currency to an associate of CC-1 to be laundered and sent to the United States. CC-1 agreed to launder the bulk currency he believed to be drug proceeds for a 6% charge. . . . .
>
> The undercover funds were dropped off and provided to CC-1's associate to launder but they were not successfully returned to the United States. According to CC-1, this is because the Portugal-based account in which the funds were placed for further movement was frozen by Portuguese authorities. I continued to communicate with CC-1 regarding the funds and he maintained that he could get them back to me. On May 13, 2021, I received a call from CC-1 who informed me that he was receiving death threats if money was not returned to the organization that he moved it for. He contacted me about these threats because, believing that I worked for a Mexican drug trafficker, he wondered if my boss and organization may have been responsible for the threats.

There is no mention of the defendant in this summary and for good reason. The $100,000.00 that was sent to CC-1 and thereafter lost had nothing to do with him. The Government contends that the defense version of the facts is "wrong," but it is based entirely on the discovery materials produced by the prosecution. This Court should assume the truthfulness of the sworn statement of the

---

[1] A copy of the search warrant affidavit was previously provided to the Court under seal.

DEA agent in support of the search warrant and conclude that the phone calls from CC-1 to the agent were part of a separate money laundering conspiracy and do not establish venue in this jurisdiction.

Finally, the Government also asserts that there is venue because the defendant was "first brought" the Eastern District of Virginia pursuant to 18 U.S. Code Section 3238. Despite the Government's concern that the defense "declined to address" this argument, the issue was directly addressed in the defense post-hearing Memorandum, which demonstrated that "first brought" has no application to this case because some of the conduct allegedly took place in the United States. ECF 156 at pp. 7-8.

In United States v. Mallory, 337 F. Supp. 3d 621, 632 (E.D. Va. 2018), for example, the court ruled that "by its own terms, venue is not established under Section 3238 when the defendant commits the essential conduct constituting the offense within the United States." See also United States v. Pace, 314 F.3d 344, 351 (9th Cir. 2002)(Section 3238 "does not apply unless the offense was committed entirely on the high seas or outside the United States"). Because the Government alleged in the Second Superseding Indictment that overt acts in this case took place *inter alia,* in New York, this venue statute does not apply and the location where the defendant was a "first brought" is of no legal consequence.

For all these reasons, Counts Three and Four must be dismissed for lack of venue.

### 2. *The Narco-Terrorism Charge Is Not Supported By The Government's Allegations And Violates Due Process*

Count One of the Second Superseding Indictment charges that defendant with "Narco-Terrorism." The statute requires proof that the defendant: (1) committed a drug offense that would be punishable in the United States pursuant to the domestic drug statute if committed in this country; and (2) gave something of pecuniary value to an organization that engaged in terrorist activity or terrorism. More importantly, jurisdiction exists only when **"the offense, the**

**prohibited drug activity, or the terrorist offense occurs in or affects interstate or foreign commerce.** 18 U.S. Code Section 960a(b)(1)(emphasis added). The Government has failed to establish the essential elements of the offense and its arguments to the contrary should be rejected.

***A. No Thing Of Pecuniary Value Was Given By The Defendant To A Terrorist Group***

The Government has not identified what thing of value that the defendant gave to any alleged terrorist organization. The prosecution instead describes the defendant's alleged drug proceeds circulating among his alleged co-conspirators. Notably, co-conspirator Santoro was not charged with narco-terrorism. There is nothing to establish that the defendant's drug proceeds were delivered to a terrorist organization – as opposed to furthering his own personal monetary gain.

The prosecution now alleges that "the defendant's organization engaged in terrorist activities like bombing police stations, threatening and even killing other members of law enforcement, and other brazen acts of violence." ECF 155 at p. 7. In that regard, the Court should recall that the Superseding Indictment alleged that the motivation for the defendant's alleged violence activities was completely different: The prosecutors alleged that:

> During the course of the conspiracy, MARSET and SANTORO threatened violence against others in order to protect the carrying on of their drug trafficking and money laundering activities.

ECF 20 at para. 8. This ever-changing interpretation of the facts is emblematic of this case. Whenever the defense identifies a fatal factual error, the prosecution simply reinterprets its own evidence.

The Government's alternative theory that the defendant provided something of pecuniary value to a terrorist organization fairs no better. The prosecution contends that the defendant aided

two other groups: Colombia's Clan de Golfo (CDG) and Brazil's PCC. But the Government concedes that neither group was designated as a Foreign Terrorist Organization at the time the defendant was allegedly involved with them. The government's post-hearing submission acknowledges that the defendant "partnered with organizations that would subsequently be designated as Foreign Terrorist Organizations ("FTOs")." ECF 155 at p. 8. As explained in the following section, due process requires that the defendant have reasonable notice that his conduct would subject him to prosecution in the United States. The designation of the CDG and the PCC is precisely the type of event that would have been unknown, unknowable, and unforeseen to a reasonable person in the defendant's position.

Finally, the defendant's alleged conduct in this case does not even remotely satisfy the statutory definition of "terrorism," which means "premeditated, politically motivated violence perpetrated against noncombatant targets by subnational groups or clandestine agents." 22 United States Code Section 2656f(d)(2).

***B. Due Process Bars This Prosecution***

The Government has also conceded that the due process clause imposes limitations on the ability of the United States to bring criminal charges against a foreign national for entirely extraterritorial conduct. The Fourth Circuit has used the "arbitrary" and "fundamentally unfair" framework in analyzing nexus claims under the Due Process clause. United States v. Murillo, 826 F.3d 152, 157 (4th Cir. 2016). The narco-terrorism statute's built-in requirement limits jurisdiction to those cases where **"the offense, the prohibited drug activity, or the terrorist offense occurs in or affects interstate or foreign commerce."**

In this case, the Government does not rely upon either the defendant's alleged drug activity or the alleged terrorism offenses to establish a connection with the United States. And

the prosecution must know that because they have instead asked this Court to rely upon the other charged offenses to satisfy due process. The Government asserts that due process is not violated by the narco-terrorism charge because:

> the fact that millions of the defendant's drug dollars were coming through U.S. banks to fund more drug trafficking and terrorism is a clear indication that the offense affected significant American interests. Of course, beyond using our financial system as a clearinghouse for drug proceeds, the defendant also: conspired to traffic cocaine on the high seas in violation of the MDLEA, trafficked cocaine into the United States, and conspired with people in the United States to ship cocaine around the world. He threatened American law enforcement, and partnered with organizations that would subsequently be designated as Foreign Terrorist Organizations ("FTOs"), officially recognizing the effect that these groups have historically had on our country. These are all significant American interests; any one of them is enough to satisfy the Due Process inquiry.

ECF 155 at pp. 6-7.

This analysis, however, is completely inconsistent with the statutory requirements for venue in the narco-terrorism statue, which is strictly limited to circumstances where the drug trafficking and/or terrorist activity affect foreign commerce. [2] This Court should reject the Government's bootstrapping argument to rely upon other counts in the SSI to establish jurisdiction for the narco-terrorism charge. In this case, the Government has the burden "of establishing by a preponderance of the evidence that venue is proper with respect to each count charged against the defendant." United States v. O'Donoghue, 2026 WL 2110788, at *4 (D.D.C.). The prosecution is apparently under the mistaken belief that venue can be established by mixing and unrelated criminal counts. This Court should reject that effort and as a result, Count One should be dismissed.

**3. The Defendant's Post-Arrest Statements Should Be Suppressed**

The principal questions presented by the motion to suppress his post-arrest statements is

---

[2] The reference to the "offense" in the statute can only be understood to refer to 18 U.S. Code Section 960a, no to other offenses in the case.

whether: (1) the defendant's invocation of his request to speak with an attorney in Bolivia render all his subsequent statements inadmissible; and (2) whether the circumstances surrounding the alleged *Miranda* waiver at Dulles Airport is credible. The defendant believes that the defendant sufficiently invoked Miranda in Bolivia such that all future statements must be suppressed. With respect to Dulles Airport, the facts admitted to by SA Greisen show a calculated effort to improperly convince the defendant to waive his rights upon the threat of a life sentence in jail and the promise of a reduction in his period of incarceration if he "cooperated" by admitting to guilt and speaking about others during the interview. With respect to Greisen, it should also come as no surprise that the Government's witness did not admit to manipulating the process – what this Court should focus on is the circumstances and the result – which more than amply justify the defense position.

The Government acknowledged in its post hearing memorandum that at the airport in Boliva, the defendant stated: "[a]nd my lawyer?" immediately after being advised of his *Miranda* rights. ECF 255 at p., but that excerpt lacks context. Rather, the agent asked the defendant as follows: and received the following reply:

> Q. Are you willing to answer some questions? It does not have to be now. It can be later on
> A. And my lawyer?
> Q. You can have one. However, you understand your right, don't you?
> A. Yes

Gov. X. 2A.

Based upon the reply, the agents immediately stopped any interrogation. While the prosecution argues that the defendant's comments was "similar in tone to these many remarks that Courts have held did not constitute an invocation of counsel," that conclusion is without

basis. ECF 155 at p. 2. The defendant's question about his attorney was a clear indication that he wanted one present, particularly since he knew he was being transported to the United States. The agents' decision to terminate the interview blocked the defendant from completing his request. Thus, all future statements should be suppressed.

The sequence of events at Dulles Airport should also lead this Court to suppress the defendant's statements. The Government concedes that SA Greisen spoke to the defendant and discussed the possibility of a life sentence, which included displaying the sentencing guideline table. Greisen further explained that the vehicle to get "points" off the sentence was to cooperate. It is little wonder that the defendant felt compelled to sign the *Miranda* waiver and speak, since the circumstances presented to him made confessing the only reasonable alternative.

This Court should examine the putative waiver in light of Greisen's intentional failure to record the conversation at Dulles Airport. The Government post-hearing memorandum did not discuss, did not mention, Greisen's failure to record the interview, or his post-hoc excuse for not doing so. There was no valid why Greisen chose not to record the interview – which of course would have left no doubt about exactly what transpired at the airport. His post-hoc claim that the DEA regulations prevented him from doing so is not supported by the regulations or by common sense. The agents in the airport in Peru and on board the plane en route to Peru were able to record their discussion with the defendant and Greisen could have done the same. Greisen admitted that he had his phone with him at Dulles Airport but intentionally chose not to memorialize his interrogation. The obvious and inexorable conclusion is that Greisen did not want anyone in the future to listen to his manipulation of the defendant, which would have revealed the violation of his *Miranda* rights. The Court should thus suppress any statement made at Dulles Airport and prevent its introduction during the Government's case-in-chief at trial.

### *4. The MDLEA Charge In Count Two Must Be Dismissed Or Appropriate Steps Taken To Protect The Defendant's Right To A Fair Trial On This Charge*

The Government argues in its post-hearing memorandum that the defendant "admits" that the vessel stopped by Colombian authorities was stateless and "abandons" his argument regarding certification. ECF 155 at p. 11. That is not what occurred. What the defendant acknowledged, in the Government's own words, was that "if this is not a flagged vessel, no certification is needed." Tr. 70. That is a conditional statement about the law: if the premise is satisfied, the consequence follows.

Jurisdiction under the MDLEA is a preliminary question for the Court to decide and the Government must establish its factual prerequisites by a preponderance of the evidence. 46 U.S.C. § 70504(a). The Government asserts that the vessel stopped by Colombian authorities was stateless, but the Government has the burden of proof with respect to this allegation. The defense does not concede that the vessel was stateless, nor does it concede the coordinates of the alleged stop, the chain of custody of the substance removed from the vessel, or that the interdiction occurred in international waters as required by the MLEA. The defense likewise cannot determine if the charge against the defendant has any validity.

The defense is without the ability to make a principled decision – or make appropriate legal arguments - as to any of these matters because: (1) no discovery concerning the defendant's alleged role in the offense has been provided; and (2) the reports provided in discovery concerning the investigation and seizure of the vessel are inconsistent with the claims by the prosecution in its pleadings. Moreover, the fate of the seized substances remains unknown to the defense and the loss and/or destruction of the putative controlled substance calls into question an essential element of the MDLEA charge. As the Court knows, the fast boat crew members were released from custody in Colombia.

In the final analysis, the defense asks that the Court require the Government to produce the original documents bearing on the jurisdictional prerequisite and conduct a brief evidentiary hearing prior to trial. The defense asks that the Court defer its decision on jurisdiction until the Government meets that burden.

### 5. *The Court Should Conclude That Institutional Pressure Was The Motivation For This Case*

This prosecution appears to be a theory in search of facts. A neutral review of the events that underlie the defendant's capture in Bolivia and his expulsion demonstrate the desire of the United States to bring him to this country, regardless of the international treaty between our nations and the safeguards in place to protect his rights. The money laundering conspiracy charge that launched this case has no venue with this jurisdiction. The testimony of the defense witness at the motions hearing that the "server" has no role in the wire transfer and the Government's remarkable change as to its theory of venue are further evidence in support of this claim. The addition of a narco-terrorism charge without a sufficient factual predicate confirms that the motivation was to get the defendant and charge him at all costs.

The designation of the motion to dismiss for vindictive prosecution is not a libel against the prosecutors and agents in this case, after all, they are not the ultimate decision makers. But it seems clear that as an institution, the Government of the United States made the strategic decision to charge Sebastian Marset in this Court irrespective of the lack of evidence. If the United States wants to be the world's policeman, at a minimum it should follow the requirements of our domestic law. If this Court independently reviews the historical predicate, the legal and jurisdictional problems inherent in the case, and the extraordinary lengths that the Government went through to place the defendant into custody and bring him to this Court, it should reach the

same conclusion. As a result, it should scrutinize the motive for this case and carefully consider whether it should impose an appropriate remedy, up to and including dismissal of the charges.

**CONCLUSION**

For all the reasons set forth herein, the Court should grant the defense motions to dismiss Counts One, Three and Four and the motion to suppress statements. At a minimum, the Court should also require additional discovery as to the MLDEA count and reserve decision as to whether jurisdiction for that count exists until such further information is provided

Respectfully submitted,

/s/ Sandi S. Rhee

Sandi S. Rhee
Counsel for the Defendant
10001 Georgetown Pike, #63
Great Falls, VA 22066
(202)285-8366
SandiRheeLaw@Gmail.com
VA Bar No. 47328

Joseph King

Joseph King
VA Bar #65632
King, Campbell, Poretz & Mitchell Pllc.
118 N. Alfred Street
Alexandria, VA 22314
(703) 683-7070 (o)
(703) 652-6010 (f)
jking@kingcampbell.com

Robert Feitel

Robert Feitel
1300 Pennsylvania Avenue, N.W
#190-515

Washington, D.C. 20004
202 255 6637 (cellular)
District of Columbia Bar 366673
*Pro Hac Vice*

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was sent via ECF to Anthony Aminoff and Catherine Rosenberg, Assistant United States Attorneys for the Eastern District of Virginia, 2100 Jamieson Avenue, Alexandria, VA 22314, and current defense counsel this 14th day of October, 2026.

/s/ Sandi S. Rhee

Sandi S. Rhee