IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>SEBASTIAN ENRIQUE MARSET CABRERA,<br><br>Defendant. | Case No. 1:23-CR-143<br><br>Hon. Rossie D. Alston |

**GOVERNMENT'S MOTION *IN LIMINE* TO ADMIT STATEMENTS OF CO-CONSPIRATORS**

The United States of America, through undersigned counsel, hereby respectfully moves this Court for a pretrial ruling to admit certain categories of statements against defendant Sebastian Marset Cabrera, pursuant to Fed. R. Evid. 104, 801(d)(2)(E), and prevailing case law.

## I. Overview of the Charged Conspiracies and Relevant Facts[1]

The defendant is charged by indictment with a narco-terrorism conspiracy, in violation of 21 U.S.C. Section 960a (Count 1), a conspiracy to violate the Maritime Drug Law Enforcement Act (MDLEA), in violation of 46 U.S.C. Section 70503 and 70506 (Count 2), and a conspiracy to launder money, in violation of 18 U.S.C. § 1956(h) (Count 3). The defendant is also charged with a substantive money laundering count, in violation of 18 U.S.C. § 1956 (Count 4). The focus of this motion is to admit certain categories of statements made in furtherance of the money laundering conspiracy.

[1] The government has not included all of its evidence that would go to show the existence of the conspiracy or defendant's participation in it. Rather, this proffer highlights for the Court some of the government's evidence in order to establish, by a preponderance of the evidence, the existence of a conspiracy and the roles of the various conspirators. Thus, this proffer does not list all of the government's witnesses, nor does it provide all of the evidence that will be presented by those witnesses who are named. Furthermore, official court-certified translations are still being finalized, and all quotations attributed herein are draft translations only.

### a. The Money Laundering Conspiracy

The defendant's money laundering conspiracy spans from approximately 2018 up to and including 2023. A particular focus of the government's case will be the time period of early 2021. As delineated below, an individual using the aliases "Madrid" and "Lisboa" (hereafter, "Madrid") sold cocaine in Europe that was supplied by the defendant. The defendant used two money launderers to repatriate money generated by Madrid from drug sales and transfer it back to the defendant in South America: (1) Federico Santoro, and (2) an individual using the alias Tony Stark. One individual working for Santoro in furtherance of this money laundering scheme was the subject of an undercover operation, as further described below.

#### 1. *The Undercover Operation*

Beginning on approximately January 25, 2021, an undercover officer (UC) based in Chantilly, VA contacted an individual (hereinafter, referred to as "the Unindicted Co-Conspirator") that the UC would later learn worked for Federico Santoro. *See* US-55996.[2] The UC, posing as an individual involved in drug trafficking, contracted with the Unindicted Co-Conspirator to launder proceeds represented to be from the sale of drugs. *See* US-56635. The funds were not transferred by the Unindicted Co-Conspirator due to the bank account being frozen. *See* US-56010.

On May 11, 2021, the UC and the Unindicted Co-Conspirator spoke by telephone, with the Unindicted Co-Conspirator explaining that there was a lot of money still blocked by the bank in Portugal, not just the UC's money—but additional funds. *See* US-56011. On May 13, 2021, the Unindicted Co-Conspirator explained that he/she had been laundering funds for someone named

[2] Bates numbers are included as a courtesy to defense counsel. The referenced documents are not the only ones in discovery supporting the assertion, but they provide some background for defense counsel in an attempt to minimize factual disputes.

Federico Santoro and he/she was now receiving threats from Santoro and one of Santoro's partners because he/she had been unable to deliver the money as promised. *See id.* The Unindicted Co-Conspirator explained that he/she earned a commission on the transactions with Santoro. *Id.* The Unindicted Co-Conspirator explained that Santoro was not the owner of the money and that he/she wanted to speak with the owner of the money. *Id.* The purpose of speaking to the owner of the money was to inform him that the money was not stolen, and to provide proof that it was because the account was frozen. US-56256. The Unindicted Co-Conspirator acknowledged that when a person steals, they have to die. *Id.* The Unindicted Co-Conspirator stated that he/she wanted to pay the money, but needed some time to pay it since the money was blocked. *Id.* The Unindicted Co-Conspirator said that if he/she could just speak to Santoro's boss, he/she would be willing to provide collateral or to acquire cocaine for the boss if need be to pay him back. US-56256, 56259. The Unindicted Co-Conspirator did not know the identity of the boss but understood that the boss worked with Brazil's PCC and that his group was from Uruguay and Paraguay. US-56291, US-56292.

Given that the UC had represented himself to be or be affiliated with a large-scale drug trafficker, the Unindicted Co-Conspirator asked the UC if the UC knew the owner of the money that the Unindicted Co-Conspirator was laundering for Santoro. *See, e.g.,* US-56258. The UC requested that the Unindicted Co-Conspirator send details regarding the work that the Unindicted Co-Conspirator was doing for Santoro. *See* US-56293. The Unindicted Co-Conspirator explained that he/she believed the problem originated in Chile because the accounts being used there were receiving high payments. *Id.*

The Unindicted Co-Conspirator sent photos of accounts where he/she was sending money for Santoro. *See* US-56012, 56013. The details included the company name, the bank name, the

account number, and other identifying information. The UC told the Unindicted Co-Conspirator, "[t]hese companies have nothing to do with us," but the UC still offered to help, writing: "I'm trying to send Federico a message. We have people who know the guy." US-56556. The Unindicted Co-Conspirator replied, "I understand…I'm going to send you a report of everything we have gotten with [Santoro] and paid." US-56556, US-56557. The Unindicted Co-Conspirator then sent a six-page document listing approximately 14 million dollars of money transfers that he/she conducted for Santoro (hereinafter, "the Ledger"). *See* US-56013, US-55975.[3] "The Ledger" also contains notations for when money is picked up, typically denoted with a token number. US-55975. The money owed by the Unindicted Co-Conspirator to Santoro increased based on the amount picked up; the money owed by the Unindicted Co-Conspirator to Santoro decreased after each outgoing wire transfer. *Id.*

The Unindicted Co-Conspirator subsequently came to the United States and the DEA downloaded the contents of the Unindicted Co-Conspirator's phone. Notably, the government obtained from the Unindicted Co-Conspirator's phone a WhatsApp conversation between the Unindicted Co-Conspirator and Santoro, wherein they coordinate the logistics for pickup of bulk currency, create false invoices in furtherance of wire transfers, discuss timing and amounts of transfers, and otherwise carry out the conspiracy. *See* US-197942.

The government anticipates at trial testimony from a cooperating witness that authenticates the Ledger as documenting transactions done by the Unindicted Co-Conspirator for Santoro in furtherance of the scheme to launder money for the defendant.

[3] The government was able to verify most of these transactions. Specifically, the government was able to subpoena U.S. correspondent banks that process dollar transactions for the particular foreign accounts used by Santoro and the Unindicted Co-Conspirator, and have thus corroborated approximately $9,146,976 worth of transfers listed on the spreadsheet.

2. *Evidence Surrounding the Connection between Madrid, Santoro, and the Defendant*

Witness testimony from co-conspirators will establish that Madrid worked with the defendant for years to sell cocaine for him, primarily in Europe. Indeed, there are numerous Sky ECC chats between them discussing various, multi-thousand kilogram loads of cocaine.

Witness testimony from co-conspirators will also establish that Santoro worked for the defendant for years to launder hundreds of millions of dollars for him. Indeed, their Sky ECC chats together reveal discussion of laundering many millions of dollars.

On December 26, 2020, the defendant, over the Sky ECC platform, texted a picture of Santoro and Madrid to a third party and said that he was with them.[4] Witness testimony will confirm that they were, in fact, meeting to plan for the laundering of multi-million dollar sums of drug proceeds beginning in early 2021. In early January 2021, the defendant passed Madrid's SkyECC PIN to Santoro.[5]

On February 9, 2021, the defendant[6] texted Madrid over the SkyECC platform the chart contained on page 5 of the Second Superseding Indictment (hereinafter, "the Chart"). The Chart, which witness testimony will establish was made by Santoro to depict the money owed by Madrid to the defendant, is reproduced below. Four of the tokens from the Chart are present in the Ledger passed by the Unindicted Co-Conspirator to the UC. Tokens referenced in the Chart and Ledger and also present in the WhatsApp chat between the Unindicted Co-Conspirator and Santoro.

---

[4] Marset, using PIN MIGWVF, texted the image to PIN nuuq73, writing "Here I am with Captain [Santoro] and the Beard [Madrid]."
[5] On January 4, 2021, the defendant, using MIGWVF, passed the contact to Santoro, who was using PIN xat3q9.
[6] The defendant texted using Sky ECC pin MIGWVF to Madrid, using 1RXKK5.

| | USD Madrid Owes<br>USD DEBE MADRID<br>7.695.000 | Madrid Owes<br>DEBE MADRID<br>17.822.000 | TOKEN | Date<br>FECHA | Place<br>LUGAR |
|---|---|---|---|---|---|
| | | -1.000.000 | MA 1004 | 05/01/2021 | CAPTAIN |
| | | -500.000 | MA 4202 | 06/01/2021 | TONY |
| | | -500.000 | 2600 | 09/01/2021 | TONY |
| | | -500.000 | VA 9087 | 13/01/2021 | TONY |
| | | -500.000 | YA 3714 | 14/01/2021 | CAPTAIN |
| | | -1.000.000 | YA 3679 | 15/01/2021 | CAPTAIN |
| | | -500.000 | PA 6251 | 19/01/2021 | TONY |
| | | -1.000.000 | MA 4564 | 25/01/2021 | CAPTAIN |
| | | -1.500.000 | YA 8042 | 05/02/2021 | CAPTAIN |
| | | -500.000 | MA 5893 | 09/02/2021 | TONY |
| Owes USD<br>DEBE USD | 7.695.000 | 10.322.000 | DEBE EUROS<br>Owes Euros | | |

3. *Evidence Surrounding Bulk Cash Deliveries to the Unindicted Co-Conspirator*

The government will present detailed evidence surrounding four of the cash deliveries noted in the Ledger and contained on the Chart above. The cash deliveries involve bulk cash going from Madrid's people to Santoro via the Unindicted Co-Conspirator. The purpose of these deliveries was so Santoro could launder the funds, in dollars, back to South America for the defendant. Two examples of the kinds of evidence that government will present are below.

i. The January 5, 2021 Delivery of 1 Million Euros

On January 4, 2021, Santoro, using PIN XAT3Q9 on Sky ECC, provided token MA1039651004 for a value of 1 million Euros to Madrid (using PIN 1RXKK5). This means that Santoro's people will collect 1 million Euros of the defendant's drug money from Madrid.

Also on January 4, 2021, the defendant himself, using PIN MIGWVF, texted Madrid, "Token MA 1039651004, Value: 1,000,000 Lisboa. First token for the disbursement of funds."

On the Ledger provided by the Unindicted Co-Conspirator, he/she has an entry representing this pickup and the corresponding value in US Dollars minus a commission fee

(1,162,135). The entry contains the first two letters and last four digits of the token number. An excerpt is below:

| | | | | | | |
|---|---|---|---|---|---|---|
| 23,447 | 28/12/20 | EXTORNO ELSIE 51.000 | 51,000.00 | | 124,321.70 | DB |
| 23,448 | 28/12/20 | PAGO CAMILA 74.321 USD | | 74,321.00 | 50,000.70 | DB |
| 23,510 | 04/01/21 | PAGO CAMILA USD 50K | | 50,000.00 | 0.70 | DB |
| 23,543 | 05/01/21 | op 1k euros lisboa tkt ma 1004 | 1,162,135.00 | | 1,162,135.70 | DB |
| 23,570 | 07/01/21 | PAGO CAMILA 50.000 REF ALBINO 22 10 | | 50,000.00 | 1,112,135.70 | DB |
| 23,571 | 07/01/21 | PAGO ELSIE 134K | | 134,000.00 | 978,135.70 | DB |
| 23,622 | 08/01/21 | PAGO ELSIE 45.000 USD | | 45,000.00 | 933,135.70 | DB |
| 23,623 | 08/01/21 | PAGO CAMILA 47.000 | | 47,000.00 | 886,135.70 | DB |
| 23,624 | 08/01/21 | PAGO CAMILA 40.000 USD | | 40,000.00 | 846,135.70 | DB |

The pickup is also noted in the first line of the Chart prepared by Santoro (wherein he is denoted as "Captain."). Witness testimony will confirm that the pickup coordinated by the Unindicted Co-Conspirator and noted as "ma 1004" on the Ledger refers to the same one discussed on Sky ECC under token MA 1039651004.

ii. The February 5, 2021 Delivery of 1,500,000 Euros

Between February 3 and February 5, 2021, the Unindicted Co-Conspirator and Santoro texted over WhatsApp to coordinate another money pickup. On February 3, 2021, Santoro asked the Unindicted Co-Conspirator to provide him with a token number for 1.5 and he/she sends a picture with a banknote with serial number YA3361088042.




*Image passed over WhatsApp between Santoro and Unindicted Co-Conspirator*

Later on February 3, 2021, Santoro passed the same token number, with a value of 1,500,000, to Madrid over Sky ECC. On February 4, 2021, Santoro confirmed the pickup time for the Unindicted Co-Conspirator, and on February 5, 2021, Santoro confirmed with the Unindicted Co-Conspirator what kind of car the Unindicted Co-Conspirator's courier would be driving. Santoro passed the information on to Madrid over Sky ECC. Later on February 5, 2021, at 9:55 AM, the Unindicted Co-Conspirator said the pickup is done, and at 10:02 Santoro sent a signed token that he received over Sky ECC from Madrid.




*Signed token sent by Madrid to Santoro Over Sky ECC*




*Forwarded image from Santoro to Unindicted Co-Conspirator over WhatsApp moments later.*

The defendant wrote later in the day to Madrid over Sky ECC, "Captain [Santoro] told me that he already received 1,500,000." The transaction is reflected on the second to last line of the Chart passed by the defendant. It is also logged in the Ledger passed by the Unindicted Co-Conspirator to the DEA UC, with the last four digits of the token noted. The amount of 1,703,551 reflects the exchange rate to US Dollars from Euros, minus a commission.

Página 4 Desde: 30/03/2020 Hasta: 30/03/2021 Fecha de emisión: 30/03/2021

| DOC Nº | FECHA | DESCRIPCION DEL MOVIMIENTO | ENTRA/DEBITO | SALE/CREDITO | SALDC |
|---|---|---|---|---|---|
| | | -01 | | | |
| 24,368 | 01/02/21 | PAGO CAMILA 100K USD REF 94267 AT E 29-01 | | 100,000.00 | 1,261,633.75 DB |
| 24,369 | 01/02/21 | PAGO 30-000 CAMILA REF 1132 DATE 2 8-01 | | 30,000.00 | 1,231,633.75 DB |
| 24,370 | 01/02/21 | 70.000 USD CAMILA REF 2125 DATE 28 -01 | | 70,000.00 | 1,161,633.75 DB |
| 24,371 | 01/02/21 | ELSIE 47.000 REF 9982 DATE 26-01 | | 47,000.00 | 1,114,633.75 DB |
| 24,372 | 01/02/21 | ELSIE 45.000 REF 9978 DATE 26-01 | | 45,000.00 | 1,069,633.75 DB |
| 24,373 | 01/02/21 | CAMILA 47.000 USD DATE 28-01N REF 2734 | | 47,000.00 | 1,022,633.75 DB |
| 24,374 | 02/02/21 | pago camila 150.000 | | 150,000.00 | 872,633.75 DB |
| 24,395 | 02/02/21 | PAGO ELSIE USD 150.000 REF 5987 | | 150,000.00 | 722,633.75 DB |
| 24,426 | 03/02/21 | camila 100.000 usd ref 2004 date 0 3-02 | | 100,000.00 | 622,633.75 DB |
| 24,434 | 03/02/21 | pago camila usd 153.000 | | 153,000.00 | 469,633.75 DB |
| 24,456 | 04/02/21 | TEXPORTO | | 20,810.00 | 448,823.75 DB |
| 24,457 | 04/02/21 | TOP CENTURY 28.870 | | 28,870.00 | 419,953.75 DB |
| 24,468 | 04/02/21 | PAGO FLASH 10.000 EUROS GRECIA | | 12,200.00 | 407,753.75 DB |
| 24,510 | 05/02/21 | op tkt 8042 date 05-02-1.500.000 p eniche | 1,703,551.00 | | 2,111,304.75 DB |

4. Additional Anticipated Testimony

The WhatsApp chat between the Unindicted Co-Conspirator and Santoro, along with witness testimony and financial records, will establish that the Unindicted Co-Conspirator organized fraudulent invoices and conducted wire transfers at Santoro's direction to repatriate the narcotics proceeds picked up. Witness testimony from a cooperating defendant will further establish that after the wire transfers were sent from Europe, in dollars, to various companies abroad, a cash payment was given in dollars to the defendant, typically in Paraguay, Peru, or Bolivia. For the deliveries made to "Tony Stark," the defendant messaged Santoro over Sky ECC the amount and token number and told him to notate it for their records.

Furthermore, after the defendant was arrested and flew from Bolivia with DEA agents, he had the following recorded exchange:

> **SA Reyes**: It [the indictment] basically says that you were trafficking cocaine to many places around the world…
> **Defendant**: Yeah.

> **SA Reyes**: …and the proceeds from that were sent by you to him [Santoro], or you were instructing him where to pick up the money because that money…
> **Defendant**: Yeah.
> **SA Reyes**: …belonged to you and he was laundering the money for you…
> **Defendant**: he would deliver the money in South America, I agree with that…I delivered the money to him in Europe, and he delivered it to me in South America.
> Gov. Ex. 3A, Pre-Trial Motions Hearing.

In short, the evidence will establish that the defendant sent cocaine to his co-conspirator (Madrid), who sold the cocaine in Europe and generated bulk Euros. Madrid then arranged for the transfer of bulk Euros with Santoro (Captain) and Tony Stark, with Santoro using the Unindicted Co-Conspirator to pick up the bulk cash and send the funds via wire transfer in dollars. Financial records will prove that millions of those dollars transited the United States financial system.

## II. Governing Law

The focus of the government's present motion is to admit statements made by the (1) the Unindicted Co-Conspirator to the undercover DEA agent, (2) statements made between the Unindicted Co-Conspirator and Santoro, and (3) statements made between Santoro and Madrid. All of these co-conspirator statements were in furtherance of getting the defendant's drug proceeds back to him.

### a. Background on Conspiracy Caselaw

It is axiomatic that a defendant may join the conspiracy "without full knowledge of all of the conspiracy's details, but if he joins the conspiracy with an understanding of the unlawful nature thereof and willfully joins in the plan on one occasion, it is sufficient to convict him of conspiracy." *United States v. Burgos,* 94 F.3d 849, 858 (4th Cir. 1996) (en banc) (brackets and internal quotation marks omitted). After a conspiracy is shown to exist, the evidence "need only establish a slight connection between the defendant and the conspiracy to support conviction." *United States v.*

*Brooks,* 957 F.2d 1138, 1147 (4th Cir. 1992). The existence of a "tacit or mutual understanding" is sufficient to establish a conspiratorial agreement, and the proof of an agreement "need not be direct"—it may be inferred from circumstantial evidence. *United States v. Ellis,* 121 F.3d 908, 922 (4th Cir.1997) (internal quotation marks omitted).

A money laundering conspiracy under 18 U.S.C. § 1956(h) requires proof of an agreement to commit money laundering, that defendant knew that at least some of the money was criminally derived, and he intended to join the conspiracy. *United States v. Green*, 599 F.3d 360, 374 (4th Cir. 2010); *United States v. Molina-Sanchez*, 630 F. App'x. 173 (4th Cir. 2015). Numerous cases uphold that any involvement in the planning or receipt of drug proceeds is sufficient for a money laundering charge. *See, e.g., United States v. Smith*, 44 F.3d 1259, 1266 (4th Cir. 1995) (person conducts a wire transfer when he is in constructive control of SUA proceeds and directs another to make the transfer); *United States v. Delgado*, 256 F.3d 264, 276–77 (5th Cir. 2001) (defendant who never handled money, but was one of several who planned sale of drugs and delivery of proceeds to original source, was guilty of conducting the transaction).

**b. Rule 801(d)(2)(E) and the Test for Admissibility**

Federal Rule of Evidence 801(d)(2)(E) provides that a "statement" is not hearsay if it "is offered against an opposing party" and is "made by the party's coconspirator during and in furtherance of the conspiracy." Admission of such co-conspirator statements against a defendant is proper if the court concludes: "(1) that there was a conspiracy involving the declarant and the party against whom admission of the evidence is sought and (2) that the statements at issue were made during the course of and in furtherance of that conspiracy." *United States v. Blevins*, 960 F.2d 1252, 1255 (4th Cir. 1992) (citing *Bourjaily v. United States*, 483 U.S. 171, 175 (1987)).[7]

---

[7] The Fourth Circuit also has formulated this test as three prongs, holding that the government must show that: (1) a conspiracy did, in fact, exist, (2) the declarant and the defendant were members of the conspiracy, and (3) the

"These preliminary questions are subject to a preponderance of the evidence standard of proof." *Bourjaily*, 483 U.S. at 175. In other words, "when the government shows by a preponderance of the evidence that a conspiracy existed of which the defendant was a member, and that the coconspirator's statement was made during the course of and in furtherance of the conspiracy, the statement is admissible." *United States v. Holmes*, 384 F. App'x 219, 225 (4th Cir. 2010) (citing *United States v. Squillacote*, 221 F.3d 542, 563 (4th Cir. 2010)); *see also United States v. Neal*, 78 F.3d 901, 904—05 (4th Cir. 1996). The indictment need not charge a defendant with a conspiracy for coconspirator statements to be admissible. *United States v. Jackson*, 757 F.2d 1486, 1490 (4th Cir. 1985); *United States v. Prieto*, 549 F.3d 513, 524 (7th Cir. 2008).

In determining admissibility of the statements, the court "is not precluded from examining the out-of-court statements sought to be admitted" and it "may consider those statements in conjunction with other evidence." *Bourjaily*, 483 U.S. at 181; *see also United States v. Fair*, 246 F. App'x 238, 240 (4th Cir. 2007) ("In resolving these preliminary factual questions for admissibility, the court may consider all evidence before it, whether admissible at trial or not, including the co-conspirator statements sought to be admitted.").

Moreover, the trial court is permitted to "conditionally admit co-conspirators' statements subject to the subsequent satisfaction of the requirements for their admission." *United States v. Hines*, 717 F.2d 1481, 1488 (4th Cir. 1983); *see also* Fed. R. Evid. 104(b) ("The court may admit the proposed evidence on the condition that the proof be introduced later.").[8] "Conditionally

---

statement was made in the course of, and in furtherance of the conspiracy. *United States v. Heater*, 63 F.3d 311, 324 (4th Cir. 1995); *see also United States v. Graham*, 711 F.3d 445, 453 (4th Cir. 2013). Notwithstanding whether the test is described as three prongs or two prongs, the essential elements of the test (the existence of a conspiracy between the declarant and the defendant and a statement made in the course of and in furtherance of that conspiracy) remain the same.

[8] The Court need not hold a separate hearing to determine the admissibility of co-conspirator statements. The Fourth Circuit has flatly rejected the "formalistic requirement that there must be a hearing to determine the existence of a conspiracy before the statements can be admitted under Rule 801(d)(2)(E)." *Blevins*, 960 F.2d at 1255 (citing *Hines*, 717 F.2d at 1488).

admitting the alleged co-conspirator's statements subject to subsequent satisfaction of the requirements for their admission at trial also avoids a lengthy mini-trial on the existence of the conspiracy which would likely be nearly as lengthy as the trial itself." *United States v. Seko*, 1:15-cr-301-JCC, 2016 WL 1586557, at *3 (E.D. Va. Apr. 19, 2016).

**c. Existence of and Membership in the Conspiracy**

On complicated issues such as the existence of a conspiracy, "individual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it." *Bourjaily*, 483 U.S. at 179-80. And "[p]roof of a conspiracy may of course be by circumstantial evidence; it need not and normally will not be by direct evidence." *Heater*, 63 F.3d at 323 (quoting *United States v. Giunta*, 925 F.2d 758, 764 (4th Cir. 1991), *overruled on other grounds by United States v. Burgos*, 94 F.3d 849 (4th Cir. 1996) (other internal citations omitted)).

**d. Statements Made "in Furtherance of" the Conspiracy**

"A statement by a co-conspirator is made 'in furtherance' of a conspiracy if it was intended to promote the conspiracy's objectives, whether or not it actually has that effect." *United States v. Shores*, 33 F.3d 438, 443 (4th Cir. 1994). For example, statements made by a conspirator to a non-member of the conspiracy are considered to be "in furtherance" of the conspiracy "if they are designed to induce that party either to join the conspiracy or to act in a way that will assist it in accomplishing its objectives." *Id.* at 444. "Most courts, including the Fourth Circuit, 'construe the in furtherance requirement so broadly that even casual relationships to the conspiracy suffice to satisfy the exception.'" *United States v. Smith*, 441 F.3d 254, 262 (4th Cir. 2006) (quoting Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* vol. 5, §§ 801.34[5], 801–89 (Joseph M. McLaughlin ed., 2d ed., Matthew Bender 2005)). "A statement may … 'be in furtherance of the conspiracy even though it is susceptible of alternative interpretations and was

not exclusively, or even primarily, made to further the conspiracy, so long as there is some reasonable basis for concluding that it was designed to further the conspiracy." *United States v. Thomson*, 634 F. App'x 100, 111 (4th Cir. 2016) (quoting *Shores*, 33 F.3d at 444).

To determine whether the statements were made in furtherance of the conspiracy, courts look to the context in which the statements were made. *United States v. Garcia*, No. 94-5117-19, 1996 WL 55992, at *6 (4th Cir. Feb. 9, 1996) (unpublished) (citing *United States v. Capers*, 61 F.3d 1100, 1106 (4th Cir. 1995)). "Rule 801(d)(2)(E) does not require that the witness [at trial] be a co-conspirator; it only requires that the declarant be a co-conspirator." *United States v. Martinez-Turcio*, 494 F. App'x 354, 361 (4th Cir. 2012) (citing *United States v. Ayala*, 601 F.3d 256, 268 (4th Cir. 2010)). Therefore, "statements 'made by a co-conspirator to a third party who is not . . . a member of the conspiracy' are admissible when made in the course and furtherance thereof." *Ayala*, 601 F.3d at 268 (quoting *Shores*, 33 F.3d at 444)).

## III. **Evidence Regarding the Existence of the Conspiracy and the Defendant's Participation in the Conspiracy**

In this case, the government will prove that the defendant conspired with Santoro and others to launder proceeds from the sale of cocaine in Europe back to himself in South America. The evidence to establish the existence of this conspiracy is overwhelming and the government's proffer here more than satisfies the preponderance standard for admissibility.

All the evidence together—the defendant's own statements over Sky ECC (passing token numbers and confirming deliveries), the proffered witness testimony about his meeting with Santoro and Madrid to plan the laundering of money (a meeting corroborated by the defendant's Sky ECC messages), the Chart prepared by Santoro and sent by the defendant to Madrid documenting the balance still owed, the Ledger obtained from the Unindicted Co-Conspirator documenting pickup of the tokens referenced, the WhatsApp chat between Santoro and the

Unindicted Co-Conspirator where they discuss in detail the pickup and transfer of the proceeds—all easily clear the preponderance standard to establish a conspiracy to launder money. On top of that, on the airplane from Bolivia to Peru with DEA, the defendant admitted to using Santoro to pickup drug money and deliver money to him in South America. Finally, Santoro has pled guilty to conspiring to launder money with the defendant. *See Fair*, 246 F. App'x at 240 ("In resolving these preliminary factual questions for admissibility, the court may consider all evidence before it, whether admissible at trial or not...").

The evidence is similarly conclusive that the Unindicted Co-Conspirator worked for Santoro and was part of the conspiracy to launder money. The Unindicted Co-Conspirator said exactly that to the DEA UC; witness testimony from a cooperating defendant at trial will confirm it. The Unindicted Co-Conspirator's WhatsApp and Ledger reference the very same tokens passed by the defendant, Santoro, and Madrid over Sky ECC. Thus, they all worked together to move drug money from Europe to South America in dollars and via the U.S. financial system.

## IV. Co-Conspirator Statements in Furtherance of the Conspiracy

### a. Statements made by the Unindicted Co-Conspirator to the DEA UC were in furtherance of the conspiracy.

The government seeks to admit certain statements made by the Unindicted Co-Conspirator to the DEA UC as in furtherance of the charged money laundering conspiracy, specifically: (1) when the Unindicted Co-Conspirator began explaining to the DEA UC that he/she has other money frozen that he/she was laundering for Santoro; (2) that the Unindicted Co-Conspirator wanted to speak to Santoro's boss, i.e. the owner of the funds, because he/she was being threatened; (3) the Unindicted Co-Conspirator's description of Santoro's boss's organization, i.e. affiliated with Brazil's PCC, made up of Paraguayans and Uruguayans, etc., to see if the DEA UC knew them; and (4) statements about the specific accounts he/she sent money to at Santoro's direction to help

further clarify if the DEA UC had any links to the money or organization, including the Ledger of transactions conducted by the Unindicted Co-Conspirator at Santoro's direction.

For each of these categories of statements, there is "some reasonable basis for concluding that it was designed to further the conspiracy." *Thomson*, 634 F. App'x at 111; *Smith*, 441 F.3d at 262 ("in furtherance" construed very broadly; even casual relationships to the conspiracy suffice). The Unindicted Co-Conspirator was looking for more time to pay back the money owed and to ensure he/she was not killed. The Unindicted Co-Conspirator wanted to present proof that the delay was due to the bank. The Unindicted Co-Conspirator believed that the DEA UC could help him/her get in touch with Santoro's boss. Once in touch with the boss, the Unindicted Co-Conspirator could appeal for more time to pay, offer collateral, and/or purchase cocaine to make up for the missing money. For that reason, the Unindicted Co-Conspirator provided the information—the accounts, the Ledger of transactions, the statements about Santoro and his bosses—to try to facilitate the DEA UC intervening on his/her behalf. It does not matter that the DEA UC was not a member of the conspiracy. *See Ayala*, 601 F.3d at 268. The salient point is that the Unindicted Co-Conspirator "intended to promote the conspiracy's objectives." *Ayala*, 469 F. Supp. 2d. at 363.

**b. Statements made between Santoro and the Unindicted Co-Conspirator were in furtherance of the conspiracy.**

The government seeks to admit Santoro and the Unindicted Co-Conspirator's discussions, including their WhatsApp conversation, surrounding the laundering of funds for the defendant. Specifically, Santoro and the Unindicted Co-Conspirator primarily discussed: (1) coordination of money pickups, including Santoro receiving tokens from the Unindicted Co-Conspirator which he would pass on to Madrid (and sometimes the defendant too); (2) directions as to where the Unindicted Co-Conspirator should send the money; (3) discussions of tradecraft, such as the size

of the bills received, use of invoices, locations for delivering the money, etc.; (4) discussions regarding the Unindicted Co-Conspirator's inability to deliver the money as directed.

These pickups were done for the defendant, to repatriate his drug proceeds from his co-conspirator Madrid back to South America. The tokens from the pickups are noted in the Chart sent by the defendant and witness testimony will further establish all of these transactions were done for him, with the other participants (Santoro, Unindicted Co-Conspirator) merely earning a percentage.

**c. Statements made between Santoro and Madrid were in furtherance of the conspiracy.**

Santoro and Madrid coordinated pickups of the defendant's drug money. They discussed locations and passed tokens. For the same reasons discussed above, these conversations are also clearly in furtherance of the charged conspiracy—it facilitated the delivery of drug proceeds from Madrid to Santoro's couriers, so that Santoro could direct wire transfers and receive corresponding cash payouts in South America to pay the defendant with.

## V. <u>Conclusion</u>

For the reasons stated herein, the government respectfully requests that the Court find, based upon this proffer, that co-conspirator statements are admissible under Rule 801(d)(2)(E). If the Court is not prepared to rule at this time that the statements are admissible, then the government respectfully requests that they be admitted conditionally, subject to Rule 104, until the government,

during its case-in-chief, has established by a preponderance of the evidence that a conspiracy existed and that the proffered statements were made in furtherance of the conspiracy.

Respectfully submitted,

Todd W. Blanche
Attorney General

Theophani K. Stamos
First Assistant United States Attorney

Date: November 11, 2026

By: /s/
Anthony T. Aminoff
Catherine Rosenberg
Assistant United States Attorneys
United States Attorney's Office
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone: (703) 299-3700
Anthony.Aminoff@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on the 11th day of November, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system.

/s/
Anthony T. Aminoff
Assistant United States Attorney