IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>SEBASTIAN ENRIQUE MARSET CABRERA,<br><br>Defendant. | Case No. 1:23-CR-143<br><br>Hon. Rossie D. Alston |

**GOVERNMENT'S MOTION *IN LIMINE* TO**
**ADMIT SUMMARY EVIDENCE**

The United States moves the Court to permit the government to introduce a summary chart of bank records pursuant to Federal Rule of Evidence 1006.

**RELEVANT FACTUAL BACKGROUND**

Beginning on approximately January 25, 2021, an undercover officer (UC) based in Chantilly, VA contacted an individual (hereinafter, referred to as "the Unindicted Co-Conspirator") that the UC would later learn worked for Federico Santoro. *See* US-55996.[1] The UC, posing as a drug trafficker, contracted with the Unindicted Co-Conspirator to launder proceeds represented to be from the sale of drugs from Portugal to the United States. *See* US-56635. The funds were not transferred by the Unindicted Co-Conspirator due to the bank account being frozen. *See* US-56010.

On May 11, 2021, the UC and the Unindicted Co-Conspirator spoke by telephone, with the Unindicted Co-Conspirator explaining that there was a lot of money still blocked by the bank in

[1] Bates numbers are included as a courtesy to defense counsel. The referenced documents are not the only ones in discovery supporting the assertion, but they provide some background for defense counsel in an attempt to minimize factual disputes.

Portugal; in other words, not just the UC's money—but additional funds. *See* US-56011. On May 13, 2021, the Unindicted Co-Conspirator explained that he/she had been laundering funds for someone named Federico Santoro and he/she was now receiving threats from Santoro and one of Santoro's partners because he/she had been unable to deliver the money as promised. *See id.* The Unindicted Co-Conspirator explained that he/she wanted to speak with Santoro's boss, i.e. the owner of the money. *Id.*

Given that the UC had represented himself to be or be affiliated with a large-scale drug trafficker, the Unindicted Co-Conspirator asked the UC if he knew the owner of the money that he/she was laundering for Santoro. *See, e.g.,* US-56258. The UC requested that the Unindicted Co-Conspirator send details regarding the work that the Unindicted Co-Conspirator was doing for Santoro. *See, e.g.,* US-56293.

The Unindicted Co-Conspirator sent details of accounts where he/she was sending money for Santoro. *See* US-56012, 56013. The details included the company name, the bank name, the account number, and other identifying information. The UC told the Unindicted Co-Conspirator, "[t]hese companies have nothing to do with us," but the UC still offered to help, writing: "I'm trying to send Federico a message. We have people who know the guy." US-56556. The Unindicted Co-Conspirator replied, "I understand…I'm going to send you a report of everything we have gotten with him [Santoro] and paid." US-56556, US-56557. The Unindicted Co-Conspirator then sent a six-page document listing approximately 14 million dollars of money transfers that he/she conducted for Santoro (hereinafter, "the Ledger"). *See* US-56013, US-55975. The Ledger is attached herein as Exhibit A (Under Seal). The government anticipates that witness testimony at trial will authenticate the Ledger as documenting wire transfers done for Santoro in furtherance of the money laundering conspiracy. It is styled as a "Bank Statement" ("Extracto de

Cuenta"), with the Unindicted Co-Conspirator's name on it.[2] It has the following columns: date ("Fecha"), a description of the money movement ("Descripcion del Movimiento"), amount coming in/owed ("Entra/Debito", which reflects when the Unindicted Co-Conspirator picked up bulk drug proceeds at Santoro's direction and typically contains a token number associated with the pickup), amount going out/credited ("Sale/Credito," which reflects when the Unindicted Co-Conspirator sent a wire transfer at Santoro's direction), and the balance ("Saldo"). The statement was prepared on "30/03/2021." The statement contains dates in a day, month, year format—a common convention in many parts of the world.

The DEA matched up the descriptions provided in the text messages with the Ledger to begin subpoenaing information. Most notably, the Unindicted Co-Conspirator sent details by text message to the UC of two companies: (1) **Camila** Imports and Exports and (2) **Elsie** Del Carmen Jorquera Olcay Chile. US-56160, US-56161. More than 70% of the transactions listed on the Ledger were listed as going to "Camila" or "Elsie," both of which had their account with Banco Santander Chile. Furthermore, the transactions documented in the Ledger were in dollars. As a result, the DEA researched which U.S. banks handled correspondent banking for Banco Santander Chile and sent subpoenas for dollar transactions processed to the accounts of Camila and Elsie.[3] These subpoenas identified the transactions listed on the ledger going to "Camila" and "Elsie," and also identified the Portuguese accounts that the Unindicted Co-Conspirator used to send the money. The DEA then sent additional subpoenas to the correspondent banks for the accounts of those Portuguese companies, which led to the identification of additional wire transfers listed on the Ledger.

---

[2] As noted in the government's other motions *in limine*, official, court-certified translations are being finalized, and all translations included in this motion are draft translations.

[3] As discussed in prior filings, if Foreign Bank 1 wants to send U.S. dollars to Foreign Bank 2, a U.S. bank (the "correspondent bank") will act as an intermediary to process the transaction.

## GOVERNMENT'S SUMMARY EVIDENCE

A financial analyst at DEA, working under the supervision of who was then the Original DEA Case Agent (who also served as the Undercover Agent communicating with the Unindicted Co-Conspirator), prepared a spreadsheet matching the information received from the Grand Jury subpoenas to the Ledger provided by the Unindicted Co-Conspirator (hereafter, "the Reconciliation Spreadsheet"). The Reconciliation Spreadsheet is attached as Exhibit B (Under Seal). The lefthand side of the Reconciliation Spreadsheet contains the information from the Ledger. The righthand side contains the information from the Grand Jury subpoenas, including: the correspondent bank, the date, the amount, the sender name, the sender bank, sender account number, receiver name, receiver bank, and receiver account. The last column, "bank fees," automatically tabulates the difference between the amount reflected on the Ledger compared to the amount reflected on the bank records. It is this Reconciliation Spreadsheet that the government seeks to admit at trial, pursuant to Federal Rule of Evidence 1006, through the testimony of either the Original DEA Case Agent or the DEA Financial Analyst.

The government believes it has identified approximately $9,146,976 of the transactions listed on the Ledger. The matching transactions in the bank records are to the recipients identified in the Ledger. They typically appear a few days after the notation in the Ledger (reflecting processing time for transactions) and are in amounts just under the amount noted in the Ledger (reflecting bank processing fees). The government has color coded the Reconciliation Spreadsheet to reflect the small differences in date, amount, or both.

For example, the first entry on the Ledger says, "I paid Elsie Date 27-10 USD 118.003." The date of the entry is "27/10/20." There is a credit on the Unindicted Co-Conspirator's balance of $118,003.50 as a result of the transaction noted on the Ledger. According to the bank records,

on October 27, 2020, BNY Mellon acted as the correspondent bank for a transfer from a Portuguese company to Elsie Del Carmen Jorquera Olcay in the amount of $117,858.75. *See* US-48672 (BNY Mellon Wire Transaction Advices, Row 280). The payment was received in the Banco Santander Chile account that was provided by the Unindicted Co-Conspirator in his/her discussions with the Undercover Agent. The approximately $144.75 difference between the amount noted on the Ledger compared to the amount reflected in the bank records is, according to anticipated expert testimony, consistent with banking fees.

Another example: according to row 22,450 of the Ledger (row 20 of the Reconciliation Spreadsheet), on November 4, 2020, the Unindicted Co-Conspirator sent "TT LianYungang USD 44.814," with credit of $44,818 applied to the balance owed. According to the bank records, BNY Mellon acted as the correspondent bank for a transaction from the Portuguese company Embalpet LDA (whose name appears elsewhere on the Ledger and who sent more than 20 of the transactions noted in the Ledger) to LianYungang Xinmeng Import and Export on November 8, 2020, in the amount of 44,699.73. *See* US-48672 (BNY Mellon Wire Transaction Advices, Row 8211). The differing amount (the bank records reflect $118.27 less) and the different date (4 days later) are consistent with processing time and bank fees.

A copy of the Reconciliation Spreadsheet was provided to the defense on or about May 7, 2026. The underlying financial records were produced to the defense on or about May 5, 2026.

## ARGUMENT

The Reconciliation Spreadsheet should be admitted under Federal Rule of Evidence 1006 because the underlying records are voluminous, admissible, and available to the defendant. Testimony from either the Original DEA Case Agent or the DEA financial analyst and the related Reconciliation Spreadsheet will assist the jury with understanding many hundreds, if not thousands, of pages of complex financial records.

### A. Federal Rule of Evidence 1006 Permits the Introduction of Testimony and Charts to Summarize Voluminous Records

Federal Rule of Evidence 1006 provides as follows:

> The court may admit as evidence a summary, chart, or calculation offered to prove the content of voluminous admissible writings, recordings, or photographs that cannot be conveniently examined in court, whether or not they have been introduced into evidence. The proponent must make the underlying originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court.

Fed. R. Evid. 1006(a) and (b).

The Advisory Committee notes for Rule 1006 add that "[t]he admission of summaries of voluminous books, records, or documents offers the only practicable means of making their contents available to judge and jury. The rule recognizes this practice, with appropriate safeguards." Fed. R. Evid. 1006; *see also United States v. Moore*, 843 Fed. Appx. 498, 504 (4th Cir. 2021) ("[the] purpose [of Rule 1006] is to reduce the volume of written documents that are introduced into evidence by allowing in evidence accurate derivatives."); *United States v. Johnson*, 594 F.2d 1253, 1255 (9th Cir. 1979) ("The purpose of Rule 1006 is to allow the use of summaries when the volume of documents being summarized is so large as to make their use impractical or impossible; summaries may also prove more meaningful to the judge and jury.").

A summary chart may be admitted as substantive evidence when the proponent establishes that the underlying data upon which the summary is based is voluminous, admissible, and available for inspection. *See* Fed. R. Evid 1006; *United States v. Janati*, 374 F.3d 263, 272–73 (4th Cir. 2004); *Johnson*, 594 F.2d at 1256. Although the materials underlying the summary chart must be admissible, the materials themselves need not be admitted into evidence. *Janati*, 374 F.3d at 273; *United States v. Rizk*, 660 F.3d 1125, 1130–31 (9th Cir. 2011). In addition, the summary chart must be "accurate, authentic, and properly introduced." *United States v. Scales*, 594 F.2d 558, 563 (6th Cir. 1979).

There is no requirement in Rule 1006 that it be literally impossible to examine the underlying records before a summary or a chart may be utilized. "All that is required for the rule to apply is that the underlying 'writings' be 'voluminous' and that in-court examination not be convenient." *Scales*, 594 F.2d at 562. Nor does the large size of a summary chart render it inadmissible when it contains otherwise unobjectionable objective evidence. *Id.* at 563. A summary chart does not necessitate expert testimony. Where a chart does not contain complicated calculations that would require an expert for accuracy, authentication of the chart requires only that the witness (1) have properly catalogued the records upon which the chart is based and (2) have knowledge of the analysis of the records referred to in the chart. *Id.* The use of other persons in the preparation of summary evidence does not affect its admissibility. *See id.* (holding that the agent "who supervised the compilation" of the summary chart "was the proper person to attest to the authenticity and accuracy of the chart"). Summary charts need not contain the defendant's version of the evidence. *See United States v. Lemire*, 720 F.2d 1327, 1349 (D.C. Cir. 1983) ("'A summary, to be admissible, we think need not give effect to the contentions of the accused.'") (internal citation omitted); *Barsky v. United States*, 339 F.2d 180, 181 (9th Cir. 1964) (rejecting

defendant's argument that summary did not contain his version of the case; accepting that argument "would be to hold that if a defendant had an alibi, no matter how improbable, then no expert could prepare a summary of the evidence tending to prove guilt").

**B. The Reconciliation Spreadsheet Is Admissible Under Rule 1006**

The Reconciliation Spreadsheet falls squarely within the ambit of Rule 1006 and should be admitted through the testimony of the Original Case Agent or the DEA Financial Analyst.

First, the underlying records are voluminous. Seven U.S. banks were involved in the transactions on the ledger as the "correspondent bank." The combined subpoena returns from these seven banks are large—likely more than a thousand pages. The records themselves can be complex and contain extraneous information. Indeed, it took the government many hours to sift through the records.

Second, the underlying records are admissible. Financial records are routinely admitted through a custodian of records, as contemplated by Federal Rule of Evidence 803(6), or even purely by affidavit, as contemplated by Federal Rule of Evidence 902(11). The financial institutions that produced the records—BNY Mellon, Citibank, JP Morgan, Wells Fargo, Standard Chartered, Bank of America, and Deutsche Bank—are prototypical examples of companies that are "acting routinely, under a duty of accuracy, with employer reliance on the result, or in short 'in the regular course of business.'" Fed. R. Evid. 803(6) Advisory Committee Notes. The underlying records were produced in Discovery Production 1 to original defense counsel on or about May 5, 2026.[4]

Third, the government has produced to the defendant the Reconciliation Spreadsheet. The Reconciliation Spreadsheet was emailed to defense counsel on or about May 7, 2026. New defense

[4] The government changed discovery processing systems in the summer of 2026. As a result, the material was re-produced to new defense counsel on or about July 30, 2026 with new Bates numbers from the new system.

counsel has confirmed that he has the Reconciliation Spreadsheet. The version that the government proposes to admit has a few minor edits, but is essentially the same as the one that defense counsel has possessed for months.

Fourth, the Reconciliation Spreadsheet is accurate and authentic and will be properly introduced by the DEA agent who oversaw this portion of the investigation, or the financial analyst himself who compiled the document. *See Scales*, 594 F.2d at 563. And, of course, the defendant will be free to cross-examine whichever witness offers it regarding any claimed inaccuracies.

Fifth, it is clear that the Reconciliation Spreadsheet will assist the jury in its deliberations to understand the nature of this money laundering conspiracy. Correspondent banking, which will be explained by an expert, is likely a foreign concept to the average juror. The chart makes clear how U.S. financial institutions were involved in allowing the defendant to run his cocaine empire and fund his terrorist activities. The Reconciliation Spreadsheet also candidly acknowledges small differences in dates and amounts by color coding the transactions appropriately.

## CONCLUSION

For these reasons stated herein, the government respectfully requests that the Court permit the government to admit the Reconciliation Spreadsheet (Exhibit B) pursuant to Federal Rule of Evidence 1006.

Respectfully submitted,

Todd W. Blanche
Attorney General

Theophani K. Stamos
First Assistant United States Attorney

Date: November 11, 2026

By: /s/

Anthony T. Aminoff
Catherine Rosenberg
Assistant United States Attorneys
United States Attorney's Office
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone: (703) 299-3700
Anthony.Aminoff@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on the 11th day of November, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system.

/s/
Anthony T. Aminoff
Assistant United States Attorney