UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

| | | |
|---|---|---|
| UNITED STATES | : | |
| v. | : | Case No. 1:23-CR-143 |
| SEBASTIAN ENRIQUE MARSET CABRERA | : | |
| Defendant | : | |

## DEFENDANT'S OMNIBUS MOTION *IN LIMINE*

## INTRODUCTION

In accordance with this Court's pretrial Order, defendant Sebastian Marset (and the Government) are required to submit any pre-trial motions *in limine* by November 11, 2026. A motion *in limine* is a vehicle by which a party seeks "to exclude anticipated prejudicial evidence before the evidence is actually offered." Luce v. United States, 469 U.S. 38, 40 n. 2 (1984). Such motions are "designed to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions." Louzon v. Ford Motor Co., 718 F.3d 556, 561 (6th Cir.2013). Motions *in limine* "aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain evidence that one party claims is not admissible," which allows the parties to prepare with a more complete understanding of the scope of the case. See United States v. Mosby, 626 F. Supp. 3d 847, 856 (D. Md. 2022).

After a review of the possible evidentiary issues that may arise during the trial of this case, the defense respectfully moves this Court *in limine*, to preclude the introduction at trial of this case the following classes of potential Government evidence concerning: (1) irrelevant and unfairly prejudicial evidence of violent acts that do not satisfy the requirements of the narco-terrorism charge; (2) a drug seizure in international waters near Africa that is not related to the

pending MDLEA count; (3) alleged drug trafficking to the United States that is not relevant to any charge in the case; (4) hearsay statements relating to the money laundering conspiracy that do not satisfy the co-conspirator exception; and (5) bank records that the prosecution cannot connect to the conspiracies charged in this case. [1] At a minimum, the Court should require a written "proffer" from the Government with respect to these categories of information in order to make a pre-trial determination as to admissibility.

The parties are scheduled to submit their respective motions by the same deadline and so it is possible that the defense will need to move to preclude other aspects of the Government's potential evidence. [2]

**RELEVANT SUMMARY OF THE CASE**

The defendant is charged in the Second Superseding Indictment (SSI) with the following charges: (1) Count One; Narco-Terrorism; (2) Count Two; Drug Trafficking on the High Seas in violation of the Maritime Drug Law Enforcement Act; (2) Count Three; Conspiracy to Commit Money Laundering; and (4) Count Four; substantive money laundering. The following sections outline the prosecution's theory as a backdrop for the defense motion to preclude the introduction of evidence relating to the various counts.

***Narco-Terrorism/Violence – Count One***

Count One of the SSI also alleges that the defendant engaged in drug trafficking that would be a crime if committed in the United States "knowing and intending to provide, directly

---

[1] The defense previously submitted a motion to preclude the introduction of Sky ECC communications. ECF 113.

[2] Pursuant to this Court's Order of July 1, 2026, the Government is not required to disclose the identity and a summary of the testimony of its potential expert witnesses until fifteen (15) business days before trial. ECF at para. 9. The Government has advised that it will not voluntarily advance the date of the disclosure. Undersigned counsel believe that is very likely that there will be additional motions to preclude the introduction of expert testimony, but without receiving the required disclosures, the defense cannot move this Court until very nearly the beginning of the trial.

and indirectly, anything of pecuniary value to any person and organization that has engaged and engages in terrorist activity." The statute specifically excludes actions taken for "personal financial gain."

The SSI identifies the following violent acts as part of the offense:

> On or about May 9, 2020, MARSET caused a co-conspirator to detonate a grenade in the parking lot of the Headquarters of the Uruguayan National Police's *Direccion General de Represion al Trafico Ilicito de Drogas* (General Directorate for the Suppression of Illicit Drug Trafficking) in Montevideo, Uruguay.
>
> On or about May 10, 2020, MARSET directed a co-conspirator to send a threatening text message to an Uruguayan prosecutor involved in narcotics investigations that affected the MARSET DTMLO. The message stated in sum and substance that law enforcement needed to give respect to the PCU to prevent further violent acts by the PCU, and that if law enforcement made things difficult for the PCU, the PCU would make things difficult for law enforcement.
>
> In approximately September 2020, MARSET personally shot and killed a co-conspirator because MARSET believed the co-conspirator was plotting against him and the MARSET DTMLO.
>
> On approximately September 12, 2021, in Asunci6n, Paraguay, MARSET arranged for a co-conspirator to be killed because MARSET believed that co-conspirator to be cooperating with law enforcement.
>
> On approximately March 26, 2025, a Special Agent with the U.S. Drug Enforcement Administration ("DEA") contacted MARSET to encourage him to turn himself in. MARSET responded by threatening the DEA Special Agent.

Although not included in the SSI, the Government has also argued that the defendant "partnered" with Colombia's Clan de Golfo and Brazil's PCC, which the Government claimed were "both designated as Foreign Terrorist Organizations." *Government Opposition To Defendant's Motion To Dismiss Count One*, ECF 122 at p. 8. As the defense noted, both organizations were designated after the defendant's alleged involvement with them. *Defense Reply In Support of Motion To Dismiss* Count One, ECF 135, at pp. 7-8.

Finally, the defense was provided discovery in this case involving the murder of

Paraguayan prosecutor on May 10, 2022 in Colombia, South America. The materials uniformly state that the defendant was not involved in the event.

***MDLEA – Count Two***

Count Two of the SSI charges that on June 16, 2024, the defendant conspired to possess with intent to distribute cocaine on board a vessel subject to the jurisdiction of the United States, in violation of the MDLEA. The Government provided discovery concerning the seizure of a "fast boat" by the Colombian navy and the arrest of its four-member crew. As the Court may recall, the Colombian authorities apparently lost of the 1653 kilograms of suspected cocaine recovered during the event. The prosecution has not produced any laboratory analysis of the recovered substance.

The Government thereafter provided additional discovery concerning the seizure of a sailboat stopped by the United States Coast Guard on February 22, 2023, off the coast of West Africa, along with the arrest of the ship's master. Nothing in the discovery connects the vessel with the defendant.

***Alleged Drug Trafficking To The United States***

The SSI does not allege that the defendant was sending drugs to the United States, and he is not charged with unlawful importation into this country. Nonetheless, the Government alleged in a prior pleading that "the government anticipates introducing evidence at trial that the defendant sent cocaine to the United States. *Government Opposition To Defendant's Motion To Dismiss Count One*, ECF 122 at p.2. The Government advised the defense that there are no discoverable materials relating to this allegation and to date, no information has been produced concerning this allegation.

*Money Laundering/Inadmissible Hearsay Statements*

The Government contends that the defendant sent drug shipments from South America to Europe and that the drug trafficking proceeds were allegedly returned to the defendant: (1) via cryptocurrency; and (2) in bulk cash deliveries.

According to the facts alleged in the SSI and the discovery produced in the case, co-defendant SANTORO and a person identified as UCC-2, operated a separate money laundering conspiracy that deposited the criminal proceeds into the European banking system and then sent approximately two hundred and two (202) international wire transfers from Europe to Asia and South America. Count Three of the SSI alleges that some of the wires transited though "correspondent banks" in the United States. These wire transfers form the basis of the Money Laundering Conspiracy in Count Three and one of the wires - for approximately $32,000.00 from a bank in Portugal to a bank in China - is the basis for the substantive Money Laundering charge in Count Four of the SSI. There is no evidence in this case, however, to establish that the defendant ever received a wire transfer to a bank account in his name and/or under his control.

The defense anticipates that the prosecution will attempt to introduce inadmissible hearsay statements through its cooperating witnesses in an effort to connect the defendant to the separate money laundering conspiracy. The Court should preclude the introduction of any such inadmissible hearsay.

*International Wire Transfers And Bank Records*

During the investigation into this case, the DEA agents obtained a "ledger" maintained by Santoro and a person identified as UCC-3, which contained information allegedly relating to eleven and a half (11.5) million dollars in bank transactions. The prosecution claims that it was able to "trace" approximately nine million dollars referenced in the ledger to wire transfers that

moved through United States correspondent banks. See *Government Opposition To Motion To Dismiss Count Three and Four,* ECF 123 at p. 3. That does not appear to be correct.

Rather, the prosecution obtained records from at least nine U.S. banks, which were compared with the transactions listed in the "ledger." Of the approximately two hundred and two ledger transactions, only eight bank records contain the same date and amount. The other transactions contain different dates or amounts; some do not match at all. While the bank records may be authentic, they are not relevant or admissible absent additional, non-hearsay testimony.

## LEGAL ANALYSIS

### 1. The Government's Evidence Is Constrained By The Federal Rules

For evidence – whether testimonial or documentary - to be admissible at a trial, it must be relevant. This requires that the evidence

> tends to make the existence of a fact of consequence to an issue in the case "more probable or less probable" than without the evidence is relevant and therefore, as a general proposition, admissible.

United States v. Queen, 132 F.3d 991, 994 (4th Cir. 1997). Even relevant evidence, however, should excluded when its probative value is substantially outweighed by its potential for "for undue prejudice, confusion, delay or redundancy. Federal Rule of Evidence 403. Prejudice is an "undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." United States v. George, 597 F. Supp. 3d 832, 837 (E.D.N.C. 2022).

The issue of unfair prejudice arises frequently in the context of the prosecution's attempt to introduce "other crimes" evidence pursuant to Federal Rule of Evidence 404(b). That Rule prohibits the introduction of evidence of "other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith." Such other crimes evidence, however, may "be admissible for other purposes, such as proof of motive, opportunity,

intent, preparation, plan, knowledge, identity, or absence of mistake or accident." The Rule 404(b) inquiry applies only to evidence of other acts that are "extrinsic" to the "charged" offense. United States v. Siegel, 536 F.3d 306, 315–16 (4th Cir. 2008).

The Fourth Circuit has outlined a four-factor test that must be satisfied before a court can properly admit evidence of prior bad acts under Rule 404(b):

> (1) The evidence must be relevant to an issue, such as an element of an offense, and must not be offered to establish the general character of the defendant. In this regard, the more similar the prior act is (in terms of physical similarity or mental state) to the act being proved, the more relevant it becomes. (2) The act must be necessary in the sense that it is probative of an essential claim or an element of the offense. (3) The evidence must be reliable.

United States v. Queen, 132 F.3d 991, 997 (4th Cir. 1997).

When measured against these rules, the defense believes that large swaths of the Government's evidence – both testimonial and documentary – must be excluded.

## ANALYSIS

The following section analyzes the Government's potential evidence under the foregoing legal rules.

### 1. *Evidence Relating To the Narco-Terrorism Charge Must Be Relevant To The Elements of the Statute*

Evidence relating to the Narco-Terrorism charge is only admissible if it is relevant to the statutory elements of 21 U.S. Code Section 960a, if it establishes that: (1) a thing of "pecuniary value" was given or attempted to be given; (2) to a person or organization engaged in terrorist activity. Thus, violent acts are not automatically admissible and any act that does satisfy the definition of "terrorist activity" must be linked to receipt of something of pecuniary value. [3]

[3] "Terrorist activity" defined As used in this chapter, the term "terrorist activity" means any activity which is unlawful under the laws of the place where it is committed (or which, if it had been committed in the United States, would be unlawful under the laws of the United States or any State) and which involves any of the following: (I) The highjacking or sabotage of any conveyance (including an aircraft, vessel, or vehicle). (II) The seizing or

Finally, the statute excludes actions taken for personal financial gain. Even a cursory review of the Government's allegations reveals the daunting failure of proof with respect to their admissibility.

Thus, for example, the SSI alleges that on May 9, 2020, the defendant caused a co-conspirator to detonate a grenade in the parking lot of the Uruguayan national police. This event should not be admitted at trial as evidence relevant to Count One unless the Government can establish that: (1) a thing of pecuniary value was given by the defendant to another person or organization; and (2) the detonation satisfies the requirement of terrorist activity. The defense does not intend to speculate as to how the prosecution might satisfy this burden but believes that the Court should require the Government to proffer these elements prior to trial to avoid the admission of unfairly prejudicial evidence which would precipitate a mistrial or a reversal.

Similarly, the Government alleges that the defendant threatened a DEA agent during an exchange of text messages. As to this allegation, it defies belief that the prosecution could establish that the conduct falls within the requirements of the narco-terrorism statute. First, there was nothing of pecuniary value given by the defendant to anyone – since he is alleged to have made the threat. Second, the conduct does not constitute terrorist activity under the definition contained in the statute.

---

detaining, and threatening to kill, injure, or continue to detain, another individual in order to compel a third person (including a governmental organization) to do or abstain from doing any act as an explicit or implicit condition for the release of the individual seized or detained. (III) A violent attack upon an internationally protected person (as defined in section 1116(b)(4) of title 18 ) or upon the liberty of such a person. (IV) An assassination. (V) The use of any— (a) biological agent, chemical agent, or nuclear weapon or device, or (b) explosive, firearm, or other weapon or dangerous device (other than for mere personal monetary gain), with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property.

8 U.S. Code 1182(a)(3)(B)(i)(I)

The same arguments apply for all the other intended acts of violence, both alleged in the SSI or otherwise. Violence *qua* violence, is not admissible for its own sake in this case and the court should grant the motion *in limine* as to these events and preclude their introduction at trial.

***Evidence Of Another MDLEA Seizure Is Irrelevant***

The SSI charges the defendant with one specific instance of drug trafficking on the High Seas in June of 2024. That event involved a "stateless" go-fast boat stopped by the Colombian Navy, manned by a crew from Costa Rica and Panama. All crew members were released from custody. The SSI alleges that the defendant transported cocaine on "unflagged vessels." SSI, ECF 95 at para. 7.

The newly disclosed event involving a sailboat ship seized by the United States Coast Guard near the coast of West Africa in February 2023. The ship was captained by a Brazilian national and the vessel was registered in Brazil. The captain was arrested and prosecuted in the United States District Court for the Southern District of Florida.

The vessels were seized in different parts of the world, thousands of miles from each other, on distinct types of vessels, and nothing in the discovery provided in this case establishes any connection between the defendant and either of the seizures or either of the vessels. The evidence of the seizure near Africa in 2023 is outside the time frame of the MDLEA conspiracy charged in Count Two and does not appear relevant to any other count in the SSI.

This Court should not permit the introduction of this evidence unless and until the prosecution can explain its relevance to the pending charges.

***Evidence Of Drug Trafficking To The United States In Inadmissible Uncharged Evidence***

The SSI contains no allegation that the defendant imported drugs into the United States. He is not charged with an importation offense. The Government has not provided any details in

support of the accusation that the defendant was involved in importing drugs to the United States, but even assuming arguendo, that there was such evidence, it would not be relevant or admissible with respect to any of the pending charges. Likewise, it would not be relevant to establish any other permissible purpose permitted under Rule 404(b) for any of the pending charges.

For example, evidence that the defendant conspired to import cocaine into the United Staes does not make it any more likely that he had the intent to possess with the intent to distribute cocaine on board a vessel on the High Seas. Indeed, the two seem mutually inconsistent. Likewise, conspiring to import cocaine into the United States is wholly distinct from the elements of the narco-terrorism charge. And finally, the theory of the money laundering charges in Count Three and Fourt is that the proceeds of drugs sold in Europe were being transmitted back to the defendant in South America. Absent any actual information concerning the defendant's alleged participation with the importation of drugs into the United States, there is no additional analysis that the defense can provide at this time, other than to note the inherent problems with the admissibility of testimony regarding this vessel.

***Money Laundering And Inadmissible Hearsay***

The defense position in this case is that the money laundering conspiracy charged in this case constitutes a separate venture and that the defendant was not a member of any such conspiracy. This is borne out by the SSI, which identifies the following manner and means were used to launder the criminal proceeds:

> SANTORO and UCC-2 utilized multiple methods to launder money on MARSET's behalf. One method was trade-based money laundering. In this method, other co-conspirators working for SANTORO and UCC-2, both known and unknown, would place the illicit currency into the global banking system, using multiple European businesses to claim the narcotics proceeds as legitimate income. The MARSET DTMLO hid the location and ownership of the assets being laundered by using

> unrelated companies all registered as purportedly doing business in different, unrelated industries. The MARSET DTMLO would conceal the source of the funds by creating false invoices to justify the wire transfers.

SSI, ECF 95 at para. 9.

The money laundering activities of SANTORO and UCC-2 (or anyone else allegedly involved in this conduct) constitute a distinct and separate criminal conspiracy, which was furthered by other persons working for them. At the trial of this case, the direct testimony by Santoro of conversations he had with the defendant might be admissible, if the subject matter is relevant. On the other hand, however, this Court should not permit the introduction of testimony from Santoro or any other cooperating witness that includes out of court declarations of absent witnesses because it constitutes inadmissible hearsay. If the Government contends that the statements are admissible as co-conspirator statements, then the burden rests with them to prove it.

Under well settled law, the admission of an out of court hearsay declaration violates a defendant's Confrontation Clause rights under the Sixth Amendment, unless it falls within a narrow exception. Thus, the federal rules of evidence prohibit a witness from relaying out of court statements to a jury, when "offer[ed] in evidence to prove the truth of the matter asserted." Federal Rule of Evidence 801(d)(2). The Government may attempt to rely in this case upon the co-conspirator exception to the hearsay rule. This exception requires that the district court find by a preponderance of the evidence that: (1) a conspiracy existed in fact, (2) "the declarant and the defendant were members of the conspiracy," and (3) "the statement was made in the course of, and in furtherance, of the conspiracy." United States v. Graham, 711 F.3d 445, 453 (4th Cir.2013). See Bourjaily v United States, 483 U.S. 171. 175-176 (1987).

In making this determination, the district court must find "independent evidence of the conspiracy apart from the statement, although the content of the statement itself can also be considered in determining whether such independent evidence exists". United States v Gatling, 96 F.3d 1511, 1520 (D.C. Cir. 1996). It is a "better practice" for the trial court to make these determinations before the statements are presented to the jury. United States v Jackson, 627 F.2d 1198, 1218 (D.C. Cir. 1980). The reason why this practice is preferable is obvious; there is a danger that the co-conspirator statements will be improperly admitted and result in prejudice to the defendant and a possible mistrial. See United States v. Ferra, 900 F.2d 1057, 1059 (7th Cir. 1990)("a court ought not routinely build into the case a feature that will force the defendant to move for mistrial in order to make a simple objection to the admission of evidence").

In this case, the Court should require the prosecution to identify any out of court hearsay statements it claims are admissible pursuant to the co-conspirator exception and explain why the statements fall within the exception. This procedure is routinely utilized in federal criminal cases so that the court can fulfill its gatekeeper function. See United States v. Bazezew, 783 F.Supp.2d 160, 166 n.8 (D.D.C. 2011)(the prosecution should submit a "written proffer setting forth its basis for the admissibility of any coconspirator statements that it intends to introduce at trial").

The defense respectfully requests that this court utilize this procedure so the defense can have a fair and complete opportunity to respond to the Government's proposed hearsay testimony.

***The Bank Records***

The bank records obtained by the Government are not admissible at the trial of this case for three separate, but equally important reasons. First, only eight of the wire transfers in the bank records match the information contained in the ledgers. Even assuming *arguendo* that the

limited group of exact match records were relevant, the remaining records are not admissible because there is an insufficient connection to the charged offenses to permit their introduction. The nexus between the non-matching bank records and the allegations in this case is merely speculative and the records are not admissible at trial. Even if the records had some *de minimis* relevancy, it would be substantially outweighed by their potential to create undue prejudice and confusion at the trial.

Second, the Government needs to prove that the funds used in each wire transaction were the product of an "illegal" activity, in this case, drug trafficking. Because the Government alleges that the wire transfers were sent by "European businesses" from their business accounts, the prosecution will thus need to connect the deposit of drug proceeds into the bank accounts of these businesses to satisfy the statutory requirement. The defense does not believe that the Government can satisfy this burden and that the court should not allow the wholesale introduction of the bank records without a pre-trial demonstration by the prosecution that it can establish the factual predicate for the introduction of the records.

Third, the SSI alleges that the wire transfers were undertaken "in a manner designed to conceal the nature, source, and ownership of those funds, and to promote the carrying on of drug trafficking." The wire transactions originated from the bank accounts of legitimate businesses entities. There was no discovery produced in this case to suggest that the Government conducted interviews with each of the companies involved in the wire transfers to determine their involvement and/or culpability in the alleged money laundering conspiracy.

In order to establish that the motive was to conceal the details of the transaction and/or to promote future drug trafficking, however, the prosecution would need to present witnesses with first-hand knowledge of the wire transfers and the reasons they were authorized. In the defense

view, this Court should not permit the money laundering conspirators to testify about any conversations with employees at the relevant European business entities, because it would constitute inadmissible hearsay.

This *in limine* challenge to the bank records is a serious matter that the defense believes requires the prosecution to establish pre-trial how these documents are relevant and admissible at the trial of this case.

**CONCLUSION**

For all of the reasons set forth in this motion, the Court should not permit the introduction of irrelevant and inadmissible testimony. At a minimum, should require the prosecution to identify and prove why the categories of information identified in this *motion in limine* should be allowed into evidence.

Respectfully submitted,

/s/ Sandi S. Rhee

Sandi S. Rhee
Counsel for the Defendant
10001 Georgetown Pike, #63
Great Falls, VA 22066
(202)285-8366
SandiRheeLaw@Gmail.com
VA Bar No. 47328

Robert Feitel

Robert Feitel
1300 Pennsylvania Avenue, N.W
#190-515
Washington, D.C. 20004
202 255 6637 (cellular)
District of Columbia Bar 366673

*Pro Hac Vice*

Joseph King

____________________________
Joseph King
VA Bar #65632
King, Campbell, Poretz & Mitchell Pllc.
118 N. Alfred Street
Alexandria, VA 22314
(703) 683-7070 (o)
(703) 652-6010 (f)
jking@kingcampbell.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was sent via ECF to Anthony Aminoff and Catherine Rosenberg, Assistant United States Attorneys for the Eastern District of Virginia, 2100 Jamieson Avenue, Alexandria, VA 22314, and current defense counsel this 11th day of November, 2026.

/s/ Sandi S. Rhee

____________________________
Sandi S. Rhee