IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>SEBASTIAN ENRIQUE MARSET CABRERA,<br><br>Defendant. | Case No. 1:23-CR-143<br><br>Hon. Rossie D. Alston |

**GOVERNMENT'S MOTION *IN LIMINE* TO ADMIT COMMUNICATIONS FROM SKY ECC**

The United States, through undersigned counsel, moves *in limine* for a ruling regarding the authenticity of Sky ECC messages sent and received by the defendant. Sky ECC was a subscription-based encrypted messaging platform popular with international criminal organizations. It was the subject of a multi-country, European law enforcement operation, wherein its messages were intercepted and its servers ultimately seized.

The defendant's messages that the United States seeks to admit were produced by France to the United States via a Mutual Legal Assistance Treaty (MLAT) request. Federal Rule of Evidence 901 requires that the proponent of an item of evidence "produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). "[T]he burden to authenticate under Rule 901 is not high." *United States v. Hassan*, 742 F.3d 104, 133 (4th Cir. 2014) (internal quotation marks and citation omitted); *see also United States v. Banks*, 29 F.4th 168, 181-82 (4th Cir. 2022) (same); *United States v. Liberto*, 565 F. Supp. 3d 739, 743 (D. Md. 2021) (burden of authenticity "is a light one").

Here, the Government can easily clear the low bar to establish that these messages are what they purport to be: Sky ECC messages sent and received by the defendant. There is more than sufficient evidence to "support [such] a finding." Fed. R. Evid. Rule 901(a).

## RELEVANT FACTUAL BACKGROUND

Sky ECC was an encrypted messaging application operated by the Canadian company Sky Global on servers located in Roubaix, France. From approximately June 2019 to March 2021, pursuant to French judicial authorization, French, Dutch and Belgian law enforcement intercepted and decrypted messages sent via Sky ECC. In March 2021, Sky ECC was shut down after a coordinated law enforcement raid by European authorities. The United States maintained a parallel investigation that led to the indictment of the Chief Executive Officer of Sky Global for a racketeering conspiracy and a conspiracy to distribute controlled substances based off of their knowing and intentional facilitation of transnational narcotics distribution over their encrypted communications devices. *See United States v. Jean-Francois Eap, et al*, Case No.: 21-cr-822GPC (S.D. Ca.).

During the course of the investigation into defendant Sebastian Enrique Marset Cabrera and his co-conspirators, the government learned that the defendant, his co-defendant Federico Santoro Vassallo, and other members of the charged conspiracy communicated over the Sky ECC platform. The government sent official requests (MLAT requests) to the government of France for data associated with particular PINs. Specifically, and most relevant here, on February 7, 2023, the government issued an official request to the government of France for all data associated with 12 PINS used by members of the conspiracy, including three PINs utilized by the defendant: JPIKRN, WXV5F7, and MIGWVF. The request was directed to a particular Investigating Judge

at the Paris Tribunal who has assisted with U.S. requests for data related to Sky ECC. On or about March 29, 2023, the French police extracted the data requested, including the three PINs utilized by the defendant, and placed it on a DVD-R, which was sent to the U.S. prosecution team.

The DVD-R contains folders labeled by PIN (e.g.: MIGWVF). Inside a particular PIN's folder are additional folders containing the chats between that PIN and others (i.e., folder 1 is MIGWVF-XAT3Q9, folder 2 is MIGWVF-UYNNK1, etc.). If you open a particular chat folder, the conversation between those PINs is contained in a spreadsheet, which is provided in both .csv format and .xlsx format. A separate folder contains "media" associated with the chat (i.e., photos, voice notes, and other items sent in the chat). These items are notated in the spreadsheet with an ID number, which can then be retrieved from the media folder.

The returns overwhelmingly establish that the defendant is the user of the three PINs: JPIKRN, WXV5F7, and MIGWVF.[1] The defendant sent pictures of himself, pictures of his tattoos, his full name, biographical information about himself (such as his birthday), biographical information about his family (such as the birth of a child), pictures of his family (wife, children, etc.), and voice notes where people familiar with the defendant's voice have confirmed that it is, in fact, him speaking. The returns also corroborate what other evidence in the case establishes independently. For example, the returns corroborate that the defendant was responsible for certain heinous acts of violence (the defendant texted a picture of an individual he murdered, and the government has independent evidence that the defendant was responsible for the murder), that the defendant was responsible for particular drug shipments that were seized by law enforcement, and

[1] The conversations are primarily in foreign languages. All quotations attributed herein are draft translations only; official court-certified translations are still being finalized.

that the defendant was involved in money laundering where the DEA also obtained independent evidence through an undercover operation.

The government anticipates introducing several Sky ECC conversations where one of the participants to the conversation with the defendant will testify. Indeed, cooperating witnesses will testify to messaging with the defendant over each of his three PINs, and will then authenticate particular text exchanges produced by the government of France as fair and accurate depictions of their conversations with the defendant. The focus of this motion *in limine* is certain conversations on Sky ECC that the government seeks to admit where a participant will not testify, i.e., where the defendant is communicating with a third party.

## LEGAL STANDARD

### A. Motions *In Limine*

"The purpose of a motion in limine is to allow a court to rule on evidentiary issues in advance of trial in order to avoid delay, ensure an even-handed and expeditious trial, and focus the issues the jury will consider." *United States v. Verges*, No. 1:13-cr-222, 2014 WL 559573, at *2 (E.D. Va. Feb 12, 2014); *see also United States v. Brawner*, 173 F.3d 966, 970 (6th Cir. 1999). A court should exclude evidence *in limine* "only when the evidence is clearly inadmissible on all potential grounds." *Verges*, 2014 WL 559573, at *3; *United States v. Johnson*, No. 24-CR-20326, 2025 WL 1865121, at *1 (S.D. Fla. July 7, 2025) (noting that some "evidentiary rulings should be deferred until trial so that [they] may be resolved in proper context").

### B. Authentication under Federal Rule of Evidence 901

Federal Rule of Evidence 901 provides that: "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a

finding that the items is what the proponent claims it is." "The burden to authenticate under Rule 901 is not high—only a *prima facie* showing is required, and a district court's role is to serve as a gatekeeper in assessing whether the proponent has offered a satisfactory foundation from which the jury could reasonably find that the evidence is authentic." *United States v. Cornell*, 780 F.3d 616, 629 (4th Cir. 2015) (internal quotation marks and citations omitted); *see also United States v. Vidacak*, 553 F.3d 344, 349 (4th Cir. 2009) (same). It requires only a "minimal showing." *United States v. Cuesta*, 597 F.2d 903, 915 (5th Cir. 1979). "The district court must merely conclude that the jury *could* reasonably find that the evidence is authentic, not that the jury necessarily *would* so find." *United States v. Recio*, 884 F.3d 230, 236-37 (4th Cir. 2018) (internal quotation marks and citation omitted).

Federal Rule of Evidence 901(b) lists several "examples" of ways that a proponent's preliminary burden may be satisfied. *See* Fed. R. Evid. 901(b) (noting the rule contains "examples only — not a complete list"). Thus, evidence may be authenticated by "testimony that an item is what it is claimed to be." Fed. R. Evid. 901(b)(1). But it also may be authenticated by more circumstantial means, including by its "appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances." Fed. R. Evid. 901(b)(4). For example, "a document or telephone conversation may be shown to have emanated from a particular person by virtue of its disclosing knowledge of facts known peculiarly to him." Fed. R. Evid. 901 Notes of Advisory Committee (describing authentication under Rule 901(b)(4)). Furthermore, "an opinion identifying a person's voice" may also authenticate evidence, if the person expressing the opinion has heard the voice "at any time under circumstances that connect it with the alleged speaker." Fed. R. Evid. 901(b)(5).

Rule 901(b)(4) is "one of the most frequently used to authenticate … electronic records." *Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534, 554–55 (D. Md. 2007). And courts have repeatedly upheld the admission of computers and other electronic evidence, even in the absence of chain-of-custody evidence, based solely on identifying evidence found on the item itself. *See, e.g., United States v. Reed*, 780 F.3d 260, 265-67 (4th Cir. 2015) (holding that "the government proffered evidence that the jury could use to attribute" a particular phone to defendant Dyer, despite offering "no testimony about how this phone was seized," because there was evidence of "photos of Dyer on the phone and text messages attributing the number to Dyer, including several that used variations on his first name"); *United States v. Siddiqui*, 235 F.3d 1318, 1322–23 (11th Cir. 2000) (email authenticated by the use of the defendant's email address and nickname, as well as its contents which included information the defendant would know); *United States v. Fluker*, 698 F.3d 988, 999-1000 (7th Cir. 2012) (same); *United States v. Lewisbey*, 843 F.3d 653, 658 (7th Cir. 2016) (cell phones authenticated in part by information on the phones themselves such as "properties," "contacts," and communications associated with the defendant). After all, a full "[c]hain of custody is one means of authenticating evidence but not the only means," *United States v. Camuti*, 78 F.3d 738, 743 (1st Cir. 1996), and chain of custody is most important for fungible evidence, such as drugs or cash, that is not "readily identifiable by a unique feature or other identifying mark," *United States v. Reyes-Rosario*, 142 F.4th 3, 13 (1st Cir. 2025).

Evidence obtained from outside the United States is frequently authenticated in a circumstantial manner. *See e.g., United States v. Collins*, 715 F.3d 1032, 1035-36 (7th Cir. 2013) (holding that chain of custody "would be an impossible standard" for foreign evidence and approving admission of audio tapes created in Mexico based on voice identification and distinctive

characteristics of the recordings); *Vidacak*, 553 F.3d at 348-50 (sufficient circumstantial proof of authenticity of military records seized in another country "despite the fact that the Government could not trace the precise history of the documents prior to their seizure" and despite the fact that the witness "could not remember specifically seeing these documents" when he participated in the search); *United States v. Dumeisi*, 424 F.3d 566, 574-75 (7th Cir. 2005) (finding a file from Saddam Hussein's former Iraqi Intelligence Service was properly authenticated based on "distinctive characteristics" of the documents themselves, "including the style and form of the documents" as well as the circumstances relating to the file recovery).

As these examples make clear, there "need be only some competent evidence in the record to support authentication . . . and such evidence can be purely circumstantial." *United States v. Dorvilus*, 357 F. App'x 239, 247 (11th Cir. 2009) (internal quotation and citation omitted); *see also Vidacak*, 918 F.3d at 350 (prima facie showing "may be accomplished largely by offering circumstantial evidence that the documents in question are what they purport to be."). "[T]he showing of authenticity [required under Rule 901] is not on a par with more technical evidentiary rules, such as hearsay exceptions," *Lexington Ins. Co. v. W. Pennsylvania Hosp.*, 423 F.3d 318, 329 (3d Cir. 2005) (quotation marks omitted)), and "conclusive proof of authenticity" is not required, *United States v. Jimenez Lopez*, 873 F.2d 769, 772 (5th Cir. 1989).

In sum, because Rule 901(a) requires only evidence "sufficient to support a finding," Fed. R. Evid. 901(a), a "party authenticating [an] exhibit need only prove a rational basis for that party's claim that the document is what it is asserted to be," *Jones v. Nat'l Am. Univ.*, 608 F.3d 1039, 1045 (8th Cir. 2010); *United States v. Lebowitz*, 676 F.3d 1000, 1009 (11th Cir. 2012) (noting that a court of appeals will not disturb a Rule 901 ruling unless there is "no competent evidence in the

record to support it"). The "ultimate resolution of authenticity"—i.e., whether the evidence is *in fact* what the proponent purports it to be—"is a question for the jury." *United States v. Branch*, 970 F.2d 1368, 1371 (4th Cir. 1992).

**C. Hearsay**

The defendant has moved to exclude the Sky ECC evidence on hearsay grounds, arguing that the statements are not "business records." Dkt. No. 113 at 5. But the government is not relying on the "business records" exception to the rule against hearsay, codified in Fed. R. Evid. 803(6), to admit the evidence. Rather, the statements that are the subject of this motion are statements by an opposing party (i.e. the defendant himself) and thus are not hearsay under Fed. R. Evid. 801(d)(2). "'A party who denies making a statement cannot keep it out . . . if the proponent presents sufficient proof to support a jury finding that the objecting party made the statement.'" *United States v. Hassanshahi*, 195 F. Supp. 3d 35, 48 (D.D.C. 2016) (quoting 4 CHRISTOPHER B. MUELLER & LAIRD C. KIRKPATRICK, FEDERAL EVIDENCE § 8:44, at 389 (4th ed. 2013) (ellipsis in original).

The spreadsheets containing the Sky ECC communications also contain machine-generated data, such as the date and time that messages are sent. Machine-generated "statements" are specifically excluded from the hearsay rule. Fed. R. Evid. 801(a) ("'statement' means *a person's* oral assertion…") (emphasis added); *see, e.g., United States v. Washington*, 498 F.3d 225, 231 (4th Cir. 2007) ("[o]nly a *person* may be a declarant and make a statement … nothing 'said' by a machine … is hear-say.") So these too need not be admitted as "business records" because they are not statements subject to the rules against hearsay.

Rather, the issue is one of authentication, and the defendant is perhaps confusing the business records hearsay exception with the rules around self-authentication for regularly

conducted activities. *See* Fed. R. Evid. 902(11). But these records need not be admitted as a regularly conducted activity pursuant to 902(11); methods of proving authenticity "can be infinite in variety, limited only by the circumstances pertaining in the particular case." 5 JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S FEDERAL EVIDENCE § 901.03 (Mark S. Brodin & Matthew Bender eds., 2d ed. 2020), LexisNexis. The government will overwhelmingly meet its "light" burden to establish authenticity in the following ways.

**PROFFER OF ANTICIPATED EVIDENCE REGARDING AUTHENTICITY**

The government intends to call several witnesses at trial to authenticate the defendant's Sky ECC communications. Below is a summary of each witnesses' anticipated testimony. Additionally, as further described below, the messages themselves corroborate that these are messages sent and received by the defendant. The messages contain several instances of self-identification by the defendant, and many of the events described in the messages are corroborated by third parties.

1. Agent 1 Will Testify Regarding Background on Sky ECC and Law Enforcement's Interception of Sky ECC Messages.

The government anticipates calling a DEA Special Agent (for purposes of this motion, referred hereafter as "Agent 1") who personally used Sky ECC on many occasions and is familiar with how it operated. He also extensively investigated the company that operated Sky ECC (Sky Global). Based on this personal experience, Agent 1 can explain the various security features on a Sky ECC device and how Sky ECC could be used to communicate with other users. He can also explain how he (like other users) was assigned a six-digit alphanumeric PIN, and how users used that PIN to send messages to others on Sky ECC.

Agent 1 can also testify that he learned, as part of his own investigation, that Sky ECC

operated on servers based in Roubaix, France, and that Dutch, Belgian, and French law enforcement were collaborating to obtain and intercept Sky ECC communications from approximately summer of 2019 through March of 2021. Indeed, Agent 1 has personal knowledge that the interception occurred because he coordinated and deconflicted his own investigation into Sky Global to avoid interfering with the European interception and because, after the interception period was over, he has on many occasions reviewed intercepted messages that he received from the European investigation.[2]

In other words, Agent 1 can testify about what Sky ECC is, and that several European governments worked together to intercept messages over the Sky ECC platform. He can also testify that European law enforcement, including the French government, has access to those intercepted messages.

2. A U.S. DOJ Cybercrime Lab Analyst Will Provide Expert Testimony on Sky ECC Interception and Decryption.

The government also intends to call a U.S. DOJ Cybercrime Lab Analyst who can offer both expert opinion and fact testimony regarding encryption generally and Sky ECC in particular. The Cybercrime Lab Analyst will establish that the decryption of the Sky ECC messages performed by European law enforcement was accurate and that the spreadsheets produced by France pursuant to Mutual Legal Assistance requests are accurate representations of the messages sent through the Sky ECC service.

The Cybercrime Lab Analyst, who has extensive experience in digital investigations and

[2] In the *United States v. Didani* trial (2:21-cr-20264) in the Eastern District of Michigan, the court qualified Agent 1 as an expert witness in encrypted communications under Federal Rule of Evidence 702. Though Agent 1 has extensive experience in encrypted communications and therefore could be qualified as an expert, the proposed testimony here would consist of fact, not opinion, testimony.

encrypted communications, can testify that IT professionals (including those working in law enforcement) seeking to intercept network traffic, including encrypted traffic, create so-called packet capture ("pcap") files, which record all the network traffic transiting a server. The Cybercrime Analyst can testify that he traveled to Europe several times to view both pcap files and the decrypted files in European law enforcement's possession. For several reasons, he can testify to the accuracy of decryption performed by European law enforcement. Two of the most pertinent reasons are as follows. First, the Cybercrime Lab Analyst has personally observed several pcap files (i.e. original raw data) from the Sky ECC interception and manually decrypted sample messages himself. In addition to performing such decryptions, he has also observed European law enforcement perform such step-by-step decryptions from the pcap files. He has compared the results of such decryptions to decrypted messages sent by France in response to a MLAT requests and can testify that the messages are the same. Second, the Cybercrime Lab Analyst has also compared data extracted directly from a Sky ECC user's phone and compared it to the decrypted data that came from Sky ECC interception and can testify that it was the same.

Furthermore, the Cybercrime Lab Analyst has personally accessed the Dutch database on which the decrypted Sky ECC messages are stored. He has also travelled to France and watched French police log onto the Dutch database and export the messages of a particular PIN into .xls and .csv files, and other media files, just as they did in response to the United States's MLAT request in this case.

Finally, the Cybercrime Lab Analyst can offer expert testimony that, as a general principle of cryptography, the fact that a decryption produces an intelligible result is very strong evidence that the decryption was performed correctly. (So, for example, if an encrypted message reads

"%Q#$1q34lsd," and the decryption reads "Good morning, how are you?," the decryption is almost certainly correct; an incorrect decryption would not render intelligible language, but instead further unintelligible cipher text such as "$#lad4FF"). Here, as further set below, *see* Section 5, *infra*, not only are the decrypted messages of the defendant's PINs intelligible, they also contain an overwhelming number of distinctive characteristics (such as photos of the defendant and his tattoos, his voice, and independently verifiable facts), such that it is highly improbable they were the result of a decryption or other error by European law enforcement.

The Cybercrime Lab Analyst can explain why, in the spreadsheets produced by France, sometimes only one side of a conversation is visible, or why messages sometimes appear in duplicate or triplicate. This does not undermine the accuracy of the decryption. Specifically, the Cybercrime Lab Analyst will explain that in his opinion duplicate or triplicate messages simply means that the message was intercepted in multiple places on the network infrastructure. The Cybercrime Lab Analyst will further explain why in certain conversations only one side was recorded; based off his expertise in cryptography and his personal experience and observations decrypting Sky ECC pcap files, he can testify that a one-sided conversation results where law enforcement has access to only one user's private key, but not that of the other participant in a conversation.

3. The DEA Case Agent Will Testify Regarding His Manual Comparison of the Defendant's Messages to the Dutch Database.

The government anticipates calling the case agent to testify that an MLAT was sent to France and a response containing the relevant spreadsheets was received. Furthermore, the government has been informed that the Dutch government will allow a DEA agent to travel to the Netherlands and manually compare every message sought to be introduced at trial to what is in the

Dutch database (the same database that the Government of France pulls from in issuing its MLAT responses). The government can thus confirm that what will be introduced into evidence is an exact copy of what was decrypted and maintained by European law enforcement. In the unlikely event that the agent is for some reason not permitted to do the manual inspection, the government anticipates obtaining a certification pursuant to Fed. R. Evid. 902(13).

4. Multiple Witnesses Will Testify Regarding the Accuracy of the Messages Exchanged Between Themselves and the Defendant.

The government anticipates that multiple witnesses will testify to using Sky ECC to message with the defendant over the three PINs in question: MIGWVF, JPIKRN, and WXV5F7. For at least two of these witnesses, the government also has their own Sky ECC communications. The government anticipates that the witnesses will testify that the Sky ECC communications that France produced are in fact Sky ECC communications that the witnesses sent and received. Furthermore, the government anticipates that the witnesses will testify that the Sky ECC communications produced of their individual conversations with the defendant over MIGWVF, JPIKRN, and WXV5F7 are accurate. In other words, the witness testimony will establish not only that the Europeans properly intercepted their communications and produced them to the U.S. in a reliable fashion (indeed, at least one witness's Sky ECC communications was produced on the same DVD-R, and in response to the same MLAT request, as the defendant's), but also that content specifically produced on the defendant's PINs is accurate as well.

5. The Messages Themselves Corroborate that these are Messages Sent and Received by the Defendant.

The Sky ECC messages on MIGWVF, JPIKRN, and WXV5F7 are self-evidently reliable and authentic, containing distinctive characteristics of the defendant and evidence of objectively

verifiable events that demonstrate that the messages are what they purport to be.

The messages contain, among other things, recordings of the defendant's voice (as identified by cooperating witnesses and DEA agents who have spoken with the defendant); pictures of the defendant; the defendant's full name; the defendant's biographical information (such as his birthday); pictures of cooperating witnesses sent by the defendant to third parties; and incidents of drug trafficking and violence that the government can show through independent evidence actually occurred. Each of the defendant's three PINS – JPIKRN, MIGWVF, and WXV5F7 – contains at least one instance in which the defendant identifies himself.

i. Self-Identification

The defendant provides photos and other identifying information for himself and his family over all three PINs. One example is on August 20, 2020, where the defendant, using JPIKRN, messages another individual using PIN 73ISVA because the defendant is trying to acquire a French passport. The defendant sends multiple voice notes (which multiple witnesses will identify as his voice) saying that the French passport he is seeking has to have his real information on it. He then sends his full name written out (Sebastian Enrique Marset Cabrera), his eye color (brown eyes), his height (1.8 meters), his date of birth (XX/XX/1991), and his birth location (Montevideo, Uruguay). He then writes on August 24, 2020 that he will be going to the hair dresser and then will send photos for the passport. On August 25, 2020, he sends the photo, depicted below, clearly showing the defendant:




On February 25, 2021, the defendant, using MIGWVF, texted another user a picture of his profile in a database. The profile clearly states his full name and other identifying information. The defendant wrote, "It keeps showing up without a photo for them. I already asked them to check using the number."




On November 7, 2020, the defendant, using WXV5F7, sent to another user a picture of his wife wearing a face mask emblazoned with "PCU"—a name for the defendant's cartel (and an abbreviation of "Primer Cartel Uruguayo," or First Uruguayan Cartel). The defendant wrote, "this one belongs to the team." A witness, based on his personal knowledge, will identify the individual

depicted as the defendant's wife. The image, which has been partially redacted by the government for this motion, is reproduced below.




Furthermore, the defendant admitted to DEA agents in his post-*Miranda* interview that he used SkyECC and specifically said that one of the screennames he used was "omelet." According to the records produced from France, on August 28, 2020, the defendant, using his newly activated PIN WXV5F7, texted Santoro: "It's me. The other already expired. I put myself as Omelet. Because I have a lot of *huevos* [literally eggs, slang for testicles]."

ii. Corroborated Events

The following are examples of incidents that demonstrate that these messages are authentic—meaning, genuine Sky ECC messages sent and received by the defendant.

a. Bombing of Uruguayan Anti-Drug Police Brigade

On May 4, 2020, the defendant, over JPIKRN, texted another individual using PIN 8a4ffc: "I'm about to have a grenade thrown at the brigade. So they stay quiet a little. Yes. They have to be made to respect PCU." Then on May 9, 2020, in the same chat, the defendant says, "There I just had a grenade thrown at the narcotics brigade. First warning PCU." The defendant then sends

this photograph:




*Brother?*

*Brother, I'll put up 20 thousand dollars so that they throw it for the brigade over there in El Prado. You have someone to do it?*

*I'll talk to them yea, and see what's up. And I'll let you know.*

On May 10, 2020, in the same chat, the defendant says, "Listen to me well. I have the number of the prosecutor she's a son of a bitch. You have a new cell there. We'll send to her a well made message. Afterwards you break it. I'm writing to you the message here. I'll pass you the number. You send to her the message." The defendant then goes on to write the following to user 8a4ffc:

> Hello [redacted], how are you? We hope all is well for now but from here on out things will go for you as you decide. We are a little upset with the narcotics section! We just gave you a small warning so that you can see we aren't afraid! We want for you to respect us so that we can respect you as well. Once that has been established there will be no attempts against the entities under your command or to you. If you continue to make things difficult for us we will become a little harder. If you all become flexible with us we will do the same. Do you understand me, I don't have to explain anymore. Remember

everything has a limit! You know.. Greetings to you from the PCU.

The DEA interviewed the prosecutor named in the text message and obtained a copy of the text message from Uruguayan authorities, which matches the one dictated by the defendant over Sky ECC. The DEA showed this text message to the defendant during his post-Miranda interview. During that interview, the defendant confirmed that he had another individual send this message to the prosecutor because the defendant deemed this prosecutor to be "incorruptible." The defendant also admitted to organizing the bombing. The government anticipates additional witness testimony that the bombing at the Uruguayan Anti-Drug Brigade building (located in the El Prado neighborhood of Montevideo) did, in fact, occur, on May 9, 2020—just as the defendant typed out in his messages.

b. 10,000 Kilogram Seizure in Belgium

On February 12, 2021, the defendant, using MIGWVF, texted photos of a particular container (with its container number and seal number visible), along with an inventory of approximately 10,000 kilograms of cocaine that were secreted inside the container hidden amongst leather. He also sent shipping documents for the container. Some of the several pictures sent by the defendant are reproduced below:














It is anticipated at trial that a member of Belgian law enforcement will testify to searching that container (MSKU 570 4800) when it arrived in Belgium and finding approximately 10,000 kilograms of cocaine, with brand names like CNGE, Pablo Escobar, and Rolex, matching the descriptions noted by the defendant. The defendant further admitted to losing a 10,000 kilogram load to seizure in Belgium in his post-arrest interview with DEA, and cooperator testimony will also establish that the defendant had an (approximate) 10,000 kilogram seizure in Belgium concealed amongst leather goods around this time.

c. Money Laundering

Finally, as laid out in the Government's Motion to Admit Co-Conspirator Statements (Dkt.

No. 164), the Sky ECC messages surrounding the money laundering activity in early 2021 are fully corroborated by a WhatsApp chat, cooperator testimony, financial records, and other evidence.

These are just examples—the government could go on and on. But the point is that the content of these messages establishes their authenticity because (1) they contain the defendant's appearance, his voice, and other unique identifying information, and (2) the events described therein are frequently otherwise tied to the defendant and corroborated.

## ARGUMENT

Here, (1) Agent 1's testimony about how Sky ECC operated and was being intercepted by European law enforcement; (2) expert and fact testimony by the Cybercrime Lab Analyst about the accurate decryption being done by European law enforcement and about the Dutch database used to respond to MLAT requests; (3) testimony from the DEA case agent about sending an MLAT, receiving a disc, and manually comparing the messages introduced to the Dutch database to ensure they are exact copies; (4) cooperator testimony that their messages with the defendant are accurate and that the spreadsheets produced by France accurately depict their messages over the Sky ECC platform; and (5) the messages' distinctive characteristics, as corroborated by testimony and other evidence that can corroborate the events or facts reflected in the defendant's messages, easily "support a finding" under Fed. R. Evid. 901(a) that the messages are what the government purports them to be: Sky ECC messages sent or received by the defendant.

As described above, under Rule 901(a), the burden of authenticity "is a light one." *Liberto*, 565 F. Supp. 3d at 743. It is satisfied so as long as the "the Government provide[s] evidence to support a finding that the evidence was what it purported to be—text messages" and images sent or received by the defendant. *United States v. Sterlin*, 466 F. App'x 792, 797 (11th Cir. 2012); *see*

*also United States v. Recio*, 884 F.3d 230, 236-37 (4th Cir. 2018).

Two district courts have issued opinions concerning the authentication of Sky ECC evidence, which—like the Sky ECC evidence in this case—was produced by France to the United States pursuant to a MLAT request. Here, the government's authentication proffer is consistent with the standards set forth in both.

First, in *United States v. Didani*, No. 21-cr-20264, 2025 WL 452472 (E.D. Mich. Feb. 10, 2025), the Government proffered that it would authenticate Sky ECC messages by having a U.S. case agent "testify as to what was requested from the French government and how [the defendant's] SkyECC accounts were identified." *Id.* at *3. The Government proffered that the case agent would testify that he identified the messages received from France as belonging to the defendant because the messages' content, including "pictures, names and birthdays which appear in the text messages," were those of the defendant and the defendant's associates. *Id. See also United States v. Didani*, No. 21-cr-20264 (E.D. Mich.), ECF No. 149 at 14-19 (government's motion in limine proffering such facts); *cf.* Fed. R. Evid. 901(4), advisory committee note ("[A] document or telephone conversation may be shown to have emanated from a particular person by virtue of its disclosing knowledge of facts known peculiarly to him"). In addition, the Government proffered that another law enforcement witness (the same agent, Agent 1, proffered here) would testify about Sky ECC generally and its interception by European authorities. *Didani*, 21-cr-20264, ECF No. 149 at 3-4. Based on this proffer, the Court concluded that the Government "can meet its slight burden to show that the SkyECC records are authentic and what the Government claims the text messages are—text messages sent or received by [the defendant]." *Id.*

In *United States v. Gogic*, No. 22-CR-493 (JMA), 2025 WL 3042350, (E.D.N.Y. Oct. 31,

2025), by contrast, the Court held that the Government had *not* sufficiently authenticated Sky ECC evidence.[3] The Court made clear, however, that is ruling was "confined to the specific facts—and significant gaps—in the evidentiary record before [it]." *Id.* at *10. In particular, in that case, the "Government ha[d] not made any representations or proffered any evidence that sheds light on how the Sky Evidence was seized, decrypted, or compiled." *Id.* at *3 (E.D.N.Y. Oct. 31, 2025). Instead, "the Government's <u>only</u> evidence describing the process by which the Sky Evidence was created [was a] Certificate of Authenticity that states, generically and in conclusory fashion, that the files were copied from an 'electronic storage medium' that contains data and original records that were 'collected' and 'captured' by European law enforcement authorities in their investigation of SkyECC." *Id.* at *9 (emphasis in original).[4] The Court in *Gogic* therefore ruled that, "[i]n the absence of additional evidence concerning the underlying investigation, decryption, or recordkeeping practices," the Government had not met its burden under Rule 901. *Id*. It therefore limited the government to presenting Sky ECC conversations in which the government could also present testimony from a witness who participated in the conversation himself or herself. *Id*. The Court made clear, however, that "[i]n another case, with different witnesses or corroborating documentation, similar evidence of captured communications could very well be admitted in the absence of testimony from an individual who personally participated in the conversation." *Id.* at *10.

In stark contrast with *Gogic*, the government here is offering much more evidence about

---

[3] Neither Agent 1 (nor any other witness) was proffered in the *Gogic* case about the interception and decryption of Sky ECC.

[4] The government is also able to produce a Certificate of Authenticity from French police similar to that in *Gogic*. But, as stated previously, the government anticipates having an agent testify that the government's exhibits are exact duplicates of what is on the Dutch server, obviating the need to use any kind of certificate.

how the Sky ECC evidence was obtained than a certificate of authenticity that states the files were copied from an electronic storage medium. Specifically, in this case, as outlined *supra*, the Government anticipates presenting testimony of the following witnesses concerning how Sky ECC operated and its interception and decryption:

(1) a DEA Special Agent (previously referred to as Agent 1) who was part of a United States investigation targeting the founder of Sky ECC, who used Sky ECC himself, and who coordinated with European law enforcement during the time they were actively intercepting Sky messages;

(2) the DEA Case Agent, who will testify to sending an MLAT for the Sky ECC data for the relevant PINs, receiving a disc in response, and then manually comparing each communication to be introduced into evidence with the Dutch database that houses the decrypted communications;

(3) the Department of Justice Cyber Crime Lab Analyst who has examined some of the underlying data that was intercepted by European law enforcement and who can testify both as a fact and expert regarding the intercepted data and the accuracy of the decryption process;

(4) Co-conspirators of the defendant who can testify that their Sky ECC messages, which were sent and received around the same time as the defendant's messages, were properly intercepted and produced by France in response to MLATs. Similarly, co-conspirators of the defendant can also testify that their specific conversations with the defendant are accurately reflected in the spreadsheets produced by France for the defendant's particular PINs; and

(5) Several witnesses who can corroborate many of the distinctive features of Sky ECC messages and confirm, for example, the tattoos and biographical data of the defendant, that drug trafficking reflected in the Sky ECC messages did in fact occur (because, for example, the shipment planned over Sky ECC was seized by law enforcement), and the threatening of a prosecutor and bombing of a police station did, in fact, occur.

The authentication evidence that the Government plans to present therefore far exceeds the quantity of authentication evidence that the Court deemed sufficient in *Didani*, where the Government did not have a Department of Justice digital forensic analyst, or a manual review of the messages to be introduced into evidence with what is contained in the Dutch database. The proffered evidence also easily surpasses the "generic[] and . . . conclusory" certificate that the Government proffered in *Gogic*. *See Gogic*, 2025 WL 3042350, at *9 (describing the certificate as "the Government's only evidence describing the process by which the Sky Evidence was created" (emphasis in original)).[5]

The Government's evidence is also consistent with—indeed surpasses—the kinds of evidence that is routinely used to authenticate intercepted communications. Courts routinely hold that the testimony of a law enforcement agent involved in an interception suffices to authenticate intercepted communication. *See e.g.*, *United States v. Rahim*, 860 F. App'x 47, 56 (5th Cir. 2021) (testimony of special agent regarding procedures used for electronic surveillance sufficient to authenticate the surveillance); *United States v. Rommy*, 506 F.3d 108, 138 (2d Cir. 2007). That is

[5] The Court's opinion in *Gogic* is not a bar to authentication in this case. Nonetheless, it is noteworthy that the *Gogic* opinion has been subject to criticism. *See, e.g.*, *Reporter's Memorandum on Artificial Intelligence and Proposed Rule 707, in Advisory Comm. on Evidence Rules, Agenda Book* 116, 117 (May 7, 2026) (observing that "it can be argued that the [*Gogic*] court erred"), https://www.uscourts.gov/sites/default/files/document/2026-05-evidence-rules-agenda-book.pdf.

true even where "the data is collected by the communication provider and then provided to the FBI" (i.e. not directly intercepted by the law enforcement), *Rahim*, 860 F. App'x at 52, or where the testifying agent has "no specific present recollection" of the specific communications in question, *Rommy*, 506 F.3d at 138. Likewise, courts have held that the testimony of a U.S. law enforcement analyst is sufficient to authenticate a data extraction from a phone, even when the extraction was performed by foreign law enforcement outside his presence. *See United States v. Gonzalez*, 144 F.4th 396, 406 (2d Cir. 2025) (testimony of U.S. analyst not present during extraction of phone's contents in Croatia sufficient to authenticate the extracted data); *cf. United States v. Varazo*, 118 F.4th 1346, 1354 (11th Cir. 2024) ("Challenges to the chain of custody generally go to the weight rather than the admissibility of evidence.").

Here, moreover, the "distinctive characteristics" of the Sky ECC messages of the three PINs utilized by the defendant themselves provide support for authentication. Fed. R. Crim. P. 901(b)(4). *See, e.g.*, *United States v. Smith*, 918 F.2d 1501, 1510 (11th Cir. 1990) ("The government may authenticate a document solely through the use of circumstantial evidence, including the document's own distinctive characteristics[.]"). Thus, for example, courts have held that "circumstantial evidence linking the defendant to [a] social media account" including the contents of messages on the account, is sufficient for authentication. *United States v. Lamm*, 5 F.4th 942, 948 (8th Cir. 2021). They have also ruled that sender and recipient headers on email printouts as well as emails' contents "authenticate them as being from the purported sender and to the purported recipient, containing as they do discussions of various identifiable matters." *United States v. Safavian*, 435 F. Supp. 2d 36, 40 (D.D.C. 2006). Likewise, courts have ruled that text messages satisfied Rule 901 because of their distinctive characteristics, including "personal or

private information known only to Defendants and their closest associates." *United States v. Kilpatrick*, No. 10-20403, 2012 WL 3236727, at *5 (E.D. Mich. Aug. 7, 2012); *see also United States v. Davis*, 918 F.3d 397, 402 (4th Cir. 2019) (finding photographs of text messages between a non-testifying informant and someone with defendant's first name were sufficiently authenticated by defendant showing up at a meeting arranged over those text messages).

As described above, the Sky ECC messages of the three PINs attributed to the defendant contain photos of the defendant, voice notes with his voice, depictions of his tattoos, his full name, his birthday, his place of birth, photos of his family, and other personal information. That the messages reflect so many distinctive details of the defendant's life, they are highly unlikely to have been spontaneously or otherwise erroneously generated by the French government. Instead, they are persuasive evidence that the defendant's communications were successfully intercepted, a conclusion supported by the cooperator testimony, the defendant's own admissions, and other testimony regarding the interception and decryption of Sky ECC data. The defendant is, of course, free to argue that the messages are not his, but that is a question to be resolved by a jury.

## CONCLUSION

The proffered evidence is more than sufficient to satisfy the "minimal showing" needed to sufficiently authenticate the evidence as what it is—messages, voice notes, and images sent to and from the defendant over Sky ECC.

Respectfully submitted,

Todd W. Blanche
Attorney General

Theophani K. Stamos
First Assistant United States Attorney

Date: November 11, 2026

By: /s/

Anthony T. Aminoff
Catherine Rosenberg
Assistant United States Attorneys
United States Attorney's Office
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone: (703) 299-3700
Anthony.Aminoff@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on the 11th day of November, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system.

__________/s/______________
Anthony T. Aminoff
Assistant United States Attorney