IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | |
| | ) | Criminal Action No. 1:23-cr-143 (RDA) |
| SEBASTIAN ENRIQUE MARSET CABRERA, | ) | |
| | ) | |
| Defendant. | ) | |

# MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendant Sebastian Enrique Marset Cabrera's Motion to Suppress Statements and Evidence Obtained thereof as the Fruit of the Poisonous Tree (Dkt. 114) (the "Suppression Motion") and Motion to Dismiss for Vindictive Prosecution and Government Misconduct (Dkt. 115) (the "Misconduct Motion") (collectively, the "Motions"). Considering the Motions together with the Government's Opposition (Dkt. 128), Defendant's Reply (Dkt. 137), the Supplemental Briefs filed by the parties (Dkts. 155, 156, 157, 158), and the argument heard and evidence presented at the September 23, 2026 Motion Hearing (Dkt. 152) ("Transcript" or "Tr."), the Court DENIES the Motions for the reasons that follow.

## I. BACKGROUND[1]

Defendant was originally indicted in the Eastern District of Virginia in March 2024. Dkt. 20. He remained at large abroad for two years thereafter.

On March 26, 2025, in an effort to get in contact with Defendant, the DEA approached Susana Castaño Rios ("Susana") at an international airport in Bogota, Colombia. Dkt. 128 at 2.

[1] The factual background is drawn from the parties' briefs, the testimony of Special Agent Michael Greisen of the Drug Enforcement Administration (the "DEA"), and the exhibits submitted by the Government both with its Opposition and during the Motion Hearing. Although there are some disputes between the parties as to certain facts and the inferences that should be drawn from those facts, the parties largely agree on the chronology of the events at issue here. Defendant did not submit any evidence outside of his cross-examination of Special Agent Greisen.

The DEA agents provided her with Special Agent Greisen's business card and told her that the DEA wanted to speak with her about Defendant. *Id.* Susana declined to speak with the DEA at the airport and, when Special Agent Greisen later attempted to contact her via text message, she again declined to respond. *Id.* The DEA did not attempt further contact with Susana. *Id.*

On March 27, 2025, Special Agent Greisen contacted Defendant directly via WhatsApp. Dkt. 152 at 19:18-20. During that conversation, Special Agent Greisen first indicated that he was providing an opportunity to establish a direct line of communication with the DEA and work towards resolving Defendant's legal issues in the United States, which is "a common practice in DEA investigations." Dkt. 128 at 3. Special Agent Greisen then expressed concern for the safety of Defendant's children, stating "I'm simply trying to offer you a way out and save your children's lives." *Id.* at 4. Special Agent Greisen testified that he did so "to offer him a way out of the drug trafficking life and to save the lives of his children who often become victims of these types of crimes." Dkt. 152 at 20:18-21. Defendant alleges that he interpreted Special Agent Greisen's statements as a threat, to which he responded: "Look, nobody's immortal. You son of a bitch." Dkts. 128 at 4; 152 at 20:4-6; *id.* at 20:25-21:6. Defendant also denied having done anything illegal in this country. *Id.* at 19:24-20:1.

Defendant then called Special Agent Greisen over WhatsApp, asserting that "[y]ou all will never capture me" and "I am not interested in the charges. I am a criminal; I will be a criminal all my life, whoever comes to look for me." Govt. Exh. 9A at 2-3. He told Special Agent Greisen to "leave my girlfriend alone because it's going to get ugly" and asserted that he is "not afraid of that, nor the DEA, or anyone." *Id.* at 2. Defendant then reiterated that "[w]e are all mortals." *Id.* Special Agent Greisen concluded his interaction with Defendant with a final message via WhatsApp stating: "I'm glad your kids are with you and safe. You need to respect the fact that

I'm communicating with you directly, like a man. So, that's how we'll leave it. You have my number if you change your mind." Govt. Exh. 8A at 3-4. Special Agent Greisen testified that part of his function as a DEA special agent is "to recruit sources" and that it is a "strategy to reach out to people directly to try to recruit them." Dkt. 152 at 25:15-21.

On March 11, 2026, Bolivian law enforcement informed the DEA that it had learned through a source of intelligence that Defendant was located in Bolivia. Dkt. 128 at 5. Bolivian law enforcement further informed the DEA that it intended to arrest Defendant. *Id.* Special Agent Greisen testified that he was not involved in the details of the planning or execution of the operation. Dkt. 152 at 22:2-4. He further testified that the Bolivian government made the decision "to expel him from [the] country as a non-Bolivian citizen." Dkt. 152 at 22:24-25.

On March 13, 2026, Bolivian law enforcement executed the operation to arrest Defendant. Dkt. 114 at 3; Dkt. 128 at 6. Bolivian law enforcement then searched the residence in which Defendant was located, as well as two nearby residences. Dkt. 128 at 6. Bolivian law enforcement located and seized more than 20 electronic devices. Dkt. 114 at 3; Dkt. 128 at 6. Later that same day, Bolivian law enforcement transferred Defendant and the seized electronic devices to DEA custody. Dkt. 128 at 6. Special Agent Greisen testified that he only became aware of the Bolivian government's intent to expel Defendant after his arrest. Dkt. 152 at 22:5-8.

After Defendant was in the custody of Bolivian law enforcement, two DEA special agents (Special Agent Reyes and Special Agent Vega), who were based in Lima, Peru, took custody of Defendant and administered *Miranda*[2] warnings to him by reading each warning out loud from a Spanish-language DEA-13b - *Miranda* Waiver Form (the "*Miranda* Waiver Form"). Dkt. 128-1;

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

Dkt. 152 at 74:20-25. During the administration of *Miranda*, Defendant asked whether a lawyer would be provided, and Special Agents Reyes and Vega responded that he would have one. Dkt. 152 at 77:5-14. Defendant signed the DEA-13b Form and indicated that he understood his rights. Dkt. 128-1.

Special Agents Reyes and Vega first transported Defendant via DEA aircraft from Santa Cruz, Bolivia to Lima, Peru. Dkt. 152 at 80:2-9. During the flight, Defendant initiated a conversation with Special Agents Reyes and Vega. *Id*. at 77:15-19. Defendant asked some questions regarding the pending indictment, and he was provided with a copy of the pending indictment. *Id.* at 77:23-78:3. After Defendant landed in Lima, Peru, the DEA secured a chartered plane to fly him from Lima, Peru to Dulles International Airport ("Dulles"), located in the Eastern District of Virginia.

Defendant landed at Dulles the morning of Saturday, March 14, 2026. Dkt. 128 at 7. Special Agent Greisen and another special agent, Special Agent Ganzel, met Defendant and escorted him from the plane to the U.S. Customs and Border Protection ("CBP") area at Dulles, where he was processed into the United States. Dkt. 152 at 80:18-20. Special Agents Griesen and Ganzel then escorted Defendant to an interview room at Dulles, where they were accompanied by DEA Intelligence Analyst Juno. *Id.* at 81:9-13. Special Agent Greisen is a fluent Spanish speaker and communicated with Defendant in Spanish during the entire meeting. *Id.* at 81:1-8; *id.* at 81:17-19. That interview was not recorded. Special Agent Greisen testified that he did not record the interview for two reasons: (i) he understood that the Dulles interview room did not have recording equipment in compliance with DEA policy; and (ii) he understood that Defendant may be a potential cooperator and to protect any statements from having to be potentially produced in discovery against other individuals. *Id.* at 82:1-16.

During that interview, Special Agent Greisen reviewed with Defendant: (i) certain biographical information; (ii) certain forms related to Interpol and Uruguay; (iii) the pending charges against Defendant and potential additional charges that could be brought against Defendant; (iv) potential cooperation; and (v) how United States Sentencing Guidelines work. *Id.* at 82:17-83:24. Special Agent Greisen testified that he explained that only a judge could determine the appropriate sentence and that, at no point, did he make any promises regarding any sentencing or what his cooperation would be worth. *Id.* at 84:2-13. Special Agent Greisen then reviewed a *Miranda* form with Defendant, which Defendant signed. *Id.* at 84:14-86:1; Dkt. 128-2. Special Agent Greisen also reviewed a consent to search form, which Defendant reviewed and signed. Dkt. 152 at 86:9-24; Dkt. 128-3.[3] After signing the consent to search form, Defendant suggested that simply signing the consent to search would be worth a certain number of points off from the guidelines table. Dkt. 152 at 87:10-13. Special Agent Greisen responded by telling Defendant he did not have the power to determine what his cooperation is worth and that a judge makes that decision. *Id.* at 87:13-18.

Special Agent Greisen then proceeded to conduct a substantive interview with Defendant. *Id*. at 88:14-16. During that conversation, Special Agent Greisen asserts that Defendant admitted to certain criminal conduct and denied other criminal conduct. *Id.* at 88:17-20. At times he corrected Special Agent Greisen regarding certain facts, and there were certain events that he refused to discuss. *Id.* at 88:21-89:1. Special Agent Greisen found Defendant's admissions

[3] Special Agent Greisen testified that the consent to search was signed after Defendant received his *Miranda* warnings at around 11 a.m. Dkt. 152 at 100:8-22. The document reflects that Defendant signed at 11:54 a.m. Dkt. 128-3. Special Agent Greisen testified that they then proceeded to discuss Defendant's electronics and later completed the attachment to the form, which Defendant signed at 3:20 p.m. Dkt. 152 at 100:25-101:23.

accurate. *Id.* at 89:2-5. Special Agent Greisen testified that at no point did Defendant ask to speak to counsel. *Id.* at 104:1-8. At the conclusion of the interview, Special Agent Greisen suggested that Defendant call his mother, which Defendant did. *Id.* at 100:1-7. Special Agent Greisen also suggested that Defendant call his Uruguayan attorney, which Defendant did from Special Agent Greisen's phone. *Id.* at 103:20-25.[4] Defendant was then transported from Dulles to the Alexandria Adult Detention Center (the "ADC"). At some point after Defendant contacted his mother on Special Agent Greisen's phone, Special Agent Greisen also attempted to contact the mother. Dkt. 115 at 8. There is no further information about that singular contact.

On March 16, 2026, Special Agents Greisen and Ganzel transported Defendant from the ADC to this courthouse for his initial appearance. Dkt. 152 at 90:17-12. The special agents were charged with transporting Defendant because he had not yet been remanded into the custody of the United States Marshals Service. *Id.* at 90:13-15. During that drive, Defendant initiated a conversation with Special Agent Greisen indicating that he had additional information to provide. *Id.* at 90:16-21. In response, Special Agent Greisen reminded Defendant of his *Miranda* rights, which were discussed on March 14, 2026, and the *Miranda* Waiver Form that Defendant had completed that same day. *Id.* at 90:22-25. Defendant then interrupted him and said "I remember the form" and "[i]t's fine." *Id.* at 91:1-6. Defendant then volunteered information regarding his electronics, safes, and other topics. *Id.* at 91:6-11.

Special Agent Greisen testified that he did not have any animus against Defendant. *Id.* at 23:21-24. He further testified that nothing about how the case was presented to the prosecution

---

[4] During the course of his testimony, Special Agent Greisen also testified that he would not have used the word "donacion" when discussing Defendant's cryptocurrency and that his "job as a DEA agent involves seizing or to incautar drugs and money [and does] not [have] nothing to do with donations or gifts." Dkt. 152 at 102:9-103:3.

was impacted by any animus against Defendant and that "this was my job as a special agent and our lives intersected here." *Id.* at 23:25-24:7. Special Agent Greisen made clear: "My job is a DEA special agent and to investigate drug traffickers, money launderers, and terrorists. That is my function. It's not personal." *Id.* at 24:13-15. He testified that he is one of several case agents assigned to this case and that, both before and after his communications with Defendant, he performed his job of investigating Defendant. *Id.* at 29:23-30:16.

On April 1, 2026, Defendant was arraigned. Dkt. 77. At that time, the parties agreed that the matter was complex and requested a future status conference to determine a trial date. *Id.* Defendant waived speedy trial and the Court issued an order determining that the case is complex. Dkts. 76, 78. Then-counsel sought a continuance of the status conference because they were discussing a resolution short of trial and because the Government had produced a large volume of discovery. Dkts. 82, 83, 84. Thereafter, new counsel appeared on behalf of Defendant. Dkts. 86, 87.

On June 25, 2026, a federal grand jury returned a Second Superseding Indictment. Dkt. 92. Defendant immediately filed a motion to dismiss Count Three. Dkt. 96.

On July 1, 2026, Defendant was arraigned on the Second Superseding Indictment. Dkt. 98. Based on the prior finding that the case is complex and the new charges added, the Court set trial for January 11, 2027. *Id.*; *see also* Dkt. 101.

On July 27, 2026, Colombian police officers stopped Defendant's Bolivian attorney at the airport in Bogota, Colombia. Dkt. 115 at 9. The officers pulled the attorney from the immigration line and brought him to meet with DEA Special Agent Tamara Teller. *Id.* Special Agent Teller asked to speak to the attorney at the U.S. Embassy on July 31, 2026. *Id.* She sent him a message confirming the same. *Id.* Nothing further is reported about their interaction or whether such a

meeting took place.

On August 24, 2026, Defendant filed the pending motions. Dkts. 114, 115. On September 7, 2026, the Government filed an Omnibus Opposition. Dkt. 128. On September 14, 2026, Defendant filed his Omnibus Reply. Dkt. 137.

On September 23, 2026, the Court held a hearing on the pending motions (and other motions filed by Defendant). Dkts. 150, 152.

On October 12, 2026, the parties filed their Supplemental Briefs. Dkts. 155, 156.

On October 14, 2026, the parties filed their Supplemental Replies. Dkts. 157, 158.

## II. Suppression Motion

Because the Misconduct Motion is premised in part on the alleged *Miranda* violation, the Court first begins with the Suppression Motion. Defendant argues that statements made during the Dulles interview must be suppressed as a violation of *Miranda* and that evidence obtained as a result of those statements must be suppressed as fruit of the poisonous tree.

It is axiomatic that the Fifth Amendment protects against compelled self-incrimination. *See* U.S. Const. amend. V. To safeguard that protection, *Miranda* generally requires that warnings precede custodial interrogation before a suspect's statements may be admitted in evidence. *See Miranda*, 384 U.S. at 476, 479 (noting that "[t]he requirement of warnings and waiver of rights is a fundamental with respect to the Fifth Amendment privilege and not simply a preliminary ritual to existing methods of interrogation"). However, a defendant can waive his *Miranda* rights and voluntarily answer questions in appropriate situations. The Supreme Court has held that a waiver of *Miranda* rights is voluntary if "it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Colorado v. Spring*, 479 U.S. 564, 573 (1987). A statement is voluntary if it was "the product of an essentially free and unconstrained choice by its maker."

*United States v. Bendann*, 180 F.4th 147, 157 (4th Cir. 2026) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973)). The proper inquiry "is whether the defendant's will has been 'overborne' or his 'capacity for self-determination critically impaired.'" *United States v. Pelton*, 835 F.2d 1067, 1071 (4th Cir. 1987). "To determine whether a defendant's will has been overborne or his capacity for self-determination critically impaired, courts must consider the totality of the circumstances, including the characteristics of the defendant, the setting of the interview, and the details of the interrogation." *United States v. Braxton*, 112 F.3d 777, 781 (4th Cir. 1997) (internal citations omitted). Moreover, "execution of a valid *Miranda* waiver gives rise to a strong presumption that subsequent statements are voluntary." *United States v. Hood*, 767 F. App'x 456, 459 (4th Cir. 2019). Defendant here argues that he invoked his right to counsel and that his will was overborne. The Court addresses each of the alleged interrogations and statements alleged to have been made in violation of *Miranda*.

A. The Flight From Bolivia to Dulles

Special Agents Reyes and Vega administered Defendant's *Miranda* warnings to him, and Defendant signed a form indicating that he understood and waived those rights. *See* Dkt. 128-1; Govt. Exhs. 2, 2A. Defendant concedes that he was administered his *Miranda* rights. Dkt. 114 at 4; Dkt. 156 at 11. Defendant contends, however, that he invoked his right to counsel.

The record reveals that, after being advised of his rights, the special agents asked, "Are you willing to answer some questions?" Govt. Exh. 2A. Defendant responded: "And my lawyer?" *Id.* The agents stated: "You can have one." *Id.* A defendant's invocation of his right to counsel must be unequivocal and unambiguous. *See Davis v. United States*, 512 U.S. 452, 459 (1994) (holding that, if "a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the [*Miranda*] right," then the officer need not end the interview).

Courts of Appeals recognized that questions, like the one posed by Defendant here, are not such an unequivocal invocation. *See, e.g.*, *United States v. Doe*, 170 F.3d 1162, 1166 (9th Cir.1999) (holding that a suspect's question, "What time will I see a lawyer?" was not an unambiguous invocation of the right to counsel, but rather an "inquiry regarding the time at which appointed counsel would be made available"); *Diaz v. Senkowski*, 76 F.3d 61, 64 (2d Cir.1996) (holding that the question, "Do you think I need a lawyer?" was not a reasonably clear invocation of the right to counsel); *United States v. Nunn*, 161 F.4th 518, 522 (8th Cir. 2025) (holding "I think I should get a lawyer, dude," was not an unambiguous invocation of the right to counsel). The Fourth Circuit has reached a similar conclusion. *See Hyatt v. Branker*, 569 F.3d 162, 170 (4th Cir. 2009) (statement that "daddy wanted him to call a lawyer" was not an unambiguous invocation).[5] Accordingly, Defendant's mere reference to "And my lawyer?" was not an unequivocal and unambiguous invocation of his right to counsel and a reasonable law enforcement officer would not have understood it as such. *See Davis*, 512 U.S. at 458-59; Dkt. 152 at 77:5-14 ("They told me that they understood that Mr. Marset was asking if at some point he would have access to a lawyer.").

Thereafter, the record establishes that it was *Defendant* who initiated a conversation with the agents approximately an hour after he was read his *Miranda* rights. Dkt. 152 at 77:15-19 ("He initiated that conversation."). Defendant then asked Special Agents Reyes and Vega questions

[5] Other Court of Appeals cases holding that a defendant did not unequivocally invoke his right to counsel are: "I might want to talk to an attorney," *United States v. Zamora*, 222 F.3d 756, 765-66 (10th Cir. 2000); "I think I need a lawyer," *Burket v. Angelone*, 208 F.3d 172, 198 (4th Cir. 2000); "Do you think I need an attorney here?," *Mueller v. Angelone*, 181 F.3d 557, 573-74 (4th Cir. 1999); I "might want to get a lawyer then, huh?," *United States v. Posada-Rios*, 158 F.3d 832, 867 (5th Cir. 1998); "I think I want a lawyer," "Do you think I need a lawyer?," *Diaz v. Senkowski*, 76 F.3d 61, 63-65 (2d Cir. 1996); and "I can't afford a lawyer but is there anyway I can get one," *Lord v. Duckworth*, 29 F.3d 1216, 1219-21 (7th Cir. 1994).

about his indictment, which they answered to the best of their ability. *See* Govt. Exhs. 3, 3A. Statements volunteered by a defendant while he is in custody are not implicated by *Miranda*. *See Rhode Island v. Innis*, 446 U.S. 291, 300-02 (1980); *see also Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981) (holding that once the right to counsel is asserted, a subject in custody may not be interrogated outside of counsel's presence "unless the accused himself initiates further communication, exchanges, or conversations with the police."). Indeed, the Fourth Circuit has addressed similar circumstances and found that there was no *Miranda* violation where "[a]pproximately 55 minutes had elapsed" between the time *Miranda* warnings were given and "the time that [the defendant] initiated further conversation and indicated that he wished to cooperate." *United States v. Evans*, 917 F.2d 800, 805 (4th Cir. 1990), *overruled on other grounds by United States v. Lancaster*, 96 F.3d 734 (4th Cir. 1996). Accordingly, there was no *Miranda* violation in this regard.

B. The Dulles Interview

Defendant makes several arguments regarding the custodial interrogation at Dulles. First, Defendant challenges Special Agent Greisen's decision not to record the interrogation. This does not alone establish a *Miranda* violation. As the Eleventh Circuit recognized, "[a]lthough a rule requiring the government to record statements made during custodial interrogations might be sound policy, . . . circuits . . . have concluded that the Constitution does not require us to adopt such a rule." *United States v. Boston*, 249 F. App'x 807, 810 (11th Cir. 2007) (citing similar decisions from the Third, Seventh, and Eighth Circuits). Special Agent Greisen testified that there was no suitable recording equipment available and that, in any event, he thought *not recording* the

interrogation would be to Defendant's benefit. Dkt. 152 at 82:1-16.[6] Accordingly, there is no *Miranda* violation in this regard.

Second, there are Defendant's pre-*Miranda* statements. Special Agent Greisen asked Defendant for certain biographical information, informed him of the charges against him, and reviewed certain documentation (such as the Interpol Red Notice)[7] for which he also confirmed certain biographical information. Dkt. 152 at 82:17-83:3. In *Pennsylvania v. Muniz*, the Supreme Court recognized a so-called "Booking Exception" to *Miranda* for questions seeking biographical information reasonably related to administrative concerns, including a suspect's name, address, and date of birth. 496 U.S. 582, 601-02 (1990) (plurality opinion). Defendant notes that Special Agent Greisen repeated some of the same requests for biographical information requested by Special Agents Reyes and Vega. Dkt. 156 at 16. Because requests for biographical information are not covered by *Miranda*, a second request for such information (by a second individual who was not present for the first provision of such information) remains excepted from *Miranda*. Defendant cites no authority to the contrary. Nor is it clear that Special Agent Greisen *knew* all of the biographical information that Special Agents Reyes and Vega had collected. *See* Dkt. 152 at 92:7-12 ("We had a brief conversation with the agents, Reyes and Vega, and we were informed

---

[6] To the extent that Defendant relies on the Department of Justice's Policy Concerning Electronic Recording of Statements (Dkt. 114-2), that policy establishes that there is presumption of recording but that such presumption is "limited to a place of detention that has suitable recording equipment." *Id.* Special Agent Greisen testified that no such suitable recording equipment was available. Dkt. 152 at 82:2-5. Thus, based on the record before the Court, there does not appear to have been a violation of the policy.

[7] Defendant asserts that he was misled by the special agents when they informed him that he was arrested in Boliva pursuant to a Red Notice. Dkt. 114 at 5. But Defendant's own explanation of a Red Notice, explains that it is a request to "locate and *provisionally arrest* a person." *Id.* (emphasis added). Accordingly, it is unclear what is false about this statement.

that he had signed the *Miranda* waiver."). Accordingly, under the application of the Booking Exception, there is no *Miranda* violation with respect to the requests for biographical information.[8]

Third, Defendant argues that he was informed of the charges against him and the possible penalties for such charges and then given a specific promise of leniency, thereby rendering his statements coerced. Dkt. 114 at 5-6. Special Agent Greisen testified that explaining the justice system, including sentencing, is part of his standard practice. Dkt. 152 at 95:13-17. He stated that no promises of leniency were made, that Defendant was the one to first assign a value to any potential cooperation, and repeatedly emphasized that he informed Defendant that a judge makes decisions regarding sentencing. *Id.* at 87:7-18 ("And I said, I don't have the authority or the decision-making power to determine how many points his cooperation is worth. Ultimately a judge will make that determination later."). Thus, the Government has established that there were no promises of leniency.

Moreover, "promises to inform a prosecutor of cooperation do not, *ipso facto*, render a

[8] Defendant also suggests that the Court should view Special Agent Greisen's booking questions as nefarious because they were intended to build a rapport with Defendant. Dkt. 156 at 16. But attempting to build a rapport alone is not a basis for a *Miranda* violation nor is it something that is separately impermissible. *United States v. Hitselberger*, 991 F. Supp. 2d 130, 139 (D.D.C. 2014) (finding no *Miranda* violation and noting "the questions are no more than conversation starters to help the agents 'establish a rapport' with the interviewees"). Although there are some circumstances where rapport can establish that un*Mirandized* statements should be suppressed, such circumstances are not present here. *See United States v. Bernard*, 927 F.3d 799, 806 (4th Cir. 2019) (finding a *Miranda* violation "[g]iven the rapport built between Officer Willis and [the defendant]" and "Officer Willis's statement asking him to be forthcoming"). In that case, the defendant was instructed to be forthcoming before being given the *Miranda* warnings. *Id.* Here, by contrast, Defendant received his *Miranda* warnings and only made incriminating statements *after* receiving such warnings. Indeed, in many circumstances, the rapport between law enforcement and a suspect or defendant can be a basis for finding that a *Miranda* waiver *is* knowing and voluntary. *See United States v. Daniels*, 163 F.4th 992, 1001 (6th Cir. 2026) ("All told, the totality of the circumstances—including [the defendant's] verbal waiver, demeanor, and rapport—establishes that he knowingly and intelligently waived his Miranda rights.").

confession coerced." *United States v. Stokes*, 631 F.3d 802, 808 (6th Cir. 2011) (quoting *United States v. Wiley*, 132 F. App'x 635, 640 (6th Cir. 2005)). Indeed, the Fourth Circuit has explicitly held that "Government agents may validly make some representations to a defendant or may discuss cooperation without rending the resulting confession involuntary." *United States v. Shears*, 762 F.2d 397, 401 (4th Cir. 1985). The Fourth Circuit has emphasized that where "agents simply informed [a defendant] of the gravity of his suspected offenses and the benefits of cooperation under the federal system . . . [a]ny coercion that [the defendant] may have felt was not the product of official action, but rather the consequence of the severity of the offenses he chose to commit." *United States v. Mashburn*, 406 F.3d 303, 310 (4th Cir. 2005). To the extent that Special Agent Greisen referenced the guidelines and cooperation, the record does not establish that he made any illusory promise as is required for such statements to be coercive. *See United States v. Meredith-Hill*, 2021 WL 3079695, at *5 (6th Cir. July 21, 2021) (finding no *Miranda* violation where defendant waived *Miranda* rights and where nothing in the record suggested promise of leniency "was not broken or illusory").[9] Thus, the Government has met its

---

[9] Defendant contends that "Greisen's claim that he never discussed that cooperation would result in 'points' being taken off his guideline sentence is directly contradicted by other testimony during the hearing." Dkt. 155 at 18 n.2. Special Agent Greisen testified that *neither he nor any law enforcement officer* told *Defendant* that he could receive points off for cooperation. Dkt. 152 at 84:9-13. This is completely consistent with his later testimony that *Defendant* himself suggested that he should be entitled to a certain number of points off. *Id.* at 87:10-13 (indicating that *defendant* stated that his cooperation "would be worth a number of points"). Special Agent Greisen further testified that he responded: "I don't have the authority or the decision-making power to determine how many points his cooperation is worth. Ultimately a judge will make that determination later." *Id.* at 87:15-18. Thus, the testimony reflects that Special Agent Greisen appears to have accurately represented the severity of the charged offenses and the potential for leniency if Defendant cooperated, while appropriately maintaining that those were not decisions for him to make, but were instead reserved for the Court. *See United States v. Perez*, 127 F.4th 146, 169 (10th Cir. 2025) (holding that officer's statements did "not amount to misrepresentation" but "merely informed [the defendant] of the potential consequences of silence versus cooperation" such that the defendant's "false-dilemma argument fails"); *United States v. Gaines*, 295 F.3d 293,

burden to demonstrate that the discussions of the charges, potential sentences, and cooperation did not constitute a *Miranda* violation.

To the extent that Defendant otherwise suggests that his will was overborne, the Government met its burden to establish that he was not interrogated in such circumstances. Special Agent Greisen testified that Special Agents Reyes and Vega reported that Defendant slept on the flight between Peru and Dulles. Dkt. 152 at 80:10-12. Furthermore, Special Agent Greisen testified that, while Defendant was in Peru, "he was fed, he ate. I understand he ate McDonalds and KFC. He was provided water, a couch to sleep. He appeared to be sleeping for majority of the time." *Id.* at 80:2-9. Furthermore, the *Miranda* waiver that Defendant signed was in Spanish, Special Agent Greisen conversed with Defendant in Spanish, and there is nothing to indicate that Defendant did not understand the *Miranda* waiver (which he was reviewing and signing for a second time). Dkt. 128-2; Govt. Exh. 6. A review of the totality of the circumstances further demonstrates that Special Agent Greisen encouraged, and provided the means for, Defendant to contact his mother and his Uruguayan attorney.[10] Dkt. 152 at 100:1-5; *id.* at 103:20-25. Thus, the Government has met its burden that, under the totality of the circumstances, Defendant validly

---

299 (2d Cir. 2002) (no *Miranda* violation where "the agent simply said that the prosecutor and the judge would be made aware of [the defendant's] behavior if it amounted to cooperation" because this "vague description of the potential benefits of cooperation contained no material misrepresentations or unfulfillable promises").

[10] It is also not relevant that the special agents knew Defendant had a Uruguayan lawyer. As the Supreme Court has recognized that, police are not obligated to inform a defendant that an attorney is trying to reach them where the Defendant at no point requested the presence of counsel. *See Moran v. Burbine*, 475 U.S. 412, 417, 421 (1986). Such failure to notify does not invalidate an otherwise knowing, intelligent, and voluntary waiver of *Miranda*. *Id.*

waived his *Miranda* rights.[11]

Finally, Defendant argues that he invoked his right to counsel. As the *Miranda* form makes clear, Defendant was advised of his right to counsel and acknowledged that he had been advised of that right. Dkt. 128-2. In his Suppression Motion, Defendant asserts that he explicitly stated: "I want to speak with a lawyer — that paper said that everything I say can be used against me." Dkt. 114 at 7. Special Agent Greisen testified, under oath, to the contrary. When asked whether Defendant requested counsel, Special Agent Greisen testified: "He did not." Dkt. 152 at 104:1-5; *id.* at 104:5-8 (testifying that Defendant did not "anything along the lines of, look this could be used against me, I want someone to advise me about my rights"). Special Agent Greisen's testimony in this regard is uncontradicted. *See United States v. Touzel*, 409 F. Supp. 2d 511, 525 (D. Vt. 2006). Furthermore, the Court finds his testimony in this regard credible, given the Court's observance of Special Agent Greisen on the stand. *See United States v. Rodriguez*, 2006 WL 3302505, at *3 (S.D. Tex. Nov. 10, 2006) (finding no *Miranda* violation where the agent credibly testified that "Defendant never asked for a lawyer at any point during questioning"). Accordingly, Defendant did not invoke his right to counsel during the Dulles interrogation.

C. The Ride to the Courthouse

When Defendant was transported to this courthouse for his initial appearance, Special Agent Greisen testified that Defendant initiated a conversation. Dkt. 152 at 90:10-21. Special Agent Greisen testified that he attempted to remind Defendant regarding his rights and that

[11] There is also no evidence in the record to support Defendant's allegation that Special Agent Greisen requested that Defendant "donate" cryptocurrency to him. Dkt. 115 at 7. Special Agent Greisen denied that he had made any such request and stated: "My job as a DEA agent involves seizing or to incautar drugs and money, not has nothing to do with donations or gifts." Dkt. 152 at 103:1-3.

Defendant responded "I remember that form. It's fine." *Id.* at 90:22-91:5. Defendant then began speaking. *Id.* at 91:6. Special Agent Greisen's testimony in this regard was credible. Again, where a Defendant initiates a conversation, *Miranda* is not implicated. *See United States v. Johnson*, 734 F.3d 270, 276 (4th Cir. 2013) (finding no custodial interrogation where defendant "voluntarily proffered information" even though law enforcement officer asked, "what do you mean?"). Accordingly, there was no *Miranda* violation in this regard.

D. Fruit of the Poisonous Tree

Even assuming that Defendant demonstrated that there was a *Miranda* violation, his Suppression Motion would still be denied with respect to his fruit-of-the-poisonous-tree argument. Defendant cites no Fourth Circuit authority in support of his fruit-of-the-poisonous-tree agreement. Dkt. 114; Dkt. 137. This is because the Fourth Circuit has long recognized that, even statements made in violation of *Miranda*, are "never fruit of the poisonous tree." *United States v. Sterling,* 283 F.3d 216, 219 (4th Cir. 2002) (internal citations omitted); *United States v. Miffin*, 2024 WL 4888978, at *10 (4th Cir. Aug. 23, 2024) (same). Defendant argues that his statement was not "voluntary," but the testimony of Special Agent Greisen does not support such characterization. Moreover, Defendant signed the *Miranda* waiver of rights form, indicating that he was waiving such rights "*voluntariamente*" or voluntarily. Dkt. 128-2.

* * *

In short, the Government has met its burden to demonstrate that there was no *Miranda* violation and, thus, there is no basis to suppress Defendant's statements. Moreover, there is no basis to suppress any physical evidence collected as fruit of the poisonous tree. Accordingly, the Suppression Motion will be denied.

### III. Misconduct Motion

Defendant next seeks to dismiss this entire prosecution on the basis that it is a vindictive prosecution. Dkt. 115. "To establish prosecutorial vindictiveness, a defendant must show, through objective evidence, that (1) the prosecutor acted with genuine animus toward the defendant and (2) the defendant would not have been prosecuted but for that animus." *United States v. Wilson*, 262 F.3d 305, 314 (4th Cir. 2001). A defendant may satisfy the first prong by showing either that "the prosecutor harbored genuine animus toward the defendant," or that the prosecutor "was prevailed upon to bring the charges by another with animus such that the prosecutor could be considered a 'stalking horse.'" *United States v. Sanders*, 211 F.3d 711, 717 (2d Cir. 2000). And a defendant may satisfy the second prong by showing that "he would not have been prosecuted . . . but for the vindictive motive" of the prosecutor or her superiors. *Wilson*, 262 F.3d at 317. "If the defendant is unable to prove an improper motive with direct evidence, he may still present evidence of circumstances from which an improper vindictive motive may be presumed. To invoke such a presumption, a defendant must show that the circumstances 'pose a realistic likelihood of vindictiveness.'" *Id.* at 314 (quoting *Blackledge v. Perry*, 417 U.S. 21, 27 (1974)). "The standard is a 'rigorous' one." *Id.* at 315 (quoting *United States v. Armstrong*, 517 U.S. 456, 468 (1996)). Here, Defendant cannot establish either prong and, thus, the Misconduct Motion will be denied.

In the first instance, the Court notes that Defendant's Misconduct Motion does not identify animus harbored by any individual. Rather, Defendant refers generically to the "Government's efforts." Dkt. 115 at 14. Specifically, Defendant makes no allegation that the two prosecutors involved in this case harbored any animus and the Court notes that the prosecutors involved are seasoned litigators whose professionalism and ethics are well-known to the Court. To the extent that the Misconduct Motion suggests that the prosecutors were vindictive because a federal grand

jury returned the Second Superseding Indictment, that argument fails. The Supreme Court has held that seeking additional charges against a defendant who chooses not to plead guilty "no more than openly presented the defendant with the unpleasant alternatives of foregoing trial or facing charges on which he was plainly subject to prosecution." *Bordenkircher v. Hayes*, 434 U.S. 357, 364-65 (1978). Courts of Appeals have likewise uniformly rejected the argument that a superseding indictment following failed plea negotiations constitutes a vindictive prosecution.[12]

Special Agent Greisen also credibly testified that he harbors no animus against Defendant. Dkt. 152 at 23:21-24. He testified that nothing about how the case was presented to the prosecution or how he conducted himself was in any way dictated by animus and that "this was not personal" it was just "my job as a special agent." *Id.* at 23:25-24:7. Special Agent Greisen testified that he was also only one of the special agents assigned to the matter and that, after he made contact with Defendant, he continued to investigate Defendant and discover new evidence. *Id.* at 30:3-16. Thus, the record also does not reflect that Special Agent Greisen had any animus against Defendant that altered the progression of this case.

---

[12] *See, e.g.*, *United States v. Jenkins*, 537 F.3d 1, 3-4 (1st Cir. 2008) (prosecutor filing an additional charge after the defendant rejects a plea offer); *United States v. Stewart*, 590 F.3d 93, 122-23 (2d Cir. 2009) (prosecutors obtaining a superseding indictment adding charges after failed plea negotiations); *United States v. Sellers*, 501 F. App'x 194, 197 (3d Cir. 2012) (prosecutor seeking a superseding indictment increasing drug quantities and penalties after the defendant declined to plead guilty); *United States v. Doty*, 832 F. App'x 174, 180 (4th Cir. 2020) (prosecutor adding charges after the defendant succeeded on motions to dismiss); *United States v. Saltzman*, 537 F.3d 353, 361 (5th Cir. 2008) (prosecutor filing a superseding indictment with three additional charges after the defendant withdrew his guilty plea); *United States v. Cooper*, 461 F.3d 850, 856 (7th Cir. 2006) (prosecutors adding a charge after plea discussions stalled); *United States v. Kent*, 649 F.3d 906, 913 (9th Cir. 2011) (prosecutor adding charges after the defendant refused to enter a plea agreement); *United States v. Ray*, 899 F.3d 852, 860 (10th Cir. 2018) (prosecutor filing a new indictment with additional charges during plea negotiations); *United States v. Murray*, 659 F. App'x 1023, 1028 (11th Cir. 2016) (prosecutor reindicting the defendant after a pretrial Speedy Trial Act dismissal).

Next, Defendant argues that the manner in which he was arrested and transported to the United States demonstrates an inference of vindictiveness. It does not. As Special Agent Greisen testified, Defendant – who is not a citizen of Bolivia – was arrested by Bolivian law enforcement, a search of his residence was conducted by Bolivian law enforcement, and then the Bolivian government made the choice to expel Defendant from the country. Dkt. 152 at 21-23, 30-31. With respect to the search of Defendant's residence *in Bolivia*, the Supreme Court has held that the Fourth Amendment does not apply to "property that is owned by a nonresident alien and located in a foreign country." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 261 (1990). Moreover, nothing about the manner of the arrest as described by the parties, "shocks the conscience." *Rochin v. California*, 342 U.S. 165, 172-73 (1952). The manner in which Defendant was transported likewise does not shock the conscience. He was not a citizen of Bolivia, and the Bolivian government chose to expel him. Special Agent Greisen testified that, to the best of his knowledge as the case agent, "the Bolivian government expelled Mr. Marset, a non-Bolivian citizen, from their country." Dkt. 152 at 31:11-13. Indeed, Special Agent Greisen (the case agent) was not aware of any decision by the Bolivian government to expel Defendant until after Defendant's arrest and was not part of any discussions regarding that decision. *Id.* at 22:2-8.

The Supreme Court has further recognized that "the power of a court to try a person for a crime is not impaired by the fact that he has been brought within the court's jurisdiction by reason of 'forcible abduction.'" *Frisbie v. Collins*, 342 U.S. 519, 522 (1952); *Ker v. Illinois*, 119 U.S. 436, 444 (1886). In other words, "the manner in which a defendant was brought into the United States d[oes] not affect the court's power to proceed." *United States ex rel. Lujan v. Gengler*, 510 F.2d 62, 64 (2d Cir. 1975). Although there may be some exceptions to the so-called *Ker-Frisbee* doctrine, Defendant has not established that they apply here. *United States v. Shibin*, 722 F.3d

233, 244 (4th Cir. 2013) (discussing exceptions for violation of an extradition treaty or shocking and outrageous conduct by the United States Government). Here, there was no forcible abduction; Bolivia expelled Defendant into the Government's custody. And, although Defendants suggests that he should have been extradited to the United States, Defendant cites no provision of any treaty that would preclude the events that happened here. The Extradition Treaty Between the United States of America and the Republic of Bolivia has no application here, where there was an expulsion. *See* Extradition Treaty Between the United States of America and the Republic of Bolivia, U.S.–Bol., June 27, 1995, Treaty Doc. No. 104-22, entered into force Nov. 21, 1996, *available at* https://www.state.gov/wp-content/uploads/2019/02/96-1121-Bolivia-Extradition-TreatyOCR.pdf. Defendant conflates the terms "expulsion" and "extradition" and the Treaty only applies to extradition, which concededly did not occur. Moreover, the decision to expel Defendant was made by Bolivia. Dkt. 152 at 22:24-25. Defendant cites no provision of law establishing that his expulsion was improper and, in any event, the testimony of Special Agent Greisen does not establish that any individual in the U.S. Government involved with this prosecution (such as the case agents or the prosecutors) had any involvement in Bolivia's decision to expel him. Thus, Defendant's expulsion from Bolivia and subsequent transport to the United States does not create an inference of vindictiveness.[13]

[13] Courts recognize that a Defendant can be transported to the United States in circumstances other than formal extradition and that, in such circumstances, a Defendant lacks standing to assert person rights provided under an extradition treaty – such as the rule of specialty. *See United States v. Valencia-Trujillo*, 573 F.3d 1171, 1178-79 (11th Cir. 2009) (despite existence of extradition treaty, defendant lacked standing to assert rule of specialty where it was not established that he was extradited under the treaty). In any event, the Fourth Circuit has held that the rule of specialty is "a privilege of the asylum state, which it may assert or waive as it so chooses; it is not a substantive right under the Treaty accruing to [a defendant]." *Ye Gon v. Holt*, 774 F.3d 207, 220 (4th Cir. 2014)

As the discussed *supra*, the record demonstrates that there was no *Miranda* violation, no involvement by the case agents in obtaining his expulsion from Bolivia, no promise of leniency, and no attempt to extort cryptocurrency. With respect to the allegation that law enforcement officers attempted to "harass defendant's family and associates," Dkt. 115 at 14, such accusation is not supported by the record. The record reflects two attempts to contact Defendant's wife, one attempt to contact Defendant, one attempt to contact Defendant's mother, and one attempt to contact Defendant's Bolivian attorney. This does not constitute harassment. Rather, it appears that the special agents were contacting people who may have information regarding the crimes charged in the pending indictment. Each of the individuals contacted are a potential witness (the wife, the mother, and the lawyer) or Defendant himself. The record does not establish that they were contacted excessively. Nor does Defendant cite any case law establishing that such contact is improper or harassing. Indeed, courts have recognized that, even where the Government threatens to indict a defendant's family members (so long as there is a basis to do so), there is no support for a claim of vindictive prosecution. *See, e.g.*, *United States v. Horton*, 646 F.2d 181, 187-88 (5th Cir. 1981) ("This court finds no impropriety in the government's warnings that members of his family could be indicted as well."); *United States v. Sainato*, 53 F. Supp. 2d 316, 320 (E.D.N.Y. 1999) ("Such 'threats,' even against family members, which are fairly commonplace in plea negotiations, do not support the defendants vindictiveness claim.").

Defendant "faces a substantial burden in bringing a vindictive prosecution claim." *United States v. Johnson*, 325 F.3d 205, 210 (4th Cir. 2003). Defendant failed to meet his burden here. Moreover, the Court notes that there is a due process violation only when the conduct at issue "is outrageous, not merely offensive" and the Fourth Circuit "has never held in a specific case that the government has violated the defendant's due process rights through outrageous conduct." *United*

*States v. Hasan*, 718 F.3d 338, 343 (4th Cir. 2013). The conduct at issue here is not outrageous. Accordingly, the Misconduct Motion will be denied.

## IV. CONCLUSION

For all of the reasons above, it is hereby ORDERED that Defendant's Suppression Motion (Dkt. 114) is DENIED; and it is

FURTHER ORDERED that the Misconduct Motion (Dkt. 115) is DENIED.

The Clerk of the Court is directed to provide this Order to all counsel of record.

It is SO ORDERED.

Alexandria, Virginia
November 17, 2026

/s/
Rossie D. Alston, Jr.
United States District Judge